<pre>
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                     (FT. LAUDERDALE DIVISION)

 3                 CASE NO. 0:21-CR-60037-AMC-1

 4

 5
    UNITED STATES OF AMERICA,          Ft. Pierce, Florida
 6
              PLAINTIFF,               January 20, 2022
 7                                     Thursday
         VS.
 8
    CHRISTOPHER TAVORRIS WILKINS,
 9                                     Scheduled for 8:15 a.m.
              DEFENDANT.               8:36 a.m. to 3:51 p.m.
10
                                       Pages 1 - 189
11

12   ------------------------------------------------------------

13
                            JURY TRIAL
14
                           DAY 2 of 2
15

16        BEFORE THE HONORABLE AILEEN M. CANNON
                 UNITED STATES DISTRICT JUDGE
17

18

19   APPEARANCES:

20
    FOR THE GOVERNMENT:      BROOKE LATTA, AUSA
21                           United States Attorney's Office
                             99 N.E. 4th Street
22                           Miami, Florida  33132

23                           AJAY ALEXANDER, AUSA
                             United States Attorney's Office
24                           500 East Broward Boulevard
                             Suite 700
25                           Ft. Lauderdale, Florida  33394
</pre>

```
 1    APPEARANCES (CONTINUED):

 2


 3
      FOR THE DEFENDANT:        JEFFREY HUNTLEY GARLAND, ESQ.
 4                              Jeffrey H. Garland, P.A.
                                2500 Rhode Island Avenue
 5                              Suite B
                                Ft. Pierce, Florida  34947-4771
 6


 7
      ALSO PRESENT:
 8

 9            KEVIN SCOTT, DEPUTY U.S. MARSHAL

10

11

12
      STENOGRAPHICALLY
13    REPORTED BY:             GLENDA M. POWERS, RPR, CRR, FPR
                               Official Court Reporter
14                             United States District Court
                               400 North Miami Avenue
15                             Miami, Florida  33128

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2

 3   CHARGE CONFERENCE                                      *

 4
                         GOVERNMENT'S EVIDENCE
 5

 6   WITNESS:                                           PAGE:

 7
     SPECIAL AGENT SARA CONNORS
 8
         Cross-Examination by Mr. Garland (continued)     17
 9
         Redirect Examination by Mr. Alexander            18
10

11   VERNON CHIPMAN

12       Direct Examination by Ms. Latta                  21

13       Cross-Examination by Mr. Garland                 33

14       Redirect Examination by Ms. Latta                47

15
     TONIANN SCHETTINO JACOBY
16
         Direct Examination by Mr. Alexander              52
17
         Cross-Examination by Mr. Garland                 64
18
         Redirect Examination by Mr. Alexander            75
19

20                          - - -

21

22

23

24

25
```

```
1                          I N D E X
                          (Continued)
2
                                                    PAGE:
3

4    GOVERNMENT RESTS                                79

5
     VERDICT FORM DISCUSSIONS                        80
6

7    MOTION FOR JUDGMENT OF ACQUITTAL                84

8
     DEFENDANT RESTS                                 99
9

10   JURY CHARGE                                    100

11
     GOVERNMENT'S CLOSING ARGUMENT
12
        BY MR. ALEXANDER                            113
13

14   DEFENDANT'S CLOSING ARGUMENT

15      BY MR. GARLAND                              125

16
     GOVERNMENT'S REBUTTAL CLOSING ARGUMENT
17
        BY MS. LATTA                                145
18

19   JURY DELIBERATIONS COMMENCED                   160

20
     VERDICT                                        161
21

22   POLLING OF JURY                                162

23

24

25
```

1                    E X H I B I T S

2
   EXHIBIT                                    RECEIVED
3

4                 GOVERNMENT'S EXHIBITS

5
   Exhibit 7                                     58
6

7   Exhibit 8                                     57

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Call to the order of the Court:)

 2         COURTROOM DEPUTY:  All rise.  Court is back in session.

 3         THE COURT:  Good morning.  You may be seated.

 4         MR. ALEXANDER:  Good morning.

 5         THE COURT:  Let's have appearances, please.

 6         MR. ALEXANDER:  Good morning, Your Honor.

 7         Assistant United States Attorneys Ajay Alexander and

 8    Brooke Latta on behalf of the United States.

 9         With the United States is Deputy Kevin Scott of the

10    U.S. Marshals Service.

11         THE COURT:  Good morning, Mr. Garland.

12         MR. GARLAND:  Good morning, Your Honor.

13         Jeffrey Garland representing Christopher Wilkins, who's

14    seated at the table with me.

15         THE COURT:  Excellent.  Good morning to you,

16    Mr. Garland and Mr. Wilkins.

17         We are here on the second day of trial, starting the

18    day off with a charge conference.

19         You've been supplied with paper copies of the

20    pre-charge draft instructions.  Those have also been docketed

21    for clarity of the record.

22         I just realized, I don't have my own copy.

23         One moment.  Okay.  All right.

24         So we will use this document as a springboard for our

25    discussion.  A lot of the preliminary instructions were
```

```
 1    uncontested, so I'd like to focus in on any disagreement, and
 2    I'll start off with Page 1.
 3            Any objection to the instruction on Page 1, from the
 4    Government?
 5            MR. ALEXANDER:  No, Your Honor.
 6            THE COURT:  Mr. Garland?
 7            MR. GARLAND:  Judge, I believe Page 1 refers to the
 8    Fort Lauderdale division, I think that's an error.
 9            But otherwise, no.
10            THE COURT:  I do believe this was filed in the
11    Fort Lauderdale division; am I incorrect about that,
12    Mr. Alexander?
13            MR. ALEXANDER:  No, Your Honor.
14            It was filed in the Fort Lauderdale division, that's
15    correct, and ultimately it was assigned to you.
16            THE COURT:  All right, that still would be deemed a
17    Fort Lauderdale division matter, as it was filed there, and
18    whether it's being tried here, does it really make a
19    difference, Mr. Garland?
20            MR. GARLAND:  It's nothing I would complain about,
21    I just pointed it out.
22            THE COURT:  I will just remove then any reference to
23    the division from Page 1.
24            Any objection from the Government to Page 2?
25            MR. ALEXANDER:  No, Your Honor.
```

```
 1          THE COURT:  Mr. Garland?

 2          MR. GARLAND:  No, Your Honor.

 3          THE COURT:  Page 3.

 4          MR. ALEXANDER:  No, Your Honor.

 5          THE COURT:  Mr. Garland?

 6          MR. GARLAND:  No, Your Honor.

 7          THE COURT:  Page 4?

 8          MR. ALEXANDER:  No, Your Honor.

 9          THE COURT:  Mr. Garland?

10          MR. GARLAND:  No, Your Honor.

11          THE COURT:  Page 5 is the standard credibility

12  instruction.  Any objection from the Government to that?

13          MR. ALEXANDER:  No, Your Honor.

14          THE COURT:  Mr. Garland?

15          MR. GARLAND:  No, Your Honor.

16          THE COURT:  All right.  Page 6, I noted both parties

17  submitted this.

18          Any objection to its inclusion, Mr. Alexander?

19          MR. ALEXANDER:  No, Your Honor.

20          THE COURT:  Mr. Garland?

21          MR. GARLAND:  No, Your Honor.

22          THE COURT:  All right, there's Page 7, which is the

23  note-taking instruction.  Mr. Alexander?

24          MR. ALEXANDER:  No objection, Your Honor.

25          THE COURT:  Mr. Garland?
```

```
 1              MR. GARLAND:  No objection, Your Honor.

 2              THE COURT:  Page 8, the introduction page.

 3         Mr. Alexander?

 4              MR. ALEXANDER:  No objection, Your Honor.

 5              THE COURT:  Mr. Garland?

 6              MR. GARLAND:  The only objection, Your Honor, is the

 7    reference to "deadly or dangerous weapon" when the indictment

 8    charges "deadly and dangerous."  We raised this objection

 9    before.  We submit that it's a constructive amendment of the

10    indictment.

11              THE COURT:  All right.  Well, that argument will be

12    rejected and, therefore, the disjunctive is appropriate.

13              Other than that, do you have any objections to Page 8,

14    Mr. Garland?

15              MR. GARLAND:  No, Your Honor.

16              THE COURT:  Okay.  All right.  Page 9, this is the

17    instruction for forcibly assaulting a Federal officer with use

18    of a deadly or dangerous weapon.

19              Mr. Garland, do you have any objection to this

20    instruction, aside from the argument you've made about

21    constructive amendment?

22              MR. GARLAND:  The term "or" does appear, I think, five

23    different times, Pages 9 and 10.  We would object to each of

24    those because it is a constructive amendment violation of due

25    process clause, Fifth Amendment.
```

1              THE COURT:  I can't hear you well.

2              MR. GARLAND:  It violates the right to be indicted by a

3      grand jury, due process, right to notice; and in this

4      particular situation, it allows the state a lesser burden of

5      proof, because they don't have to prove that it was deadly and

6      dangerous, they have to prove only that it was deadly "or"

7      dangerous, and those are, I would submit, different things.

8              THE COURT:  All right.  Well, I've considered your

9      argument and I think under the authority of Eleventh Circuit

10     case law, including, for example, *United States versus Simpson*,

11     S-I-M-P-S-O-N, at 228 F.3d 1294, pin cite 1300,

12     Eleventh Circuit, in the year 2000, it's well-established that

13     where an indictment charges in the conjunctive several means of

14     violating a statute, a conviction may be obtained on proof of

15     only one of the means and, accordingly, the jury instruction

16     may properly be framed in the disjunctive.

17             All right, so your objection, however, Mr. Garland, is

18     preserved.

19             Anything else to discuss, Mr. Garland, or

20     Mr. Alexander, on Pages 9 and 10 of the draft instructions?

21             MR. ALEXANDER:  No, Your Honor.

22             THE COURT:  Mr. Garland?

23             MR. GARLAND:  Your Honor, the only thing I would note

24     is that the way the instruction is couched, we have a forcible

25     assault which could be by an intentional threat, which is,

1    essentially, the same thing as Count 2.

2          So for -- Count 1 and Count 2 are, essentially, the

3    same thing, and I would point that out and later on it will be

4    subject, if we get there, to appropriate motion.

5          THE COURT:  All right.  Thank you.

6          Mr. Alexander, any response to Mr. Garland's argument?

7          MR. ALEXANDER:  Your Honor, I will just note that these

8    are two separate offenses, each with different elements, so the

9    Government would argue that they're not the same offense.

10          I think counsel is trying to argue that this is

11   multi -- or, I'm sorry, duplicitous or anything of the sort --

12   sorry, multiplicitous of any sort.

13          So the Government would just argue to that point.

14          THE COURT:  All right.  These are two separate crimes

15   under the United States Code, they are not identical.

16          Count 2 includes, for example, the retaliation

17   component that is not present in Count 1, and there are other

18   material differences between the offenses, but I note your

19   objection and will deny it.

20          So we have, I think, completed our discussion of

21   Pages 9 and 10.  Anything else, Mr. Garland?

22          MR. GARLAND:  No, ma'am.

23          THE COURT:  Okay.  So just so I understand, it would be

24   your contention that the Government would have to proceed on

25   only Count 1 or Count 2, but not both; is that your argument?

1           MR. GARLAND:  Judge, I think when one looks at the

2    elements that are being presented in the jury instruction, it's

3    an alternative that the jury's given as to Count 1, that it can

4    be a forcible assault as an intentional threat or an attempt to

5    actually do something.

6           So, as instructed to the jury, the jury can find

7    Mr. Wilkins guilty of Count 1 just for making a forcible threat

8    and -- or, alternatively, could find him guilty for actually

9    attempting to do a physical act, and given that Count -- the

10   elements of Count 2 as they are present in these jury

11   instructions, I would submit that every element of Count 1 on

12   the threat theory is included as an element in Count 2.

13          I don't know that --

14          THE COURT:  Well, I don't know.  We have the use of a

15   deadly or dangerous weapon component.  And then there are

16   distinctions that correspond to Count 2 that are not present in

17   Count 1, so I understand your argument, though, I just wanted

18   to clarify that.

19          Let's turn now to the lesser-included offenses.

20          This was taken, I think, almost verbatim from the

21   parties' submission.

22          Any objection, Mr. Alexander, to Page 11?

23          MR. ALEXANDER:  No, Your Honor.

24          THE COURT:  Mr. Garland?

25          MR. GARLAND:  The only objection is the same as

1    previously noted, on Page 11 the term "or" as opposed to "and"

2    based on Footnote 15 on the submission.

3            THE COURT:  So specifically, which paragraph would that

4    apply to on Page 11?

5            MR. GARLAND:  I believe the paragraph that goes, "The

6    lesser-included offense of assault of an Assistant United

7    States Attorney," going down to the last four words, "It's

8    deadly or dangerous."

9            THE COURT:  Got it.  Okay.  Thank you.  That's

10   consistent with your earlier objection.  All right.

11           Now we're at Page 12 of the draft instructions.  This

12   is the offense in Count 2, Title 18, United States Code,

13   Section 115(a)(1)(B).  Any objection from the Government?

14           MR. ALEXANDER:  No, Your Honor.

15           THE COURT:  Mr. Garland?

16           MR. GARLAND:  Your Honor, we made an objection in the

17   pretrial submission Footnote 22, to the idea of having a threat

18   to assault or murder and we argue that the "murder" is a

19   specific intent crime.  "Assault" is not, and that when it

20   comes to penalty, these charges are actually -- the threat to

21   murder is more serious than the threat to assault, and

22   addressing them in a single instruction is confusing and, in

23   our opinion, erroneous because it allows the jury to come back

24   on an either/or theory when it has to be one or the other.

25           THE COURT:  All right.  The argument is noted but

```
 1    rejected.  I think the Eleventh Circuit has been clear that
 2    both 18 USC Section 111 and Section 115 are general intent
 3    statutes, not specific intent statutes, and the verdict form is
 4    clear that it requires the jury to unanimously agree as to
 5    whether the threat was to murder or to assault.
 6              So I don't think there's any real risk of confusion, as
 7    you say.
 8              Anything further, Mr. Garland, on Page 12?
 9              MR. GARLAND:  No, ma'am.
10              THE COURT:  Okay.  Page 13, Mr. Alexander?
11              MR. ALEXANDER:  No objection, Your Honor.
12              THE COURT:  Mr. Garland?
13              MR. GARLAND:  No objection, Your Honor.
14              THE COURT:  Mr. Alexander, Page 14?
15              MR. ALEXANDER:  No objection, Your Honor.
16              THE COURT:  Mr. Garland?
17              MR. GARLAND:  Judge, just to the extent that I argued
18    that it should be "and," the Court's overruled my objections,
19    so taking that into account, I do not object to this particular
20    instruction, but without waiving my previous challenges.
21              THE COURT:  Understood.  Page 14 will be included.
22    Now we're at Page 15.  Any objection from the Government?
23              MR. ALEXANDER:  No, Your Honor.
24              THE COURT:  Mr. Garland?
25              MR. GARLAND:  Judge, without waiving the objections
```

```
1    about, especially the "and" and "or," and on Count 2 that

2    murder is -- the threat to murder is separate and more serious

3    than a threat to assault, without waiving those objections, I

4    don't object to this particular language.

5            THE COURT:  Okay.  I'll just note for the record, I

6    think the Eleventh Circuit decision in *Ettinger*, which is 344

7    F.3d 1149, speaks to the general intent nature of both of the

8    crimes charged in this indictment.

9            I think we're then at duty to deliberate, which is a

10   standard instruction.  I assume no objection, but let me

11   inquire.  Mr. Alexander?

12           MR. ALEXANDER:  No objection, Your Honor.

13           THE COURT:  Mr. Garland?

14           MR. GARLAND:  No objection, Your Honor.

15           THE COURT:  And then the final page, which references

16   the verdict form, Mr. Alexander?

17           MR. ALEXANDER:  No objection.

18           THE COURT:  Mr. Garland?

19           MR. GARLAND:  No objection.

20           THE COURT:  All right, so let's discuss the verdict

21   form then.

22           Any objection from Mr. Garland?

23           MR. GARLAND:  Judge, can I have a moment to study it?

24           THE COURT:  Sure.

25           MR. GARLAND:  We were given these not long before you
```

1    came in.

2          THE COURT:  If you want to raise any particular

3    objections to the verdict form, I'll permit that during our

4    first morning break.

5          Would that be preferable to you, Mr. Garland?

6          MR. GARLAND:  It would be.  That way we can proceed,

7    Judge.

8          THE COURT:  Okay.  Well, then let's do that, we will

9    table the verdict form until our first break.  We'll have a few

10   minutes to gather the jurors and make sure they're here and

11   I'll see the parties in, roughly, 10 minutes.

12         COURTROOM DEPUTY:  All rise.

13         (Recess taken from 8:50 a.m. to 9:09 a.m.)

14         COURTROOM DEPUTY:  All rise.

15         THE COURT:  Please be seated.

16         (Jury entered courtroom at 9:08 a.m.)

17         THE COURT:  You may be seated.  Good morning, ladies

18   and gentlemen.  Thank you very much for your prompt arrival.

19         We will continue the examination of Ms. Connors.

20         Is she ready to go, Mr. Alexander?

21         MR. ALEXANDER:  Yes, Your Honor.

22         THE COURT:  All right.  Let's escort her in, please.

23         Good morning, again, ma'am.

24         THE WITNESS:  Good morning.

25         (Witness resumes stand.)

```
 1              THE COURT:  Mr. Garland, you may proceed.

 2              MR. GARLAND:  Thank you, Your Honor.

 3              (SPECIAL AGENT SARA CONNORS, being previously sworn,

 4    continued to testify as follows:)

 5                     CROSS-EXAMINATION (CONTINUED)

 6    BY MR. GARLAND:

 7    Q.  Good morning, Agent Connors.

 8    A.  Morning.

 9    Q.  Just following up on the recordings that we just listened

10    to in the trial, during the course of that trial were you

11    seated at counsel table?

12    A.  Yes, I was.

13    Q.  All right.  And at the time you were seated at counsel

14    table, were you next to prosecutor John McMillan?

15    A.  Yes, I was.

16    Q.  And at the time that you first heard anything happening,

17    were you looking at the jury as it was exiting the courtroom?

18    A.  Yes, I was.

19    Q.  All right.  After you heard this noise, did you turn your

20    attention to Mr. Wilkins and the situation over there?

21    A.  Yes.

22    Q.  Okay.  So is it fair to say that if this chair was thrown,

23    you did not see the chair being thrown?

24    A.  You are correct, I did not see the chair being thrown.

25    Q.  And if the chair -- if you did not see the chair being
```

 1  thrown, is it fair to say that you could not be in fear of the

 2  chair because you did not know that it was being thrown?

 3  A.   I wasn't in -- I don't know if that's a necessarily

 4  accurate statement.  I was not in fear of the chair, but once

 5  the chair hit and there was clearly so much commotion and the

 6  threats coming from Mr. Wilkins, that was certainly scary.

 7  Q.   Let's break this into two different pieces, the chair and a

 8  the statements.

 9  A.   Okay.

10  Q.   So if you were not aware that the chair had been thrown,

11  isn't it fair to say that you could not be in fear of the chair

12  at the time it happened?

13  A.   At the time that it happened, no.

14  Q.   Okay.  All right.

15       MR. GARLAND:  Nothing further, Judge.  Thank you.

16       THE COURT:  All right.  Thank you, Mr. Garland.

17       Any redirect?

18       MR. ALEXANDER:  Briefly, Your Honor.

19                     REDIRECT EXAMINATION

20  BY MR. ALEXANDER:

21  Q.   Special Agent Connors, during cross-examination counsel

22  asked you about whether you were in fear of the chair; correct?

23  A.   Yes.

24  Q.   Now, as you testified, where were your eyes fixated as the

25  jury was exiting the courtroom?

```
1   A.   I was looking at them, at the jury leaving the courtroom.

2   Q.   And how did you feel once you heard that loud sound?

3   A.   When I first heard it, I was actually pretty shocked, I

4   didn't really realize what had happened because the noise was

5   so loud, until the shouting started, I didn't -- I was kind of

6   trying to process what had actually occurred.

7   Q.   And you just testified that until the shouting happened.

8   Who was shouting?

9   A.   Mr. Wilkins.

10  Q.   And what was he shouting at that time?

11  A.   He continued shouting for a long time about he was going

12  to -- when he gets out, he was going to find the prosecutor --

13  he was referring to the prosecutor -- and kill him.

14  Q.   So let me ask you this:  Mr. Garland also asked you whether

15  you were in fear of the chair without having actually seen it

16  thrown; correct?

17  A.   Yes, that's what he asked.

18  Q.   But despite the fact that you didn't see the chair, the

19  fact that, for example, if someone were to attack you from

20  behind, you wouldn't be in fear until you recognized that the

21  harm was about to happen; is that fair?

22  A.   That's correct.

23  Q.   So the fact that your eyes are fixated means that your

24  attention was elsewhere, but that doesn't mean no harm would

25  ever come to you?
```

```
 1   A.   Correct.

 2   Q.   But at that given moment, once you heard the sound and

 3   started to see everything that was transpiring, what was going

 4   through your mind?

 5   A.   Oh, it was very scary once I realized what was going on.

 6   Q.   And what interfered with the defendant's ability to do more

 7   than just throw the chair, what was that?

 8   A.   The Marshals.

 9        MR. ALEXANDER:  Thank you, Special Agent Connors.

10        Your Honor, I have no further questions.

11        THE COURT:  Thank you, Mr. Alexander.

12        Please call your next witness.

13        MR. ALEXANDER:  Your Honor, at this time, the

14   Government calls Vernon Chipman.

15        THE COURT:  Thank you.  Excuse me, I'm sorry, I didn't

16   excuse you.  Thank you, you may be excused.

17        THE WITNESS:  Thank you, Your Honor.

18        (Witness excused.)

19        MR. ALEXANDER:  The Government calls Vernon Chipman.

20        THE COURT:  Good morning, sir.

21        THE WITNESS:  Good morning, Judge.

22        THE COURT:  Please walk over here to the witness stand

23   and remain standing to be sworn in.

24        COURTROOM DEPUTY:  Please raise your right hand.

25        Do you solemnly swear that the testimony you're about
```

 1    to give in this cause will be the truth, the whole truth, and

 2    nothing but the truth, so help you God?

 3              THE WITNESS:  Yes.

 4              COURTROOM DEPUTY:  Please state your name, spelling

 5    your last name, please.

 6              THE WITNESS:  Vernon Chipman.  Chipman, C-H-I-P-M-A-N,

 7    Chipman.

 8              THE COURT:  Thank you, sir, please remove your mask and

 9    be seated.

10              MS. LATTA:  May I proceed, Judge?

11              THE COURT:  You may.

12              MS. LATTA:  Thank you.

13              (VERNON CHIPMAN, being sworn, testified as follows:)

14                          DIRECT EXAMINATION

15    BY MS. LATTA:

16    Q.   Mr. Chipman, good morning.  How are you?

17    A.   Good morning.

18    Q.   Let's start with this, are you currently employed?

19    A.   Yes, ma'am, I am.

20    Q.   Who do you work for or with?

21    A.   I work with the U.S. Marshals Service.

22    Q.   In what capacity do you work?

23    A.   I work in the capacity of DSO, the acronym stands for a

24    district security officer.

25    Q.   And what does a district security officer do?

1    A.   We support and provide security in courtrooms in concert

2    with the U.S. Marshals.

3    Q.   And how long have you been with the U.S. Marshals?

4    A.   I've been with the U.S. Marshals now since maybe

5    August 2009.

6    Q.   Any prior law enforcement experience before the U.S.

7    Marshals?

8    A.   Yes, ma'am, part of being a DSO, you have to have previous

9    law enforcement experience, either as a sworn police officer or

10   a correction officer, and military doesn't hurt the cause.

11       I also served three years in the military prior to becoming

12   a correction officer.

13   Q.   What branch was that?

14   A.   The U.S. Army.

15   Q.   We talk about the U.S. Marshals, and I know some of us have

16   heard that name before.  What is the United States Marshal

17   Service responsible for?

18   A.   They're responsible for transport of people that have been

19   arrested at some point.  We also provide security for the

20   courtroom, movement of prisoners and personnel that come to

21   court from time to time.

22   Q.   And when folks like yourself are working a courtroom detail

23   or you're securing the courtroom, are you wearing an armed

24   uniform or do you wear suits?

25   A.   I'm pretty much dressed like I am today, ma'am,

1    particularly, in trials.

2    Q.   Okay.  Have you had any types of training about courtroom

3    security?

4    A.   Yes, ma'am.  Working as a correction officer, I worked

5    maybe five years courtroom security, have some incidents where

6    we have to be responsible for controlling and maintaining

7    security in the courtroom, that comes through the academy where

8    you learned that, the Marshal Service.

9         I have not received a whole lot of extensive training from

10   the Marshal Service, it's basically the knowledge that I came

11   with that I'm able to perform my duties.

12   Q.   I'm going to embarrass you for a moment.

13   A.   Yes, ma'am.

14   Q.   How tall are you?

15   A.   I'm six-three.  Not embarrassed.

16   Q.   I want to draw your attention to November 7, 2019.  Were

17   you still with the U.S. Marshals during that time?

18   A.   Yes, ma'am.

19   Q.   Still in the capacity as courtroom security?

20   A.   Yes, ma'am.

21   Q.   Do you remember what happened that day?

22   A.   Yes, ma'am, I do.

23   Q.   Okay.  Can you tell us -- kind of give us the setup of

24   what's happening in the courtroom, and then I will probably

25   interrupt you and follow up on a few things.

1    A.   Yes, ma'am.  That day was kind of different than what I'd

2    call a normal day.  I was working Judge Altonaga's courtroom

3    and there was a trial with the defendant, Mr. Wilkins, and

4    right as the jury verdict had been read, Mr. Wilkins stood --

5    well, everyone was standing as the verdict was being read, the

6    jury was exiting the courtroom, and Mr. Wilkins grabbed the

7    chair and threw it in the direction of the prosecution table.

8    Q.   Let me ask you this:  When you mentioned the name

9    Christopher Wilkins, I saw, and for the record, you kind of

10   give a nod towards the right side of the courtroom.

11   A.   Yes, ma'am.

12   Q.   Do you see him in the courtroom?

13   A.   Yes, ma'am.

14   Q.   Do me a favor, could you just point to something that he's

15   wearing?

16   A.   The gentleman sitting to my far right, your left, with the

17   dark colored shirt or jacket.

18   Q.   Okay.

19   A.   And next to the gentleman with the gray suit.

20        MS. LATTA:  Let the record identify the in-court

21   identification of the defendant.

22        THE COURT:  So reflected.

23   BY MS. LATTA:

24   Q.   Now, let's do this, when you're in the courtroom back on

25   November 7, 2019, where are you positioned?

```
 1   A.   The setup of that courtroom was, more or less, the defense
 2   table would have been right where those chairs are, a little
 3   bit more towards me.  I was sitting directly behind them on the
 4   other side of the galley, where the young lady with the blue
 5   top and white sweater and blue mask is sitting.
 6   Q.   And when you say behind the gallery, is it fair to say that
 7   we're talking about behind the Bar?
 8   A.   Yes, ma'am, that separates the court personnel from the
 9   persons of the defendant's family that visit.
10   Q.   Okay.  And who were you sitting behind?
11   A.   I was sitting behind Mr. Wilkins.
12   Q.   And is there anybody that's sitting next to you?
13   A.   My partner for that courtroom day was Deputy U.S. Marshal
14   Dana Staples.
15   Q.   How close are you -- when you're sitting behind counsel's
16   table, how close are you to counsel's table?
17   A.   About the distance from where that lady is, but what I
18   normally do is, as the point the verdict is being read, I come
19   as close to the aisle -- the barrier as I can get.
20   Q.   Why do you do that?
21   A.   Just in case somebody acts out, I'm in a little better
22   position to respond.
23   Q.   Are you trained to be prepared in certain times when a
24   verdict is read?
25   A.   Yes, ma'am, absolutely.  I've had other incidents where a
```

1  person may lose control in the courtroom; even family members,

2  sometimes when people are getting sentenced and you have to

3  control the situation in the courtroom, that's what we're here

4  for.

5  Q.  So, on this day, November 7, 2019, when the verdict is

6  being read, who were you looking at?

7  A.  I looked over to the jury, they exited to my right --

8  that's where the jury room was -- and I kind of had one eye

9  over there, but I also kept my good eye on Mr. Wilkins, I will

10  just say it like that.

11  Q.  I want you to tell us what you started to notice about the

12  defendant and what he started to do before he picked up the

13  chair, what stood out to you?

14  A.  What stood out to me is he looked to -- can I stand up?

15  Q.  Absolutely.

16        MS. LATTA:  Judge, if I may, with the Court's

17  permission, can I do this?

18  BY MS. LATTA:

19  Q.  Mr. Chipman, can I have you come out, if that helps a

20  little bit more?

21  A.  Yes, ma'am, it would.

22        MS. LATTA:  Judge, are you okay with that?

23        THE COURT:  Yes, that's fine.

24        MS. LATTA:  You know what, I'll get you a mic just in

25  case.

1              THE WITNESS:  I'm actually on the other side of this

2    rail, and Mr. Wilkins and his attorney are sitting right

3    opposite me.  I come as close to the rail as I can, and as the

4    jurors were exiting the courtroom, I watched Mr. Wilkins kind

5    of look to his left, and he looked around.

6              And after about maybe two, three, four of the jurors

7    had walked out, he grabbed the chair and threw it toward the

8    direction of the prosecution table.

9    BY MS. LATTA:

10   Q.  How quickly was he able to grab the chair?

11   A.  I mean, it was right there.  It was a lot bigger and

12   heavier than this chair.  It seemed to be, at least.

13   Q.  Was it a chair that he was sitting in or was it somebody

14   else's chair?

15   A.  No, it looked like a chair that was next to him, but it

16   happened so fast, I'm not 100 percent sure, but it looked like

17   a chair that was next to him.  He just grabbed it and yelled

18   some obscenities at the same time.

19   Q.  And here's what I want you to, if you don't mind, because

20   you're breaking -- I appreciate the movement because it helps

21   us better understand, but you're breaking up a little bit when

22   you're moving it.

23   A.  Okay.

24   Q.  When he grabs the chair, does he also move with the chair?

25   A.  Yes, ma'am.  He actually came in my direction, which helped

```
 1   me to gain control of him.
 2   Q.  And when you say your direction, is it fair to say that
 3   you're sitting behind the defense attorney?
 4   A.  Yes, ma'am.
 5   Q.  Okay.  When you see him with the chair, is he moving with
 6   the chair towards -- aside from your area, towards another
 7   particular area?
 8   A.  Yes, ma'am.  So I can step out here so the jury can see me.
 9       Let's say his position started out right here, he grabbed
10   the chair, which may have been right there.  And when he threw
11   it, his momentum carried him, again, towards me -- well,
12   towards the jury, towards the prosecution table, actually, and
13   I just reached up under him, grabbed him, took him across the
14   galley onto the bench in first row where I had been sitting.
15   Q.  And was he also moving his feet?
16   A.  Yes, ma'am.
17   Q.  I'm going to have you come back, if you don't mind.
18           (Witness complying.)
19   BY MS. LATTA:
20   Q.  You're familiar that he was an inmate at the time?
21   A.  Yes, ma'am.
22   Q.  Do you recall if he was shackled by the feet or he had
23   chains on his feet?
24   A.  He had feet shackles on, yes, ma'am.
25   Q.  Now, given your experience with transporting inmates and
```

```
 1   monitoring courtroom security, do you often see folks with
 2   chains on their feet a lot?
 3   A.   Yes, ma'am.
 4   Q.   Are they able to walk in those chains?
 5   A.   Absolutely.
 6   Q.   Are they able to move in those chains?
 7   A.   Some can run, they call it a little shuffle.
 8   Q.   When the defendant picks up the chair, do you see who he's
 9   looking at when he's got the chair and he's moving?
10   A.   Yes, ma'am.
11   Q.   Who is that?
12   A.   The prosecutor, Mr. McMillan.
13   Q.   Okay.  How do you know that?
14   A.   Well, he yelled some obscenities and he's looking directly
15   at him and Mr. McMillan was looking back at him, and he
16   basically yelled obscenities, like, "Cracker, I'm going to get
17   you."
18   Q.   What stopped when the defendant has the chair -- and by the
19   way, when he's got the chair, is he carrying it at chest height
20   or is it over his head?
21   A.   It went over his head.  He's a pretty strong guy.
22   Q.   And when it gets over his head and he's moving towards the
23   prosecution table, what stops him?
24   A.   Me.
25   Q.   How do you stop him?
```

```
 1   A.   Again, he's coming parallel to me, and I knew that I had to
 2   stop him from getting over to McMillan because nothing good was
 3   going to come out of that, and I just reached up, grabbed him
 4   and used my momentum to pull him backwards to pull him up over
 5   the railing, and he landed on top of the bench.
 6   Q.   How quickly from when you, essentially, make physical
 7   contact with him are you pulling him over the bench?
 8   A.   I'm splitting hairs now, ma'am, but it may have been two
 9   seconds.
10   Q.   Now, Mr. Chipman, is there a certain level of force that we
11   would use in different scenarios?
12   A.   Absolutely.
13   Q.   So, for example, if I understand this correctly, are there
14   some individuals that may act up in court that require no
15   force --
16   A.   Yes, ma'am.
17   Q.   -- taken by you?
18   A.   Yes, ma'am.
19   Q.   In this particular case, what level of force did you have
20   to use to grab him and why did you choose to use that level of
21   force?
22   A.   I chose to use that level of force to restrain him, and one
23   of the things I do, I try to talk guys down.  So when I grabbed
24   him and got him on the bench, I said, "Wilkins, it's over with,
25   it's over, it's over."  I just kept repeating that so he
```

```
 1    wouldn't try to continue to direct his outburst, his rage
 2    towards me or anyone else who was assisting to try to restrain
 3    him.
 4    Q.  When you grab him and you pull him over the bench, is he --
 5    what's he doing with his body?
 6    A.  He's kicking and trying to get loose from us.
 7         My partner, Dana Staples, was pretty quick in getting
 8    handcuffs on him and that helps the situation.
 9         The courtroom CSO, I remember he was a real big guy, I
10    don't remember his name, but he came over and held Wilkins'
11    legs down because he was kicking his legs around.
12         Another deputy actually witnessed it on the monitor inside
13    our control room inside the Marshals' office, saw -- just
14    happened to look at the monitor in Judge Altonaga's courtroom,
15    she come running in the courtroom to assist us.
16    Q.  How many folks did it take to restrain him to the point
17    where we knew that he wasn't getting out?
18    A.  I would say all four of us before we were able to gain full
19    control, get him to stand up and escort him out of the
20    courtroom to back to the holding cell.
21    Q.  When he's being restrained -- and you mentioned a moment
22    ago he's making some threats?
23    A.  Yes, ma'am.
24    Q.  How do you know that those are being directed at Prosecutor
25    McMillan?
```

```
 1   A.   I heard him say something to the effect, and I can't quote

 2   me because my focus was more on controlling him than it was

 3   trying to pay attention to what he was saying, but best recall,

 4   "Cracker, don't think I don't know you drive a black truck, I'm

 5   going to get you.  This is the second time you've come after

 6   me.  I'm going to get you.  I'm going to kill you."

 7        He actually said, "I'm going to kill you."

 8   Q.   When he's being restrained by the four folks, yourself and

 9   others --

10   A.   Yes, ma'am.

11   Q.   -- he is still saying those threats?

12   A.   Yes, ma'am, throughout the time we actually walked him out

13   the door.

14             MS. LATTA:  Your Honor, may I have a moment?

15             THE COURT:  Yes.

16             (Brief pause in the proceedings.)

17   BY MS. LATTA:

18   Q.   Mr. Chipman, just one or two quick questions as well.

19        When we're talking about the resisting by Mr. Wilkins, once

20   you all had him kind of restrained, what level of resistance

21   was he giving back to you guys?

22   A.   I would say this:  He was trying to push his way up to try

23   to get up, but it wasn't like he was directing any of his

24   aggression towards us, he was trying to get loose to try to

25   get, I guess, across that prosecution table.
```

1          We had to apply a reasonable amount of force just to

2    control him, and I don't know any other way to put it, you

3    know, we just had to -- because he's a pretty strong guy, so it

4    wasn't like he laid there and I'm going to pin you down.

5          He was fighting his way, trying to get back up.

6    Q.   I appreciate that, sir.  Thank you for your time.

7    A.   Yes, ma'am.

8              THE COURT:  You may proceed, Mr. Garland.

9              MR. GARLAND:  Thank you, Judge.

10                        CROSS-EXAMINATION

11   BY MR. GARLAND:

12   Q.   Officer Chipman, you've just concluded your testimony

13   saying that Mr. Wilkins was down.

14        Can you explain what you mean by that?

15   A.   At the point that I grabbed him and brought him across the

16   rail --

17   Q.   That is correct.

18   A.   I can do it sitting here; okay, I grab him, I throw him

19   facedown and land on his back, "Hey, man, it's over with, it's

20   over with," and he's still twisting and pushing, trying to get

21   back up.  Again, my partner, Dana Staples, was making every

22   attempt that he could, using reasonable force to handcuff him.

23   Q.   Now, you just said you were on his back; is that what I

24   understood?

25   A.   Yes, sir.

```
 1  Q.   And when you say you were on Mr. Wilkins' back after
 2  bringing him across the rail, what do you mean?
 3  A.   My body weight bringing him across that rail landed me on
 4  top of him, and at that time I had to kind of pull to the side,
 5  because otherwise my partner wouldn't have been able to
 6  handcuff him behind his back.
 7  Q.   And you say your partner, Dana Staples --
 8  A.   Yes, sir.
 9  Q.   -- was able to handcuff Mr. Wilkins behind his back at that
10  point?
11  A.   Correct.
12  Q.   So, at that point, you were on top of Mr. Wilkins and
13  Mr. Wilkins was on the pew?
14  A.   I had gotten off of him because Staples would not have been
15  able to get to him with me on top of him.
16  Q.   Now what we're calling -- I'm calling it a pew, is it
17  similar to what's in the courtroom, the wooden --
18  A.   Yes, sir, just like where the lady with the blue sweater --
19  the blue top is sitting, that's what I'm referring to when I
20  say "pew," is the row.
21  Q.   Now, you said you were on top of Mr. Wilkins; you're six
22  foot-three, how much did you weigh at the time?
23  A.   Maybe, 212.
24  Q.   All right.  And did you ever play sports?
25  A.   Basketball, all my life.
```

1   Q.   You're pretty fit, I would imagine?

2   A.   Reasonably, yes, sir, pretty fit.

3   Q.   Now you described your height and your weight?

4   A.   Yes, sir.

5   Q.   Mr. Wilkins, at the time, weighed about 155 pounds?

6   A.   Yes, sir.

7   Q.   Mr. Wilkins is, what, five foot-seven, five foot-eight?

8   A.   He's pretty compact, but this guy's strong.

9   Q.   You're much stronger; would you agree?

10  A.   I'm probably twice his age.

11  Q.   Okay.  All right.  And Dana Staples was there with you to

12  help you do all this?

13  A.   Yes, sir, he came around -- I don't know if he jumped

14  over -- no, he was right next to me, so he was sitting -- the

15  lady with the blue top -- that would have been Dana Staples --

16  the lady sitting to her right.

17  Q.   Now -- go ahead.

18  A.   I'm sorry.  And once I got Wilkins across, Staples, of

19  course, pulls out his handcuffs and was trying to put handcuffs

20  on him, and I'm trying to slide off of him, and I'm talking to

21  him the whole time, "Hey, man, it's over, it's over."

22  Q.   Standard procedure in that situation, would it be to

23  handcuff the subject in front of their body or behind their

24  body?

25  A.   I don't know if it's standard procedure but for me I'd

```
 1   rather have his handcuffs behind him.
 2   Q.   In this particular situation, did Dana Staples handcuff
 3   Mr. Wilkins behind his body?
 4   A.   If I recall correctly, he did.
 5   Q.   And at that time, was Mr. Wilkins facedown on the pew?
 6   A.   He was still down.  We were holding him down because he's
 7   pushing and kicking and, you know, trying -- as a matter of
 8   fact, the CSO must weigh over 300 pounds, he came and basically
 9   was holding his legs, because it was hard to control his body
10   movement.
11   Q.   And Mr. Wilkins was facedown on the pew at that time?
12   A.   Yes, sir.
13   Q.   Mr. Dana Staples, I think you just estimated his weight.
14   What did you say Dana Staples' weight was?
15   A.   I don't know if I estimated his weight, but I would say
16   Dana is about the size as Mr. Wilkins.
17   Q.   So, at that point, with his face down on the pew, would it
18   be fair to say that other people would have a hard time seeing
19   Mr. Wilkins' face, if his face was down on the pew?
20   A.   If his face was facedown?  I mean, he could be facing out,
21   he could be to the side.  But you could also get a head-butt,
22   sir, and that could knock you out.  So trying to control him is
23   not something I take lightly, or anybody, for that matter, when
24   I'm trying to, you know, control a suspect.
25   Q.   But I'm asking you, sir, his face was down on the pew?
```

1   A.   Right.

2   Q.   Maybe he was struggling a bit, as you've said?

3   A.   Uh-huh.

4   Q.   But wouldn't it be difficult for someone across the room to

5   be able to see --

6   A.   At that point?

7   Q.   -- at that point?

8   A.   Yes, sir.  At that point, when he's facedown and everybody

9   that remained in the courtroom were kind of standing at the

10  time, the jurors were ushered out, but the courtroom personnel,

11  pretty much.

12  Q.   Okay, so what we have is a pew that's similar to those

13  pews?

14  A.   Yes, sir.

15  Q.   Mr. Wilkins is facing down on the pew, and you and deputy

16  or Officer Staples --

17  A.   Deputy Staples.

18  Q.   -- are doing all possible to bring him under control?

19  A.   That's correct.

20  Q.   Now, in addition to this, you've already said that

21  Mr. Wilkins had some type of device on his feet?

22  A.   Yes.

23  Q.   What type of device was that that was on Mr. Wilkins' feet

24  at that particular time?

25  A.   I want to say they were leg shackles.  If he had leg

1    restraints on, they would be leg shackles.

2    Q.   So these leg shackles, are they like chains?

3    A.   That's correct.

4    Q.   What's the purpose of putting chains onto a person's feet?

5    A.   Well, to keep them from running.

6    Q.   So with what you just said, to keep a person from running,

7    what does that mean to you?

8            MS. LATTA:  Objection as to relevance.

9            THE COURT:  Overruled.

10           THE WITNESS:  What that means, to me, is to put the

11   security personnel, the Marshals or someone like myself, or

12   even a CSO that was there would not have a disadvantage in case

13   that person decides to act out.  When we transport them,

14   everyone is transported as leg shackles.

15   BY MR. GARLAND:

16   Q.   And so the purpose of shackles is to prevent someone from

17   running and acting out; is that --

18   A.   To restrict movement, yes, sir.

19   Q.   Okay.  Now, could you estimate the length of these leg

20   shackles?

21   A.   Yes, sir.  They're about, I would say, two feet,

22   three feet.  I was going to say about two feet.

23   Q.   About two feet?

24   A.   Yes, sir.

25   Q.   Now, you played sports.

```
 1        When you played sports, did you ever learn about how to
 2   position your body to get the maximum advantage?
 3   A.   Absolutely.
 4   Q.   Your feet would need to be pretty far apart?
 5   A.   Yes, sir.  Yes, sir.
 6   Q.   Usually, your shoulders apart; right?
 7   A.   Yes, sir.
 8   Q.   If you're going to shoot a basketball, you want to be in
 9   position; correct?
10   A.   Right.
11   Q.   If you want to defend a tackle or make a tackle, you want
12   to have good position; right?
13   A.   Yes, sir.
14   Q.   Now, these shackles, they would interfere with a person's
15   ability to assume a posture that would allow them to be
16   aggressive; wouldn't that be true?
17   A.   Shackles limit movement, they don't restrict movement, so a
18   person is still able to do pretty much a lot of what they would
19   be able to do without shackles.
20        They can only just do so much of it.
21   Q.   Okay.  So, as I'm understanding this, because of the
22   circumstance, you were on high alert at the point just before
23   this happened?
24   A.   I don't have any ax to grind with Mr. Wilkins.
25        He made comments in the movement, in the process coming to
```

1    and from the courtroom, just some B.S., stuff like that.

2        So I kind of say I wouldn't be surprised if he tried to do

3    something.  Yes, sir, I was on high alert.

4    Q.   Now, the jury had been out all day that day and part of the

5    day before?

6    A.   Yes, sir.

7    Q.   And they come back with a lot of different letters; didn't

8    they?

9    A.   Yes, sir.

10   Q.   And, you know, it's now getting to be about 6:30 in the

11   evening; is that right?

12   A.   Yes, sir.

13   Q.   So it's been a long, trying day for everyone?

14   A.   That's correct.

15   Q.   So, the jury comes back with a question, the Judge

16   addresses it; right?

17   A.   Yes, sir.

18   Q.   And then the jury comes back about 20 minutes later with a

19   verdict.

20   A.   Correct.

21   Q.   Is that what happened?

22   A.   Yes, sir.

23   Q.   And it was during that process -- now, you said you had one

24   eye on the jury as they exited the courtroom and your attention

25   was also focused on Mr. Wilkins?

```
 1   A.   That's correct.
 2   Q.   So, at the first opportunity when something was amiss, you
 3   were in a position to quickly try and bring that under control?
 4   A.   Correct.
 5   Q.   And that's part of your job at that time, was to keep these
 6   things from happening?
 7   A.   Correct.
 8   Q.   So, at the time that this took place, you immediately
 9   reacted to help gain control of the situation?
10   A.   Yes, sir.
11   Q.   And so did Deputy Staples, who was there, too?
12   A.   Correct.
13   Q.   So -- now, you've talked about position of chairs.
14        So, you know, I'd like to, just as an example, take two
15   chairs and put them right here.
16        Let's just suppose one chair belongs to Mr. Wilkins and
17   let's say one chair belongs to the defense attorney in this
18   case; right?
19   A.   Yes, sir.
20   Q.   Is that fair?
21   A.   Yes, sir.
22   Q.   Now, because both -- the jury was being excused, was it
23   customary for court personnel, Mr. Wilkins, his attorney, the
24   prosecutor, and other people in the courtroom, was it customary
25   for them to stand?
```

1  A.   Yes, sir, any time the jury enters or leaves the courtroom,

2  everyone in the courtroom stands.

3  Q.   Now, I've got these chairs here, but I do not have a table.

4  A.   Correct.

5  Q.   But we have a table over here where the -- you know, the

6  prosecutors in this case are sitting and where Mr. Wilkins and

7  I are sitting.  Do you see that?

8  A.   Yes, sir.

9  Q.   Are those tables somewhat similar to what you had in the

10  courtroom at that time?

11  A.   I would agree.

12  Q.   So the chairs that I'm using here as examples would have a

13  table in front of them; correct?

14  A.   Correct, yes, sir.

15  Q.   So as the people stood up, Mr. Wilkins stood up, his

16  attorney would stand up next to him?

17  A.   That's correct.

18  Q.   So at the time that you described a chair being lifted, his

19  attorney was standing right there where the attorney's chair

20  was; isn't that true?

21  A.   Quite honestly, I don't even remember seeing his attorney

22  standing there.  I couldn't tell you if he was standing there

23  or stepped back a little bit, but to my best recollection it

24  was the chair next to Mr. Wilkins' chair that he actually

25  grabbed, to my recollection, yes, sir.

1   Q.   Did you see the video recently about this incident?

2   A.   I saw it.

3   Q.   Okay.  So the video will actually show exactly the

4   relationship of the people, the chairs and the table; wouldn't

5   it?

6   A.   Yes, sir.

7   Q.   And, you know, the video hasn't changed since the event?

8   A.   That's correct.

9   Q.   So if we're talking about what the best exact evidence is,

10   it might be the video; right?

11   A.   Videos are accurate, yes, sir.

12   Q.   Okay.  So, would you agree or not agree that Mr. -- the

13   defense attorney in that case, Ron Chapman, did he move out of

14   the way?

15   A.   I don't remember seeing him there.  I mean, my focus was on

16   Mr. Wilkins.  I don't know if he moved forward, he moved

17   backwards.

18       I grabbed Mr. Wilkins and I took him across the rail.

19   Q.   So, whether the defense attorney, Ron Chapman, moved out of

20   the way or not wasn't the focus of your attention?

21   A.   I couldn't tell you.  I would be lying if I even told you

22   I remember seeing that on the video.

23       I was locked on Mr. Wilkins, and that was my

24   responsibility.

25   Q.   And part of the reason for that is Ron Chapman wasn't part

1    of your responsibility?

2    A.   Not for security purposes, no, sir.

3    Q.   Mr. Wilkins was your responsibility?

4    A.   That's correct.

5    Q.   Focus on Mr. Wilkins?

6    A.   Yes, sir.

7    Q.   Now, we have two tables and were they set up similar to

8    what we have here, two tables?

9    A.   Yes, sir.  One would have been right here in front of those

10   two chairs, four chairs going across; and the other one was on

11   that side of the aisle, pretty much same setup.

12   Q.   Okay.  So, during this particular event, just to go back

13   through it, a chair was picked up, and you saw this chair being

14   picked up?

15   A.   Yes, sir.

16   Q.   And you then were reacting immediately because this posed a

17   threat to court security?

18   A.   Absolutely.

19   Q.   Deputy Staples was acting immediately because this posed a

20   threat to courtroom security?

21   A.   Yes, sir.

22   Q.   Now, at that point, were you able to grab Mr. Wilkins and

23   bring him over the dividing Bar?

24   A.   That's correct.

25   Q.   And then you've already described bringing him under

```
 1   control or attempting to in the pew; right?
 2   A.   Yes, sir.  Yes, sir.
 3   Q.   Now, there was a judge in the courtroom, I think it was
 4   Judge Dimitrouleas?
 5   A.   That's correct.
 6   Q.   And Judge Dimitrouleas, at some point, he had to do
 7   something with Mr. Wilkins, that is, he had to adjudicate him
 8   guilty?
 9   A.   That's correct.
10   Q.   Now, were you standing with Mr. Wilkins when
11   Judge Dimitrouleas adjudicated him guilty of those charges?
12   A.   Yes, sir.
13   Q.   And were you still out beside the pew at the time that
14   happened?
15   A.   No, sir.  Myself and Deputy Staples -- and Deputy Peters,
16   I think, the CSO, may have stepped away at that time -- we
17   brought him around and kind of stood right there toward where
18   the end of the jury box would be.
19   Q.   Okay.  So, at that particular time, you brought him around
20   in front of Judge Dimitrouleas, he did what he needed to do?
21   A.   Yes, sir.
22   Q.   Okay.  So the time -- you know, when Mr. Wilkins was
23   ultimately brought under control, did you stand him up?
24   A.   Yes, sir.  You know, we walked him around, there was three
25   of us and one of him, so we were able to walk him around, and
```

1   he was still yelling obscenities, and he finally calmed down.

2   Q.   What do you mean by "obscenities," what do you mean?

3   A.   "Cracker, I'm going to get you.  This is the second time

4   you came after me."

5   Q.   Have you read the transcript of this proceeding?

6   A.   No, I haven't.

7   Q.   Okay.  Are you aware that customarily in Federal court

8   proceedings there's a court stenographer and a transcript can

9   be made?

10  A.   Yes, I do.  Yes, I do.

11  Q.   So, in this particular case, have you listened to the

12  recording of the sound?

13  A.   There was no recording from what I received; I just have a

14  video.

15  Q.   Okay.  So, as you testified today, in terms of you're going

16  from your memory as to what was said or not said?

17  A.   That's all I got.

18  Q.   Okay.  All right.

19          MR. GARLAND:  Now -- just one moment, Judge.

20          (Brief pause in the proceedings.)

21          MR. GARLAND:  Judge, I have nothing further.

22          THE COURT:  Thank you, Mr. Garland.

23          Any redirect?

24          MS. LATTA:  Yes, ma'am.

25

                          REDIRECT EXAMINATION

BY MS. LATTA:

Q.   I'm going to go tell Dana Staples that you estimated his
weight in court.

     Let me ask you this:  So how long have you been working in
courtrooms?

A.   Oh, man, if I count my Correction experience, that was back
in 1985, about five years -- I mean, just to give you an
example:

     I've even been in a courtroom where someone tried to --
before the metal detectors were in -- back in the '80s --
someone tried to bring a gun in the courtroom, and I happened
to be in that courtroom, so I stay on high alert, I don't take
it for granted.

Q.   In your experience working in courtrooms for a long time
now --

A.   Yes, sir.

Q.   -- it's fair to say that all inmates, people incarcerated,
currently --

A.   Yes, ma'am.

Q.   -- all inmates that come in court have leg shackles; is
that right?

A.   Yes, ma'am.

Q.   Every single one of them?

A.   Yes, ma'am.

1    Q.   And we still see disturbances in court?

2    A.   Yes, ma'am.

3    Q.   Okay.  There are certain level of restrictions on an

4    inmate; is that right?

5    A.   Yes, ma'am.

6    Q.   All inmates have leg shackles --

7    A.   Correct.

8    Q.   -- when they come to court?

9    A.   Correct.

10   Q.   But on occasion, sometime, some defendants will be chained

11   to the table by a hand; right?

12   A.   I've been a part of that as well, yes, ma'am.

13   Q.   Some folks will be wearing bodysuits, so they don't have

14   restrictions for their arms or their movements?

15   A.   Yes, ma'am.  They're called a "box," they're better than

16   handcuffs because you're actually restricted from doing

17   anything with your hands.

18   Q.   Well, some folks, actually, in addition to the leg chains,

19   will they be chained to the floor?

20   A.   Or to a chair, yes, ma'am.

21   Q.   Okay.  So, in this particular case, the level of restraint

22   that he had was no different than every other inmate that comes

23   to court in a daily basis?

24   A.   Absolutely, no difference.

25   Q.   We are spending a lot of time talking about whether he can

```
 1    move or he can't.  You've seen it.
 2    A.   Yes, ma'am.
 3    Q.   Can these folks get momentum and move in these chains?
 4    A.   Yes, ma'am.
 5    Q.   Let me ask you this:  Prosecutors, as well, we're familiar
 6    with who's an inmate and who's not?
 7    A.   Correct.
 8    Q.   So fair to say that prosecutors will also be aware of the
 9    restrictions against a particular inmate?
10    A.   Yes, ma'am.
11    Q.   Or whether some inmates don't have any restrictions other
12    than the leg shackles?
13    A.   Correct.
14    Q.   And you talked about the handcuffs being placed on him.
15         Your experience in courtrooms working with inmates --
16    A.   Yes, ma'am.
17    Q.   -- have you seen folks, still, even though they're cuffed,
18    being able to cause a disturbance or strike another individual?
19    A.   Yes, ma'am.  The hands are a weapon; and again, as I told
20    defense counsel, even the head, if a person head-butts you,
21    they can knock you out.
22         I witnessed it, and it's not a good thing.
23         So when you're applying force, you know, Deputy Staples and
24    myself never attempted to choke or use any excessive force.  We
25    basically tried to control his head, his hands, and his feet
```

```
 1    were already under control.  Once we did that, we knew we could
 2    pick him up and take him out of the courtroom.
 3    Q.   And when he's making the threats -- because Mr. Garland
 4    pointed this out and he spent a little time on it -- when he's
 5    making the threats and he's down at some point and he's being
 6    restrained, is he still a security risk?
 7    A.   Yes, ma'am.
 8    Q.   Is there still the risk, based on what you've seen, for him
 9    to get loose, get to the prosecutor, or hurt somebody?
10    A.   Yes, ma'am, until we get him out of the courtroom, we have
11    to treat it as if they're still a threat factor.
12    Q.   And when he's making those threats -- and at some point we
13    see him get up, you move him up --
14    A.   Yes, ma'am.
15    Q.   -- when he's making those threats, is he trying to still
16    move towards and get towards John McMillan?
17    A.   Yes, ma'am.  As a matter of fact, when he was getting up,
18    he was trying to make a move, so I actually had to tell
19    Mr. McMillan, "I need you to step back now," because at that
20    point we wanted to walk Mr. Wilkins around so that the Judge
21    could finish adjudicating him and we can get him out of here.
22    Q.   And when you walked him around, does he have to come near
23    the path of John McMillan?
24    A.   Yes, ma'am, he was like coming through those opening doors
25    right there, like open the swinging gate, and Mr. McMillan was
```

1    standing right where the podium was, and I didn't want him to

2    have any chance of reaching over or trying to actually get

3    toward him, and I asked Mr. McMillan could he step back so we

4    could get in.

5         We were going out that door, which is to your right.

6    Q.   Is there still, based on your experience, the possibility

7    that when he is walking -- because he can walk in his chains;

8    right --

9    A.   Yes, ma'am.

10   Q.   -- when he's walking with you and being escorted, that he

11   could still be a threat?

12   A.   Yes, ma'am, he can shake free.  I mean, he's a pretty

13   strong guy, I mean.

14   Q.   I want to ask you about that.

15        Are you familiar with the chairs in the courtroom at the

16   time that the defendant was sitting in and counsel was sitting

17   in?

18   A.   Yes, ma'am.

19   Q.   Do you know how heavy those are?

20   A.   Maybe three of those chairs would make the weight of one of

21   those chairs that they sit in.  Those are pretty -- not flimsy,

22   I don't want to say that -- they're pretty light chairs,

23   whereas, the chairs that are assigned at the defense table and

24   prosecution table are a lot heavier.

25             MS. LATTA:  I've got nothing else.  Thank you.

```
 1              Judge, I appreciate the time.

 2              THE COURT:  Thank you.  Thank you.

 3              You may be excused.

 4              THE WITNESS:  Thank you, Judge.

 5              (Witness excused.)

 6              THE COURT:  Government, please call your next witness.

 7              MR. ALEXANDER:  Your Honor, at the time the Government

 8     calls ToniAnn Jacoby.

 9              THE COURT:  Good morning.  If you could please make

10     your way to the witness stand, remain standing to be sworn in,

11     and remove your mask.  Thank you.

12              COURTROOM DEPUTY:  Do you solemnly swear that the

13     testimony you're about to give in this cause will be the truth,

14     the whole truth, and nothing but the truth, so help you God?

15              THE WITNESS:  I do.

16              COURTROOM DEPUTY:  Please state your name, spelling

17     your last name.

18              THE WITNESS:  ToniAnn Schettino Jacoby, J-A-C-O-B-Y.

19              THE COURT:  You may be seated, thank you.

20              MR. ALEXANDER:  May I proceed, Your Honor?

21              THE COURT:  You may.

22              (TONIANN SCHETTINO JACOBY, being sworn, testified as

23     follows:)

24                         DIRECT EXAMINATION

25     BY MR. ALEXANDER:
```

1    Q.   Good morning, Ms. Jacoby.

2    A.   Good morning.

3    Q.   Ms. Jacoby, can you please tell the jury, what is your

4    current occupation?

5    A.   I'm a courtroom deputy for Honorable Roy K. Altman.

6         I'm employed by the United States District Court for the

7    Southern District of Florida.

8    Q.   And when it comes to -- I think you said the Honorable

9    Roy K. Altman, is he a United States District Judge?

10   A.   Yes.

11   Q.   And where is he based?

12   A.   He is based out of Miami.  We also have chambers in

13   Fort Lauderdale.

14   Q.   And in your capacity as a courtroom deputy, what does that

15   entail?

16   A.   As a courtroom deputy, I support the judge in many ways in

17   the courtroom and also in chambers.  I organize and help out in

18   trials, civil and criminal, in all proceedings that happen in

19   the courtroom; also, with scheduling, I prepare orders on

20   various findings on the docket.

21        I handle everything in trial with the jurors, exhibits,

22   witnesses, read the verdict, poll the jurors, I basically

23   manage the courtroom in all proceedings and manage the office

24   as well.

25   Q.   So you're essentially Judge Altman's right hand?

1    A.   Yes.

2    Q.   And, Ms. Jacoby, how long have you served as courtroom

3    deputy for Judge Altman?

4    A.   I've been with Judge Altman since he was appointed to the

5    bench, about three years, going on three years.

6    Q.   And prior to serving as a courtroom deputy for Judge

7    Altman, what was your employment?

8    A.   I've been employed by the United States District Court

9    since May of 2008, I was a courtroom deputy previously for

10   Honorable Beth Bloom in Miami for about five-and-a-half years.

11        Prior to that, I was a relief courtroom deputy for all -- I

12   supported all the judges in Fort Lauderdale, Miami, and some in

13   West Palm; and most of my career, I was a courtroom deputy or

14   relief courtroom deputy.  I worked briefly in the Clerk's

15   Office for maybe two years before that.

16   Q.   Ms. Jacoby, when it comes to the Fort Lauderdale courtroom

17   that Judge Altman has, are you familiar with the layout of that

18   courtroom?

19   A.   Yes.

20   Q.   And you're familiar with the different types of furniture

21   and items within that courtroom?

22   A.   Yes.

23   Q.   And are you familiar with the types of chairs that were

24   present at counsel table?

25   A.   Yes.

1    Q.   And how would you describe the chairs in question?

2    A.   The chairs assigned to counsel tables were large wooden

3    chairs with wheels with green, I want to say they were up

4    holstered green, kind of like a leather material.

5    Q.   And prior to trial today, did you inspect one of the chairs

6    that was in Judge Altman's courtroom at the time of November 7,

7    2019?

8    A.   Yes.

9    Q.   And when you inspected that, you were able to confirm that

10   this was the chair that was present in that courtroom at the

11   time?

12   A.   Yes.

13   Q.   Did you mark it in any way to confirm that that same chair,

14   if you were to see it again, would be the same chair that was

15   present at the time?

16   A.   Yes, I put a label, I signed and dated it.

17          MR. ALEXANDER:  Your Honor, with the Court's

18   permission, may I show the witness what has been marked as

19   Government's Exhibit 8?

20          THE COURT:  You may.

21          Any objection, Mr. Garland?

22          MR. GARLAND:  No objection.

23          THE COURT:  All right.

24          I have a question.  Is it Government's Exhibit 8 or 7?

25          MR. ALEXANDER:  That would be 8, Your Honor.

```
 1              THE COURT:  Okay.
 2   BY MR. ALEXANDER:
 3   Q.  Do you see any kind of marking on the chair with the
 4   exception of the exhibit sticker?
 5   A.  Yes.
 6   Q.  And what do you see?
 7   A.  A white label with my signature, my name printed, and the
 8   date.
 9   Q.  And did you mark this chair at the time that you inspected
10   it to confirm that this was the same chair in Judge Altman's
11   courtroom at the time?
12   A.  Yes.
13   Q.  And were these chairs -- and were the chairs that were
14   present, all of them were the same at each of the counsel
15   tables?
16   A.  Correct.
17   Q.  And that would include the prosecution table, as well as
18   the defense table?
19   A.  Yes.
20              MR. ALEXANDER:  Your Honor, at this time the Government
21   moves to admit what has previously been marked as Government's
22   Exhibit 8 into evidence.
23              THE COURT:  Any objection?
24              MR. GARLAND:  No objection.
25              THE COURT:  Government's Exhibit 8, the chair, is
```

```
 1    admitted into evidence.

 2            Mr. Alexander, I would just note your exhibit list

 3    marked that as Exhibit 7.

 4            MR. ALEXANDER:  Yes, Your Honor, I have an updated list

 5    now, I advised the Court of that.

 6            THE COURT:  Okay, thank you.

 7            (Government's Exhibit 8 received into evidence.)

 8    BY MR. ALEXANDER:

 9    Q.   Now, Ms. Jacoby, when it comes to Judge Altman's courtroom

10    located in Fort Lauderdale, the building itself, is that the

11    U.S. Federal Building and Courthouse located in

12    Fort Lauderdale?

13    A.   Yes.

14    Q.   Located in Broward County?

15    A.   Yes.

16    Q.   In the Southern District of Florida?

17    A.   Yes.

18    Q.   I'm going to show you --

19            MR. ALEXANDER:  Your Honor, if I may have one moment?

20            (Brief pause in the proceedings.)

21    BY MR. ALEXANDER:

22    Q.   Ms. Jacoby, I'm going to show you a photograph that's been

23    marked as Government's Exhibit 7.

24            MR. ALEXANDER:  Your Honor, may I approach the witness?

25            THE COURT:  You may.
```

1  BY MR. ALEXANDER:

2  Q.  Ms. Jacoby, do you know what that's a photo of?

3  A.  May I?

4  Q.  Yes, please.

5  A.  This is the United States Federal Courthouse in Fort

6  Lauderdale.

7  Q.  Is that a fair and accurate depiction of the courthouse

8  itself?

9  A.  Yes.

10      MR. ALEXANDER:  Your Honor, at this time the Government

11  moves to admit what's been previously marked as Government's

12  Exhibit 7 into evidence.

13      THE COURT:  Any objection, Mr. Garland?

14      MR. GARLAND:  No objection.

15      THE COURT:  Government's Exhibit 7 is admitted without

16  objection.

17      (Government's Exhibit 7 received into evidence.)

18      MR. ALEXANDER:  Your Honor, may I publish?

19      THE COURT:  You may.

20  BY MR. ALEXANDER:

21  Q.  Ms. Jacoby, what we're doing on the monitor right now, that

22  is the U.S. Federal Building and Courthouse in Fort Lauderdale,

23  Florida; is that correct?

24  A.  Yes.

25  Q.  And Judge Altman's courtroom was in this building at the

1    time on November 7 of 2019?

2    A.   Yes, and currently it still is.

3    Q.   As I would imagine, he has a chambers in Fort Lauderdale,

4    as well as in Miami?

5    A.   Correct.

6    Q.   I want to draw your attention to a trial that began on

7    October 30, 2019, and ended on November 7, 2019, United States

8    of America versus Christopher Tavorris Wilkins.

9         Do you recall that trial?

10   A.   Yes.

11   Q.   And were you present during that trial?

12   A.   Yes.

13   Q.   And were you serving as a courtroom deputy during the

14   course of that trial?

15   A.   Yes.

16   Q.   I want to draw your attention specifically to November 7,

17   2019.  Do you recall the verdict being returned that day?

18   A.   Yes.

19   Q.   And can you tell us what transpired at that moment?

20        So, beginning with the return of the verdict, did you read

21   the verdict?

22   A.   Yes, when I -- when the verdict was received by the

23   foreperson of the jury, it was handed over to myself, and I

24   handed it to the Judge to review, and then the Judge handed it

25   back to me to publish.

1   Q.   Now, the Judge in question on that day of trial was

2   Judge Dimitrouleas?

3   A.   Correct.

4   Q.   And that's because Judge Altman was unavailable in that

5   evening?

6   A.   Yeah, Judge Dimitrouleas was present for the publishing of

7   the verdict.

8   Q.   And did you read the verdict to the jury at that time?

9   A.   I did.

10  Q.   And after the verdict was read, what happened?

11  A.   After the verdict was read, I polled the jury.

12  Q.   And after polling of the jury -- and what is the purpose of

13  polling the jury?

14  A.   Polling of the jury is to ask each juror individually if

15  the verdict as read is their true verdict.

16  Q.   And did the jurors confirm that it was their true verdict?

17  A.   Yes.

18  Q.   And it was finding guilty on Counts 1, 3, 6 and 7?

19  A.   Correct.

20  Q.   As well as not guilty on the remaining counts?

21  A.   Correct.

22  Q.   And after the jury had been polled, what happened after

23  that?

24  A.   After the jury had been polled, an incident happened in the

25  courtroom with Mr. Wilkins.

```
 1   Q.   And you say an incident involving Mr. Wilkins, what does
 2   that mean?
 3   A.   Well, at the time the jury ended being polled and some of
 4   the jurors were exiting the jury box to go back into the jury
 5   room.  Mr. Wilkins was standing for the publishing of the
 6   polling of the jury, but he made several -- he picked up the
 7   chair he was sitting in and threw it towards the Government
 8   table and made several statements at the Government.
 9   Q.   Do you remember any of those statements?
10   A.   I do.  I don't remember word-for-word, but I remember a few
11   things that stood out in my head.
12   Q.   And what were they?
13   A.   Um, that he was going to, um, get the Government and kill
14   him, that he beat the charges, he was going to find him and
15   kill him -- something about his black car -- and he would find
16   him and kill him.
17        There was several statements made to that effect.
18   Q.   And you say "him," who is the him that he was referencing?
19   A.   The Government attorney was John McMillan.
20   Q.   And that would be Assistant U.S. Attorney John McMillan?
21   A.   Correct.
22   Q.   And, Ms. Jacoby, how did you feel at that moment when you
23   were observing everything?
24   A.   Well, everything happened so fast, I know at that moment I
25   reached to call for the Marshals' Office, so I have a silent
```

1    alarm under my desk, so I reached for that, and I also called

2    them on the phone at the time to alert them that they need to

3    come down here.

4    Q.   And during this time, after the chair was thrown, what did

5    you observe happening to the defendant, Christopher Tavorris

6    Wilkins?

7    A.   Well, when the chair was thrown towards the Government, he

8    also went to go, like, launch his body towards him as well, but

9    then at the time the two Marshals that were sitting in the row

10   behind Mr. Wilkins reached over and grabbed him to secure him

11   and to stop him from reaching the Government.

12   Q.   And did you see the level of resistance that Wilkins was

13   exhibiting at the time?

14   A.   I did.  And also at the time the court security officer had

15   to come over to assist them, so it was the two Marshals had to

16   try to restrain him and the court security officer; and then

17   after that, the Marshals from upstairs from the phone call I

18   made came through the door.

19   Q.   And was court still in session during all of this?

20   A.   Yes, court was still in session, and the jurors were --

21   most of the jurors were present for this, because only a few of

22   them made it into the hallway towards the jury room.

23       And court was in session, we hadn't finished the

24   proceedings yet.  We still had to -- the Judge still had to

25   pronounce the sentencing date and a few other matters.

```
 1   Q.   And in the courtroom at the time, can you describe where
 2   you were positioned?
 3   A.   So my area is right in front of the Judge, so it's similar
 4   to how it's set up here in this courtroom.  I was sitting right
 5   in front of the Judge, and the defendant's table is to my left
 6   catty-cornered from me.
 7   Q.   Were you able to see everything clearly from your vantage
 8   point?
 9   A.   I was -- it's a smaller courtroom than this.  Everything
10   was closer, so directly in front of me would have been the
11   Government's table -- well, would have been the podium and the
12   Government's table; and on the left side of the courtroom, if
13   I'm facing the back of the courtroom, would have been the
14   defendant's table, the galley, and the jury box would have been
15   to my right.
16   Q.   And, Ms. Jacoby, when it comes to the chairs that were
17   present at the counsel table in Judge Altman's courtroom, can
18   you describe -- just describe it in terms of its weight, if you
19   know the answer.
20   A.   The chairs are solid.  They're very heavy.  I mean, I don't
21   think -- I know like the bottom and it's all solid wood, so
22   these are old chairs, I don't think I could lift it up.
23        MR. ALEXANDER:  Your Honor, if I may have a moment?
24        THE COURT:  Yes.
25        (Brief pause in the proceedings.)
```

BY MR. ALEXANDER:

Q.   And, Ms. Jacoby, during the course of the trial with the defendant Christopher Tavorris Wilkins, he was wearing a suit during the entirety of the trial; is that right?

A.   I believe so.  I believe he was dressed appropriately for court.

Q.   And the only restrictions that he had, if you know, were on his legs?

A.   I really don't recall if he was -- had leg constraints on.  I believe that was the policy and I believe he did, because usually they will and the table will cover it, but I'm not 100 percent share if it was on or not.

Q.   In terms of any other restraints, did he have any hand restraints or anything of the sort?

A.   No.

Q.   Otherwise, he was free from the rest of the body, as far as you know?

A.   Correct.

Q.   Thank you, Ms. Jacoby.

        MR. ALEXANDER:  Your Honor, I have no further questions.

        THE COURT:  Thank you.  Mr. Garland?

        MR. GARLAND:  Thank you, Judge.

                        CROSS-EXAMINATION

BY MR. GARLAND:

1   Q.   Good morning, ma'am.

2   A.   Good morning.

3   Q.   Going back to November 7th of 2019, you've already said

4   this trial lasted for quite a bit of time, from October 30th to

5   November 7th?

6   A.   Correct.

7   Q.   Now, had the jury gone out the day before, on November 6th

8   of 2019?

9   A.   No.

10  Q.   When did they retire to deliberate?

11  A.   If I recall, I believe it was on November 7th.

12  Q.   At what time?

13  A.   I know Judge Altman had to leave, he had a phone call from

14  his wife, and I'm not 100 percent sure but it had to be closer

15  to the end of the day.  I don't know if it was 4:00 or 5:00,

16  I'm not really sure.

17  Q.   And did the jury come back with any questions?

18  A.   Yeah, we had juror questions.

19  Q.   Do you remember how many jury questions?

20       MR. ALEXANDER:  Objection.  Relevance.

21       THE COURT:  Overruled.

22       THE WITNESS:  I don't recall how many, but I know there

23  was several questions.

24  BY MR. GARLAND:

25  Q.   Now, in connection with the matters held in Federal court,

```
 1   you've described the role of a courtroom deputy, which is you?
 2   A.   Correct.
 3   Q.   But in court proceedings, is there also somebody called a
 4   transcriptionist or somebody who's keeping a record?
 5   A.   A court reporter.
 6   Q.   Okay.  And during the course of the trial that you're
 7   referring to on November 7th, was there a court reporter
 8   present at that time?
 9   A.   Yes.
10   Q.   And to your knowledge, was a transcript of that proceeding
11   prepared?
12   A.   Yes, there's always a court reporter in criminal
13   proceedings, whether they -- whether they transcribe the
14   proceedings, I don't know, but they're always taking it down in
15   court, live.
16   Q.   Have you reviewed that transcript in preparation for your
17   testimony?
18   A.   No.
19   Q.   Would you assume that transcripts prepared by an official
20   court reporter --
21          MR. ALEXANDER:  Objection.  Speculation.
22          THE COURT:  Well, let him finish his question.
23   BY MR. GARLAND:
24   Q.   Would you assume that the transcript prepared by an
25   official court reporter is accurate?
```

```
 1   A.   Ye --
 2           THE COURT:  Hold on.  What's your objection,
 3   Mr. Alexander?
 4           MR. ALEXANDER:  Speculation as to assumption.
 5           THE COURT:  Overruled.
 6           THE WITNESS:  Yes.
 7   BY MR. GARLAND:
 8   Q.   There was a recording made, a sound recording made in this
 9   case.  Did you have a chance to listen to the sound recording
10   before your testimony?
11   A.   Yes.
12   Q.   Okay.  When did you listen to that sound recording?
13   A.   On Monday.
14   Q.   Okay.  So having not looked at the trial transcript, I'm
15   assuming that you did not compare the sound recording to the
16   transcript?
17   A.   No, I haven't seen the transcript in this case.
18   Q.   Okay.  All right.  Now, in terms of the situation that you
19   recall, you said there was a chair, and this chair is now in
20   evidence?
21   A.   Yes.
22   Q.   Okay.  So this chair was thrown; am I correct?
23   A.   Correct.
24   Q.   All right.  And now that chair is thrown, and was there a
25   defense attorney there?
```

1    A.   Yes.

2    Q.   Now, just suppose that these two chairs that happen to be

3    here, that one chair is the chair which Mr. Wilkins sat and one

4    chair is the chair in which the defense attorney was sitting;

5    would that be a fair situation?

6    A.   Yes.

7    Q.   Would those two chairs be similar in distance to what we

8    have here?

9    A.   You mean to each other?

10   Q.   Yes.

11   A.   Correct.

12   Q.   So at the time that the jury was leaving the courtroom, was

13   everyone in the courtroom asked to stand?

14   A.   Yes.

15   Q.   Did Mr. Wilkins stand?

16   A.   Yes.

17   Q.   Did his attorney stand?

18   A.   Yes.

19   Q.   Did his attorney stand next to Mr. Wilkins?

20   A.   Yes.

21   Q.   Now, the prosecutor would have been at a separate table; am

22   I right?

23   A.   Correct.

24   Q.   And in between the prosecutor and Mr. Wilkins was the

25   defense attorney; am I right?

```
 1   A.   Yes.
 2   Q.   Okay.  So in order for a chair to go from Mr. Wilkins to
 3   the prosecutor, it would first have to pass through or over the
 4   defense attorney?
 5   A.   Correct.
 6   Q.   Okay.  Now, that defense attorney, do you recall whether he
 7   ducked out of the way?
 8   A.   It happened so fast, actually the chair went like right
 9   over him, Mr. Chapman.
10   Q.   So your recollection is that the chair was thrown by
11   Mr. Wilkins over the top of --
12   A.   Or right behind him.  It was right close proximity to
13   Mr. Chapman.
14   Q.   Okay, but let's really drill down into what you remember.
15   A.   Uh-huh.
16   Q.   Okay.  The defense attorney, Ron Chapman, is there
17   standing.  Mr. Chapman's a pretty big man; isn't he?
18   A.   I think -- I recall him being tall, I don't know about big,
19   but I recall him being tall.
20   Q.   And the chair, as you recall -- do you recall whether the
21   chair went over Ron Chapman, or Mr. Chapman moved out of the
22   way, or the chair went behind Mr. Chapman?
23   A.   I don't recall specifically, no.
24   Q.   Okay.  But let's just say, hypothetically, Mr. Chapman did
25   not move out of the way, then the chair would have been
```

1   targeted at Mr. Chapman; wouldn't you agree?

2   A.   No.

3   Q.   And the only way that could be is if the chair was going

4   over the top of Mr. Chapman?

5   A.   It was thrown in the direction of the Government.

6   Q.   But Mr. Chapman was in the direction of the chair; wasn't

7   he?

8   A.   Mr. Chapman was located right next to Mr. Wilkins; correct?

9   Q.   Right.  So the chair is going in the direction of the

10   defense attorney, Ron Chapman, and also in the direction of the

11   prosecutor table; right?

12   A.   Yes.

13   Q.   So it's going in the direction of both of them?

14   A.   I mean, I wouldn't say that.  That wasn't my recollection,

15   because Mr. Chapman was directly next to him.  It's a very

16   small courtroom, and the space where the Government is, is very

17   close to where Mr. Chapman was standing; and it was thrown

18   towards the Government's table, and the statement that was

19   being said at the moment was derogatory towards the Government.

20   Q.   Okay.  And there was a video recording made of that

21   courtroom?

22   A.   Yes.

23   Q.   Did you have a chance to watch that video recording in

24   preparation for your testimony today?

25   A.   Yes, I did on Monday.

1  Q.  All right.  So, would you agree that what's depicted on the

2  video is a fair and accurate representation of what actually

3  happened?

4  A.  Yes.

5  Q.  Okay.  And would you also agree that the video has not been

6  changed since the day this happened?

7  A.  Yes.

8  Q.  Okay.  Now, seated behind Mr. Wilkins, when everyone stood

9  for the jury to leave were two court security officers.

10      Do you recall that?

11  A.  Yes.

12  Q.  Do you recall one of those court security officers was

13  Mr. Chipman?

14  A.  Yes.

15  Q.  And the other one was Mr. Staples?

16  A.  Yes.

17  Q.  Both are large men?

18  A.  Mr. Staples is not large.

19  Q.  Okay.  So as soon as the chair was being lifted, isn't it

20  true that Deputy Chipman acted to prevent that from happening?

21  A.  I don't recall that.  I would have to see the video again.

22  I only saw the video very briefly, like once or twice, I really

23  didn't -- haven't seen it recently.

24  Q.  Okay.  All right.  So, whatever happened -- ultimately, did

25  Deputy Chipman grab Mr. Wilkins and pull him over the Bar into

1  the pew area?

2  A.   That's what I recall, yes.

3  Q.   And at the time that Mr. Wilkins was in the pew area, was

4  he facedown on the pew being brought under control by the court

5  security officers?

6  A.   I do -- what I recall is when they grabbed him, they pulled

7  him over, I'm pretty sure he was facedown, but I can't --

8  without seeing the video, I don't really remember exactly where

9  his face was located.

10  Q.   Fair enough.  Now, at some point do you recall whether

11  Mr. Wilkins was handcuffed by the court security officers?

12  A.   Yeah, I'm pretty sure he was restrained.  I don't recall

13  specifically that, no.

14  Q.   If you don't recall specifically --

15  A.   I don't.

16  Q.   -- so --

17  A.   Without seeing the video, I really don't recall that part

18  of it.

19  Q.   Now, we know, because Judge Altman had a situation, another

20  judge was receiving the verdict?

21  A.   Yes.

22  Q.   Now, it was necessary, under the court rules, for

23  Judge Dimitrouleas to adjudicate Mr. Wilkins guilty based upon

24  the verdict that was received; right?

25  A.   Yes.

1  Q.   Now, can you describe where Mr. Wilkins was when Judge

2  Dimitrouleas adjudicated him guilty in accordance with the

3  Court procedures?

4  A.   At that point, I was in the jury room because

5  Judge Dimitrouleas asked me to go into the jury room to check

6  on the jurors and give them their certificates, so I'm not sure

7  I was in the courtroom at that time.

8  Q.   Okay, fair enough.

9       Now, going back to the chair, once the chair has left

10  Mr. Wilkins' hands, did you see Mr. Wilkins with any weapon in

11  his possession?

12  A.   No.

13  Q.   Okay.  So the only thing that Mr. Wilkins had at that time

14  that could have been a weapon is the chair that's in evidence?

15  A.   Yes.

16  Q.   But once that chair is gone, he's no longer armed; right?

17  A.   No.

18  Q.   Now, you said that Mr. Wilkins made a motion toward a

19  particular direction; right?

20  A.   Correct.

21  Q.   So I think the question is, do you know whether Mr. Wilkins

22  had leg shackles on at that particular time?

23  A.   I really don't because the -- normally, in the normal

24  course of a trial when a defendant is in custody, they are

25  shackled.  There was a time where if an attorney asked for it

1   to be removed, and it was up to the Judge if those shackles

2   were removed during those proceedings.

3       I don't remember in this instance if that was the case or

4   not, so I don't recall him having shackles on.

5   Q.  Okay.  So, as you were reacting at that time, you didn't

6   know whether Mr. Wilkins' legs were shackled or not shackled;

7   right?

8   A.  Correct.

9   Q.  Okay.  But that's something the prosecutor would have

10  known; don't you think?

11  A.  I'm not really sure.  I think, really, only the Marshals --

12  the United States Marshals knew and at times the Judge, the

13  court security officer.  I'm not sure if the Government's aware

14  of those details from the Marshals' Office.

15  Q.  But if a person is shackled, the whole purpose of that is

16  to maintain control over that individual?

17  A.  Yes.

18  Q.  Okay.  In this case, you've said that certain things were

19  said or directed to the prosecutor.

20      Now, obviously, you can't read somebody's mind?

21  A.  Correct.

22  Q.  So the statements that were made, would you agree that some

23  of those statements were made while Mr. Wilkins was facedown on

24  the pew?

25  A.  Yes.

1    Q.   And when a person's facedown on the pew, wouldn't it be

2    difficult to see that person's face?

3    A.   Well, I know some of the statements weren't only made when

4    the chair was being thrown.  It was when he was in that first

5    row, the pew, whether he was facedown or not, I don't recall.

6         But he was also brought back to the defendant's table so

7    Judge Dimitrouleas could finish his adjudication.  So I'm not

8    sure right now if some of the statements were made as he was

9    walking back or when he was in the pew, that part -- at that

10   point, I was in the jury room.

11   Q.   Okay.  So, in terms of going to the jury room, do you

12   recall where Mr. Wilkins was when you then left his presence

13   and went into the jury room?

14   A.   Yeah, because there was more statements made than what I

15   heard.  I mean, I heard a lot, I just don't remember

16   specifically word-for-word all of them.  There were a lot of

17   statements made from the time I was in the courtroom until I

18   got to the jury room.

19        But when I got to the jury room and Judge Dimitrouleas

20   asked me to go back there and give them the certificates, I

21   would have to look at the video, but I believe at that point he

22   was still in the first row, but I'm not 100 percent, I would

23   have to look at the video.

24   Q.   Okay.  So --

25             MR. GARLAND:  That's all the questions I have.  Thank

1    you very much.

2            THE WITNESS:  You're welcome, sir.

3            THE COURT:  Thank you, Mr. Garland.

4            Any redirect?

5            MR. ALEXANDER:  Yes, Your Honor.

6                      REDIRECT EXAMINATION

7    BY MR. ALEXANDER:

8    Q.   Now, Ms. Jacoby, in your capacity as a courtroom deputy,

9    you work for Judge Altman; is that right?

10   A.   Yes.

11   Q.   You don't work for the U.S. Attorney's Office?

12   A.   No.

13   Q.   And you don't work for any defense firm or defendant?

14   A.   No.

15   Q.   So your role is specifically to ensure that everything

16   operates smoothly on that day on November 7, 2019?

17   A.   Correct, I work for the Clerk of Court.

18   Q.   Now, as Mr. Garland had asked you, when the jury was

19   leaving the room, everyone stood up?

20   A.   Yes.

21   Q.   And that included the defendant?

22   A.   Yes.

23   Q.   But at that moment when the chair was thrown, only one

24   person threw a chair?

25   A.   Correct.

```
 1   Q.   Only one person was yelling threats?

 2   A.   Correct.

 3   Q.   And that was the defendant, Christopher Tavorris Wilkins?

 4   A.   Yes.

 5   Q.   And when it comes to the questioning of -- or the position

 6   of the defense attorney, Ron Chapman, did the Defendant Wilkins

 7   strangle his defense counsel?

 8   A.   No.

 9   Q.   Did he punch him?

10   A.   No.

11   Q.   Did he do any sort of physical harm to a guy that is right

12   next to him?

13   A.   No, not at all.

14   Q.   And as you testified, he lifted the chair over his head?

15   A.   Correct.

16   Q.   He didn't keep it body length or at least right in front of

17   him?

18   A.   No.

19   Q.   And he didn't swing it side-to-side?

20   A.   No.

21   Q.   But he threw it?

22   A.   Yes.

23   Q.   And where did it ultimately land?

24   A.   It landed right -- I thought it hit Mr. McMillan.  But it

25   landed right in front of Mr. McMillan, the corner of the table,
```

1    and I guess there was a chair there, but I believed it hit

2    Mr. McMillan, in my -- that's what I viewed.

3    Q.   And then during the course of the making of the threats

4    about to kill and to, "When I beat this, I'm going to kill

5    you," at any point did he look at his attorney and say, "I'm

6    going to kill you"?

7    A.   Not that I recall, no.

8    Q.   Where was he looking most of that time?

9    A.   At the Government table at Mr. McMillan.

10   Q.   And when he was making these statements and fighting off,

11   or at least resisting law enforcement and they're trying to

12   restrain him, was he looking at Mr. McMillan when he was making

13   these statements?

14   A.   Yes.

15   Q.   And when it comes to, you know, whatever weapon that he

16   used -- I mean, Mr. Garland had asked you if he had any weapon

17   besides the chair.  Do you recall that question?

18   A.   Yes.

19   Q.   But for someone in leg shackles who is a pretty good

20   distance away from the prosecutor, not too far, but he's not --

21   obviously, John McMillan was not next to him; is that correct?

22   A.   Correct.

23   Q.   What the defendant did grab was this chair, Government's

24   Exhibit 8; is that correct?

25   A.   Yes.

1   Q.   And that was what he ultimately threw?

2   A.   Correct.

3   Q.   He didn't throw a piece of paper?

4   A.   No.

5   Q.   He didn't throw a pen?

6   A.   No.

7   Q.   He didn't throw a book?

8   A.   No.

9   Q.   It was this chair, an incredibly heavy, wooden chair at the

10  direction of the prosecutor and then afterwards was making

11  threats towards him?

12  A.   Correct.

13          MR. ALEXANDER:  Thank you, Ms. Jacoby.

14          Your Honor, no further questions.

15          THE COURT:  Thank you, Ms. Jacoby.  You may be excused.

16          THE WITNESS:  Thank you.  Thank you, Your Honor.

17          Shall I wait outside or am I excused from the trial?

18          THE COURT:  Mr. Alexander, is Ms. Jacoby excused fully?

19          MR. ALEXANDER:  Yes, Your Honor.

20          THE COURT:  You may be excused.  Thank you.

21          THE WITNESS:  Thank you, Your Honor.

22          (Witness excused.)

23          THE COURT:  All right, Mr. Alexander.

24          MR. ALEXANDER:  Your Honor, at this time the

25  Government rests.

THE COURT: All right.

Ladies and gentlemen, we are going to take a longer morning break today until, approximately, 11:00 a.m. It is currently 10:27.

All rise for the jury.

(Jury exited courtroom at 10:27 a.m.)

THE COURT: You may be seated.

We're going to take a 10-minute bathroom break for court personnel, so we'll see you all at, approximately, 10:40.

(Recess taken from 10:28 a.m. to 10:44 a.m.)

COURTROOM DEPUTY: All rise. Court is back in session.

THE COURT: You may be seated. All right. Let's finish our charge conference focusing now on the verdict form.

Mr. Garland, any objections?

MR. GARLAND: Judge, on the verdict form, for Count 1A, it says "deadly or dangerous" --

THE COURT: I can't hear you well.

MR. GARLAND: On Count 1A of the verdict form, it says "deadly or dangerous." Count 1B, "deadly or dangerous."

We would repeat the same objections for the same reasons, that it should be "deadly and dangerous."

THE COURT: All right, that's denied for the reasons stated earlier.

MR. GARLAND: And I'm more inquiring at this point, in Count 2, paragraph 2A, if the jury were to find Mr. Wilkins

1    guilty on 2A, that's the misdemeanor version?

2           THE COURT:  Let's see.  Yes, this is, I think, maybe

3    not as clear as it needs to be.

4           Mr. Alexander, does this need to be reoriented, in your

5    view?

6           MR. ALEXANDER:  I actually don't, Your Honor.

7           I think this is very similar to what we've seen, for

8    example, when we look at a Title 18, United States Code,

9    Section 924(c) count, where the jury has to find that the

10   defendant possessed a firearm, or brandished a firearm, but

11   they have -- or use and carry a firearm.  They have to make a

12   specific finding to determine which it is, and I think that's

13   kind of how it's outlined here.

14          So, ultimately, the jury can say, yes, we find that the

15   Government's proven its case beyond a reasonable doubt.

16   Subsequently, they now need to make a finding as to which of

17   these two beyond a reasonable doubt, and that's going to be

18   necessary in order for there to be finality to that

19   decision-making.

20          So I think the way it's organized is fine, because they

21   still have to make that additional finding in 2B.

22          THE COURT:  I see, okay.  So, Mr. Garland, let's turn

23   back to you, what's your particular objection to the format?

24          MR. GARLAND:  Judge, I think that 2A, if the jury came

25   back guilty on 2A, then that would be the misdemeanor, as far

1    -- but --

2          THE COURT:  I mean, let me understand.  So if they

3    check the box yes for 2A, then they have to proceed to address

4    2B?

5          MR. GARLAND:  They would, those were the enhancements.

6          THE COURT:  Okay.

7          MR. GARLAND:  And instead of the yes or no, it has to

8    be a guilty or not guilty.  That's the traditional

9    nomenclature.  And then the enhancing factor, which is

10   presented on this form, would be 2B, they would either say yes

11   on the first one or yes on the second, but --

12         THE COURT:  There needs to be a way to differentiate

13   between the threat to murder versus a threat to assault, so I

14   think that needs to be broken out as it is in 2B.

15         The question is whether there needs to be any sort of

16   maybe melding together of 2A and 2B.  But the simple assault, I

17   think, is covered in 1C, which is the lesser-included offense

18   of Count 1.

19         So I don't believe that 2A is representative or

20   standing in for the simple assault version; is that your

21   understanding, Mr. Alexander?

22         MR. ALEXANDER:  That's correct, Your Honor.  If I can

23   refer the Court to the actual statute itself, it notes that the

24   penalty provision is that a threat made in violation of this

25   action shall be punished up to 10 years, except that

```
 1    imprisonment for a threatened assault shall not exceed six

 2    years.

 3           So, in the statute, an individual threatened to murder,

 4    kidnap, or assault -- obviously, kidnap is not implicated in

 5    this case, but in this particular instance there is no

 6    misdemeanor offense, as I'm aware.

 7           And the reality is the jury has to make a

 8    determination, either -- beyond a reasonable doubt, all of them

 9    have to agree -- threat to murder, threat to assault, or both,

10    or neither, but they have to reach that conclusion.

11           But the initial question is, did the Government prove

12    its case beyond a reasonable doubt that the defendant

13    threatened a law enforcement officer, that's the crime.

14           What they need to then do is articulate which threat it

15    is, either, or both, or neither, so I think it's fine in its

16    current formulation.

17           THE COURT:  All right.  Mr. Garland, you may present

18    any final argument on this point, and I will take it under

19    advisement.

20           MR. GARLAND:  Judge, the defense maintains that this

21    statute, which is 18 USC, Section 115, that it has three levels

22    of offense:

23           One is a misdemeanor, simple assault; and one is a

24    six-year felony, which would be the threat to assault; and one

25    would be a 10-year felony, which is a threat to murder.
```

1          So that is what occasioned my question about what is

2     the effect of 2A, and it looks to me like 2A, whatever its

3     terminology, would result in a conviction for simple assault, a

4     misdemeanor.

5          And that 2B, would be the additional findings necessary

6     to have felonies at different level, either a six-year level or

7     10-year level, depending upon the finding.

8          One of my problems here is that it doesn't call it

9     "simple assault" and it doesn't say "guilty" or "not guilty"

10    anywhere in this.

11         THE COURT:  Well, I think in contrast to 111, which

12    does set forth three separate crimes, Title 18, United States

13    Code, Section 115, doesn't operate in that fashion.

14         I think it sets forth various means with enhanced

15    penalties, depending on the nature of the threat, but I don't

16    think it warrants, essentially, a lesser-included offense in

17    Count 2, in the same way that we would see in Count 1.

18         So I'm going to finalize the ultimate language, but I

19    don't see at this point anything legally incorrect about the

20    manner in which the verdict form is drafted as to Count 1 or

21    Count 2, although, I note your arguments in opposition,

22    Mr. Garland.

23         Let's now hear any appropriate motions.

24         MR. GARLAND:  Your Honor, at this point I'd move for,

25    on behalf of Mr. Wilkins, a judgment of acquittal on Count 2.

1          The concept of assault, we would argue, involves the

2    person having some apprehension of fear.  They don't have to be

3    in actual fear, but they have to be in actual apprehension.

4          And the evidence in this case shows that the

5    prosecutor, John McMillan, never knew that a chair was actually

6    thrown toward his direction, so we would submit that the

7    evidence fails because of the lack of proof of an apprehension

8    on the part of the victim.

9          Now, there's a second part of what Mr. McMillan

10   testified to.  He said that the defendant was charging at him

11   or running at him, but at that particular point Mr. Wilkins did

12   not have any weapon in his hand, he was unarmed in any way, and

13   if that were to constitute an assault, resulting in some

14   apprehension, then we would submit that that would be only a

15   misdemeanor; so, consequently, we would submit that the Count 1

16   should not be submitted to the jury on anything other than the

17   misdemeanor.

18         But going on, we submit that the evidence in this case

19   is insufficient to show that the chair is a deadly or dangerous

20   weapon, or a deadly and dangerous weapon, based upon the

21   character of the chair and the manner of its use; and the

22   general idea being that the evidence seems to show that while

23   the chair was thrown in the direction of the prosecutor's

24   table, there was an attorney standing in between -- named Ron

25   Chapman -- and that the chair fell short, for whatever reasons,

1    it didn't touch the prosecutor, John McMillan.

2           And there were other situations put in place, the leg

3    shackles on the defendant's feet, the presence of two court

4    security officers, they reduced the likelihood that any person

5    could really launch a chair as heavy as described in this

6    evidence, and the chair is actually in evidence.

7           So we submit that the evidence is insufficient to

8    establish a chair is a deadly or dangerous, and certainly not a

9    deadly and dangerous weapon.

10          We move for judgment of acquittal on the basis that the

11   Government's failed to prove that Mr. Wilkins was specifically

12   targeting the Assistant United States Attorney John McMillan,

13   which is alleged in the indictment.

14          The evidence in this case, most recently today, the

15   courtroom's officer testified that Mr. Ron Chapman was actually

16   standing in the way.  There's other evidence in this case,

17   there's a video showing Ron Chapman moving out of the way.

18          But at the time that the chair was picked up to be

19   thrown, it was going in the direction of Ron Chapman.

20          Now, it may be true, the evidence suggests, that the

21   prosecutor's table is also in that direction, but the fact that

22   both are in the same direction does not establish, by itself,

23   who the chair was being directed toward.

24          We would also broach the subject that on Count 1, the

25   very charge of Count 1 was the subject of sentencing

1    enhancements in the earlier case.  Mr. Wilkins received

2    210 months in prison, based upon a number of sentencing

3    enhancements.

4         The Judge in that case specifically addressed the

5    events that took place in this trial, and he actually asked

6    counsel whether there was a pending prosecution, which at that

7    time there was not, and there were certain enhancements that

8    resulted in a much longer sentence, and they were recently

9    affirmed by the Eleventh Circuit, a matter which the Court has

10   already noticed in previous rulings.

11        So, in this case, the defense submits that there is a

12   double jeopardy problem with Count 1 with the penalty that's

13   already been imposed in the prior sentencing.

14        THE COURT:  Okay.  Thank you.  Any other arguments in

15   support of your Rule 29 motion?

16        MR. GARLAND:  Yes.  On Count 2, there's a threat.  The

17   essence of the threat is a threat to murder, and "murder" is a

18   very specific term.  It's more than the term "to kill."

19        There's evidence in this case that Mr. Wilkins said the

20   word "kill," but the term "kill" and the term "murder," while

21   all murders can involve killing, not all killings involve

22   murder, and I would submit that the evidence on the threat with

23   intent to murder is insufficient because of the lack of proof

24   of what is meant by "murder."

25        Also, the defense moves for judgment of acquittal on

1    Count 2 because there was no realistic possibility of that

2    being carried out during the course of that proceeding, and to

3    the extent that the statement might involve a future act, it

4    would be a conditional statement; and we submit that a

5    conditional statement, the "if/then" scenario makes it not a

6    direct threat, it makes it a conditional statement which does

7    not constitute a threat prosecutable under the statute,

8    Your Honor.

9           Those would be the grounds for the judgment of

10   acquittal.

11          THE COURT:  Thank you, Mr. Garland.

12          Let's take these up in some order.

13          Mr. Alexander or Ms. Latta, who will be addressing

14   these arguments?

15          MR. ALEXANDER:  I will, Your Honor.

16          THE COURT:  All right.  Let's start with the argument

17   that, as I understand it, because Mr. McMillan didn't know at

18   that particular moment when the chair itself was being thrown

19   that that -- what I'm hearing -- would negate criminal

20   liability under this indictment.

21          MR. ALEXANDER:  Your Honor, when we look at the

22   definition of "forcible assault," it's an intentional threat or

23   attempt to cause serious bodily injury when the ability to do

24   so is apparent and immediate.

25          When focusing on the first element, the defendant

```
1    forcibly assaulting another person, there isn't a requirement

2    that the person actually perceives it.  The emphasis is on the

3    acts of the defendant; did he forcibly assault someone; did he

4    intentionally threaten or attempt to cause serious bodily

5    injury?

6              The evidence in this case when considering in the light

7    most favorable to the Government and all inferences --

8              THE COURT:  Slow down, please.

9              MR. ALEXANDER:  I apologize, Judge.

10             In considering all reasonable inferences in the

11   Government's favor, that's indicative that this element can be

12   met and the Government has established a prima facie case to

13   that effect.

14             The perception itself, or at least the focus of this

15   charge, is focusing on whether or not the defendant attempted

16   to cause serious bodily injury --

17             THE COURT:  Slow down.

18             MR. ALEXANDER:  My apologies, Judge.

19             THE COURT:  When you're reading, it's quite difficult

20   to transcribe, so...

21             MR. ALEXANDER:  I understand, Your Honor.  I'm a fast

22   speaker, and I'll work on that.

23             THE COURT:  Okay.

24             MR. ALEXANDER:  So when we look at the "forcible

25   assault" definition, there is the attempt to cause serious
```

1    bodily injury.  From the evidence in this case, it is

2    undisputed that that is exactly what is happening.  You pick up

3    this heavy wooden chair, and I say "you," in reference to the

4    defendant, hoist it over his head, and he launches it at the

5    AUSA.  That is the attempt to cause serious bodily injury.

6         And, moreover, as the instruction also notes, the

7    victim doesn't have to be injured, and a forcible assault

8    requires -- sorry, the threat or attempt doesn't have to be

9    carried out and the victim doesn't have to be injured.

10         So the emphasis here is on the act of the defendant,

11   did he forcibly assault?

12         Now the definition includes intentional displays of

13   force that would cause a reasonable person to expect immediate

14   and serious bodily harm, or death.

15         It doesn't focus on solely the subjective nature of the

16   victim, but in its totality the evidence is sufficient to

17   proceed forward on this charge based on the definition set

18   forth in the jury instructions and the elements of the statute.

19         THE COURT:  All right.  Thank you.

20         On the argument that because Mr. McMillan didn't see in

21   that particular moment the chair being hurled negates criminal

22   liability, I'm going to reject that argument.

23         As I read the law in this offense, it includes any

24   intentional display of force that would cause a reasonable

25   person to expect immediate and serious bodily harm or death;

```
 1    and so, the fact that subjectively the victim didn't know at
 2    that singular instance and learned only moments later, I don't
 3    think would warrant a Rule 29 motion.
 4            A reasonable person, under the facts and circumstances
 5    here, I think a reasonable jury could conclude, constitutes a
 6    forcible assault, and so that argument the Court does not find
 7    persuasive.
 8            Let's turn next to the issue of the chair itself and
 9    whether it can constitute a deadly or dangerous weapon.
10            Any argument on that point, Mr. Alexander?
11            MR. ALEXANDER:  Yes, Your Honor.  When relying on the
12    definition, a "deadly or dangerous weapon" includes any object
13    that can cause death or present a danger of serious bodily
14    injury.
15            The phrase "any object" is incredibly important because
16    it focuses on the reality that any object can be weaponized.
17    We can look at any object that is simple, a pen, a book, or any
18    other simple object, they're not weapons.
19            A chair is not a weapon, in and of itself, but what
20    matters is the manner in which it's used.
21            So, in this case, was the object, a chair, did it
22    present a dangerous serious bodily injury, and the answer is
23    yes, based on the manner it was used by the defendant; and
24    there is a definition on what it means to use a weapon.
25            This defendant possessed the chair and intentionally
```

1    displayed it during the forcible assault.

2         In this specific case, he threw it directly at the

3    AUSA; and that, based on its weight, based on the descriptions

4    provided of it and the fact that any juror can go ahead and

5    lift it, but we have testimony that indicates that it is a

6    heavy chair.  This isn't like -- in fact, it was Officer

7    Chipman that says that the weight of this chair is similar to

8    multiple chairs in this courtroom combined.

9         THE COURT:  All right.  Thank you.

10         So weighing the evidence in the light most favorable to

11   the Government, and resolving any conflicts in the evidence in

12   favor of the Government, the Court is going to reject the

13   argument that the chair in this case that was thrown by the

14   defendant couldn't be perceived by a reasonable jury as a

15   deadly or dangerous weapon, given that such phrase means,

16   quote:  "Any object that can cause death or present a danger of

17   serious bodily injury."

18         And I think here the facts presented with respect to

19   the weight of the chair, the size of the chair, and the manner

20   in which it was thrown would lead a reasonable person to

21   believe that it satisfies that definition.

22         Let's move on then to the next argument in support of

23   Mr. Garland's motion, which is that the defendant wasn't

24   targeting J.M., in particular, but, rather, was directing the

25   chair-throwing to his attorney.

1          Mr. Alexander?

2          MR. ALEXANDER:  Your Honor, there's no evidence that

3    the chair was targeted at the attorney.  In fact, there was

4    more than ample evidence that the target was John McMillan.

5          And based upon all the evidence there and the evidence

6    taken in the light most favorable to the Government and all

7    reasonable inferences in the Government's favor, there is no --

8    there is a prima facie case that the target of the attack was

9    John McMillan.

10         THE COURT:  All right.  I agree with the Government, I

11   think there is ample evidence to support that the acts were

12   done in a manner to target J.M., and, in any event, there is

13   certainly enough for a jury to conclude as much, even if the

14   defendant has presented some potential factual possibilities in

15   a different direction.

16         Now, with respect to the fact that the defendant was

17   wearing leg irons and was restrained at some point, do you have

18   anything to add to that, Mr. Alexander?

19         MR. ALEXANDER:  No, Your Honor, it doesn't affect the

20   forcible assault because leg irons did not preclude the

21   defendant from throwing the chair and then lunging forward

22   towards John McMillan.

23         There's been testimony that an individual is not

24   incapable of moving, running or acting otherwise in a motion

25   towards an individual in leg irons, so he wasn't shackled to

1    the ground, shackled to a permanent object.

2         THE COURT:  All right.  The Court's going to find that

3    although there is some evidence that the defendant was

4    wearing -- I'm sorry, that there is evidence that he was

5    wearing leg irons that, in and of itself, although it may have

6    limited his movement, there was testimony from Mr. Chipman, for

7    example, that such restraints don't prevent an inmate from

8    moving forward and charging forward, even if they can't run

9    very quickly, they can still move forward and present a risk

10   until they're fully restrained and removed from the courtroom.

11        Now, I think there's this argument about the double

12   jeopardy issue, which, I think, essentially, has been ruled

13   already on by the Court in its order denying the defendant's

14   motion denying the motion to dismiss indictment.

15        Anything further on that, Mr. Alexander?

16        MR. ALEXANDER:  No, Your Honor, just to point out

17   exactly what you had said, this matter has been briefed by the

18   parties and the Court has already issued an order denying the

19   motion to dismiss the indictment on double jeopardy grounds.

20        THE COURT:  All right, Mr. Garland, your argument at

21   this point, does it differ in any respect as it was already

22   ruled upon?

23        MR. GARLAND:  The argument on Count 1 or the Count 2,

24   the double jeopardy argument?

25        THE COURT:  Yes, sir.

 1            MR. GARLAND:  It does not.

 2            THE COURT:  Well, pursuant to the Court's prior ruling,

 3    I'm going to reject any Rule 29 arguments on the basis of a

 4    double jeopardy violation.

 5            Now, moving to the argument as to Count 2, what I'm

 6    hearing is that because the defendant said the word "kill" and

 7    not "murder," that makes a legally significant difference.

 8            Mr. Alexander, any response?

 9            MR. ALEXANDER:  Your Honor, it's not legally

10    significant.  The statute focuses on the threat to murder, it

11    doesn't state that a specific individual, and a jury can

12    perceive from the use of the word "kill," that it is

13    interchangeable with that phraseology.

14            The act itself is to cause serious -- to cause death,

15    essentially, is what we're looking at based on the language

16    there.  The jury can look from the definitions included on this

17    specific instruction to determine that the defendant knowingly

18    threatened to murder the individual described or to assault the

19    individual described.

20            THE COURT:  All right.  Anything further on that point,

21    Mr. Garland?

22            MR. GARLAND:  No, ma'am.

23            But I did omit saying, too, two of the arguments on

24    Count 2, one being that the evidence is insufficient to show on

25    Count 2 that the defendant was targeting Mr. McMillan, and his

```
 1    comments, whatever those comments were, and the other being the
 2    double jeopardy argument on the same grounds set for Count 1.
 3              THE COURT:  Okay, thank you.
 4              I will also note on the targeting point that there is
 5    evidence in the form of jail calls in which the defendant is
 6    heard stating that he threw a chair at the prosecutor.
 7              Let's see.  Are there any other arguments that I have
 8    overlooked, Mr. Garland?
 9              MR. GARLAND:  Just what I had said a moment ago about
10    targeting and double jeopardy as to Count 2.
11              THE COURT:  Okay.  Well, I think for the same reasons
12    that the targeting argument fails under Count 1, it would fail
13    under Count 2 for purposes of your Rule 29 motion, accepting,
14    of course, all reasonable inferences to support the
15    Government's case.  All right, I think we have adequately
16    covered your Rule 29 argument.
17              Anything further on that, Mr. Garland?
18              MR. GARLAND:  No, ma'am.
19              Are we ready for closing argument?
20              THE COURT:  On that point, how much time do the parties
21    request?
22              MR. ALEXANDER:  Your Honor, the Government would ask
23    for 30 for its first close and then 20 for its rebuttal.
24              THE COURT:  Mr. Garland, what's your request?
25              MR. GARLAND:  I'll ask for the same, but I only get one
```

1   closing.

2           THE COURT:  All right.  I think 50 minutes is excessive

3   for the length of this trial, we will go with 40 minutes per

4   side and the Government can divide it up as you wish.

5           On the verdict form, the Court's going to recess very

6   briefly to finalize that.

7           Having considered the arguments, I'm going to stick

8   with what is in the draft instructions for Count 2.  I think

9   it's a correct statement of the law and it requires the jury to

10  identify specifically the nature of the threat, while also

11  concluding that there was, in fact, a threat of a Federal law

12  enforcement officer.

13          So if you could all give the Court just a few moments

14  to finalize the jury instructions and the verdict form.

15          In the meantime, we will gather the jurors.

16          Mr. Garland, will there be a defense case?

17          MR. GARLAND:  I met with the client after court

18  yesterday and he indicated that he would not be testifying,

19  given the overall circumstances of this prosecution, the Court

20  may wish to inquire further.  But I have recommended that he

21  not, and I recommended that we not submit any other evidence,

22  Your Honor.

23          THE COURT:  All right.  Thank you.

24          Mr. Wilkins, you do have a right to testify if you

25  wish, you are not required to.

```
 1              Do you wish to testify in this case?

 2              DEFENDANT WILKINS:  No.

 3              THE COURT:  All right.  Have you made that decision

 4    knowingly and voluntarily?

 5              DEFENDANT WILKINS:  Yes.

 6              THE COURT:  Has anybody forced you to make that

 7    decision?

 8              DEFENDANT WILKINS:  No.

 9              THE COURT:  All right.  Well, then, we are in a brief

10    recess, I will see the parties momentarily.

11              COURTROOM DEPUTY:  All rise.

12              (Recess taken from 11:11 a.m. to 11:18 a.m.)

13              COURTROOM DEPUTY:  All rise.  Court's back in session.

14              THE COURT:  The Court is currently making the

15    parties -- I'm sorry, making available to the parties the final

16    jury instructions.  You may be seated.

17              Mr. Alexander, how will you be separating your time, or

18    do you want us just to do 40 minutes and let you know how much

19    time remains?

20              MR. ALEXANDER:  Your Honor, we're going to aim for

21    25/15.  I would ask for a five-minute notice from the Court.

22              MS. LATTA:  If the Court will indulge me, Your Honor,

23    I will take a two-minute notice as to the 15 minutes.

24              THE COURT:  Two minutes on your rebuttal?  Okay.

25              MS. LATTA:  Yes, thank you.
```

```
 1              THE COURT:  All right.  Anything further before we

 2   bring the jury in?

 3              MR. ALEXANDER:  Not from the United States, Your Honor.

 4              THE COURT:  All right.

 5              MR. GARLAND:  Not from the defense.

 6              THE COURT:  Mr. Garland, I'll inquire, I'll just ask

 7   you, Mr. Garland, anything further, and at that point if you

 8   could indicate the defense is resting, so the record is clear.

 9              MR. GARLAND:  Yes.

10              THE COURT:  All right.  I assume the Government has no

11   rebuttal witnesses; is that correct?

12              MR. ALEXANDER:  That's correct, Your Honor.

13              THE COURT:  Okay.  All right, let's call the jury in.

14              While we're waiting, I just want to make sure the

15   parties have organized their exhibits, labeled properly in the

16   right order, and are ready to submit those to the jury to avoid

17   any delay?

18              MR. ALEXANDER:  Yes, Your Honor.

19              THE COURT:  Okay.

20              (Jury entered courtroom at 11:21 a.m.)

21              THE COURT:  You may be seated.

22              Thank you very much for your patience, ladies and

23   gentlemen.  Mr. Garland?

24              MR. GARLAND:  Your Honor, at this time the

25   defense rests.
```

```
 1          THE COURT:  Anything further from the Government?
 2          MR. ALEXANDER:  No, Your Honor.
 3          THE COURT:  All right.  Ladies and gentlemen of the
 4   jury, as I instructed you earlier at the start of these
 5   proceedings, the Court is going to instruct you on the law.
 6          These are called "jury instructions."
 7          You will have written copies of these instructions
 8   while you're deliberating, so you don't need to memorize every
 9   word I'm saying, but please listen carefully, I'm going to read
10   those out loud to you now.
11          After that, the Government is going to present a
12   portion of their closing statement; then you will hear a
13   closing statement from the defense attorney; and, after that,
14   because it is the Government's burden of proof, they will have
15   a final opportunity to present the remainder of their closing
16   argument.
17          At that point, your deliberations will commence.
18          So, with that:
19                         JURY CHARGE
20          THE COURT:  Members of the jury, it is my duty to
21   instruct you on the rules of law that you must use in deciding
22   this case.
23          After I have completed these instructions, you will go
24   to the jury room and begin your discussions -- what we call
25   your deliberations.
```

1          You must decide whether the Government has proved the

2    specific facts necessary to find the defendant guilty beyond a

3    reasonable doubt.

4          Your decision must be based only on the evidence

5    presented here.  You must not be influenced in any way, either

6    by sympathy for or prejudice against the defendant or the

7    Government.

8          You must follow the law as I explain it, even if you do

9    not agree with the law; and you must follow all of my

10   instructions as a whole.  You must not single out or disregard

11   any of the Court's instructions on the law.

12         The indictment or formal charge against a defendant is

13   not evidence of guilt.  The law presumes that every defendant

14   is innocent.  The defendant does not have to prove his

15   innocence or produce any evidence at all.

16         A defendant does not have to testify; and if the

17   defendant chose not to testify, you cannot consider that in any

18   way while making your decision.

19         The Government must prove guilt beyond a reasonable

20   doubt.  If it fails to do so, you must find the defendant not

21   guilty.

22         Now, the definition of "reasonable doubt."  The

23   Government's burden of proof is heavy, but it doesn't have to

24   prove the defendant's guilt beyond all possible doubt.  The

25   Government's proof only has to exclude any reasonable doubt

```
1   concerning the defendant's guilt.

2        A "reasonable doubt" is a real doubt, based on your

3   reason and common sense after you've carefully and impartially

4   considered all the evidence in the case.

5        "Proof beyond a reasonable doubt" is proof so

6   convincing that you would be willing to rely and act on it,

7   without hesitation, in the most important of your own affairs.

8        If you are convinced that the defendant has been proved

9   guilty beyond a reasonable doubt, say so; if you are not

10  convinced, say so.

11       As I said before, you must consider only the evidence

12  that I have admitted in this case.

13       Evidence includes the testimony of witnesses and the

14  exhibits admitted, but anything the lawyers say is not evidence

15  and is not binding on you.

16       You should not assume from anything I've said that I

17  have any opinion about any factual issue in this case.  Except

18  for my instructions to you on the law, you should disregard

19  anything I may have said during the trial in arriving at your

20  own decision about the facts.

21       Your own recollection and interpretation of the

22  evidence is what matters.  In considering the evidence, you may

23  use reasoning and common sense to make deductions and reach

24  conclusions.  You should not be concerned about whether the

25  evidence is direct or circumstantial.
```

1        "Direct evidence" is the testimony of a person who

2   asserts that he or she has actual knowledge of a fact, such as

3   an eyewitness.

4        "Circumstantial evidence" is proof of a chain of facts

5   and circumstances that tend to prove or disprove a fact.  There

6   is no legal difference in the weight you may give to either

7   direct or circumstantial evidence.

8        When I say you must consider all the evidence, I don't

9   mean that you must accept all the evidence as true or accurate.

10  You should decide whether you believe what each witness had to

11  say and how important that testimony was.

12       In making that decision, you may believe or disbelieve

13  any witness, in whole or in part.

14       The number of witnesses testifying concerning a

15  particular point doesn't necessarily matter.  To decide whether

16  you believe any witness I suggest you ask yourself a few

17  questions:

18       Did the witness impress you as one who was telling the

19  truth?

20       Did the witness have any particular reason not to tell

21  the truth?

22       Did the witness have a personal interest in the outcome

23  of the case?

24       Did the witness seem to have a good memory?

25       Did the witness have the opportunity and ability to

1   accurately observe the things he or she testified about?

2        Did the witness appear to understand the questions

3   clearly and answer them directly?

4        And did the witness's testimony differ from other

5   testimony or other evidence?

6        If the Government offers evidence that a defendant made

7   a statement or admission to someone after being arrested or

8   detained, you must consider that evidence with caution and

9   great care.  You must decide for yourself whether the defendant

10  made the statement and, if so, how much weight to give to it.

11  To make these decisions, you must consider all the evidence

12  about the statement, including the circumstances under which it

13  was made.

14        Now, you have been permitted to take notes during the

15  trial.  Most of you, perhaps all of you, have taken advantage

16  of that opportunity.  You must use your notes only as a memory

17  aid during deliberations.  You must not give your notes

18  priority over your independent recollection of the evidence,

19  and you must not allow yourself to be unduly influenced by the

20  notes of other jurors.  I emphasize that notes are not entitled

21  to any greater weight than your memories or impressions about

22  the testimony.

23        Now, the indictment charges two separate crimes called

24  "counts" against the defendant.  Each count has a number.

25  You'll be given a copy of the indictment to refer to during

your deliberations.

Count 1 charges that the defendant forcibly assaulted a Federal officer using a deadly or dangerous weapon while the officer was performing official duties in violation of Title 18, United States Code, Sections (a)(1) and 111(b).

If you find the defendant not guilty of the crime charged in Count 1, then you will be asked to consider certain lesser-included offenses of Count 1, forcible assault of a Federal officer without using a deadly or dangerous weapon, or simple assault.

Count 2 charges that the defendant threatened to assault or murder a Federal law enforcement officer in violation of Title 18, United States Code, Section (a)(1)(B). I will now provide more detailed instructions on these counts.

Forcibly assaulting a Federal officer with use of a deadly or dangerous weapon.  It is a Federal crime to forcibly assault a federal officer using a deadly or dangerous weapon while the officer is performing official duties.

The defendant can be found guilty of this crime only if the following facts are proven beyond a reasonable doubt:

Number 1, the defendant forcibly assaulted the person described in the indictment; Number 2, the person assaulted was a Federal officer performing an official duty; and Number 3, the defendant used a deadly or a dangerous weapon.

A "forcible assault" is an intentional threat or

1   attempt to cause serious bodily injury when the ability to do

2   so is apparent or immediate.  It includes any intentional

3   display of force that would cause a reasonable person to expect

4   immediate and serious bodily harm or death.

5           The Government must prove beyond a reasonable doubt

6   that the victim was an employee of the United States performing

7   an official duty and the defendant forcibly assaulted the

8   officer.  Whether the defendant knew at the time that the

9   victim was an employee of the United States carrying out an

10  official duty does not matter.

11          An Assistant United States Attorney of the

12  United States Attorney's Office is a Federal officer and an

13  employee of the United States, and has the official duty to

14  prosecute violations of Federal criminal law.

15          And a Federal courthouse is Federal property.

16          A "deadly or dangerous weapon" means any object that

17  can cause death or present a danger of serious bodily injury.

18  To show that such a weapon was used the Government must prove

19  that the defendant possessed the weapon and intentionally

20  displayed it during the forcible assault.

21          Though, a forcible assault requires an intentional

22  threat or attempt to inflict serious bodily injury, the threat

23  or attempt does not have to be carried out and the victim does

24  not have to be injured.

25          Lesser-included offenses.  In some cases, a defendant

1    is charged with breaking a law that actually covers more than

2    one crime.  A lesser-included offense is a crime that is not as

3    serious as the other crime a defendant is charged with.

4           If you find the defendant not guilty of the crime

5    charged in Count 1, you must determine whether the defendant is

6    guilty of either of the following lesser-included offenses:

7           One, assault of an Assistant United States Attorney

8    without the use of a deadly or dangerous weapon, under 18

9    United States Code, Section 111(a)(1), or simple assault.

10          The lesser-included offense of assault of an Assistant

11   United States Attorney without the use of a deadly or dangerous

12   weapon under Title 18, United States Code, Section 111(a)(1),

13   requires proof beyond a reasonable doubt of the facts necessary

14   to prove the crime charged in Count 1, except the use by

15   defendant of a deadly or dangerous weapon.

16          If you find the defendant not guilty of the first

17   lesser-included offense, then you must determine whether the

18   defendant is guilty of simple assault.  The defendant can be

19   found guilty of simple assault only if all the following facts

20   are proved beyond a reasonable doubt:

21          Number 1, the defendant knowingly assaulted the

22   individual described in the indictment; and Number 2, the

23   assault occurred on Federal property or the person assaulted

24   was a Federal officer performing an official duty.

25          A "simple assault" is a willful attempt to inflict

1  injury upon the person of another or a threat to inflict injury

2  on the person of another, which, when coupled with an apparent

3  present ability, causes a reasonable apprehension of immediate

4  bodily harm.

5          A Federal courthouse is Federal property.

6          Now, threatening a Federal law enforcement officer.

7          It is also a Federal crime to threaten to assault or

8  murder a Federal law enforcement officer with intent to impede,

9  intimidate, or interfere with the Official's performance of

10 official duties or with intent to retaliate against the

11 Official on account of the Official's performance of official

12 duties.

13         The defendant can be found guilty of this crime only if

14 the Government proves all the following facts beyond a

15 reasonable doubt:

16         Number 1, the defendant knowingly threatened to assault

17 or murder the individual described in the indictment; and

18 Number 2, the defendant made the threat with the intent to

19 retaliate against such Official on account of performance of

20 official duties.

21         The Government must prove beyond a reasonable doubt

22 that the victim was a Federal law enforcement officer or

23 United States Official.  Whether the defendant knew at the time

24 of the alleged threat that the victim was a Federal law

25 enforcement officer or United States Official does not matter.

1          An Assistant United States Attorney is a Federal law

2     enforcement officer authorized by law to engage in the

3     prosecution of any violation of Federal criminal law.

4          A "threat" is a serious expression of intent to inflict

5     bodily injury or murder made under circumstances that would

6     cause apprehension in a reasonable person as distinguished from

7     mere idle or careless talk, exaggeration, or something said in

8     a joking manner.

9          You'll see that the indictment charges that a crime was

10    committed on or about a certain date.  The Government doesn't

11    have to prove that the offense occurred on an exact date.  The

12    Government only has to prove beyond a reasonable doubt that the

13    crime was committed on a date reasonably close to the date

14    alleged.

15         The word "knowingly" means that an act was done

16    voluntarily and intentionally, not because of a mistake or by

17    accident.

18         Where a statute specifies multiple alternative ways in

19    which an offense may be committed, the indictment may allege

20    the multiple ways in the conjunctive, that is, by using the

21    word "and."  If only one of the alternatives is proved beyond a

22    reasonable doubt, that is sufficient for conviction, so long as

23    you agree unanimously as to that alternative.

24         Each count of the indictment charges a separate crime.

25    You must consider each crime and the evidence relating to it

1    separately.  If you find the defendant guilty or not guilty of

2    one crime, that must not affect your verdict for any other

3    crime.

4         I caution you that the defendant is on trial only for

5    the specific crimes charged in the indictment.  You're here to

6    determine from the evidence in this case whether the defendant

7    is guilty or not guilty of those specific crimes.

8         You must never consider punishment in any way to decide

9    whether the defendant is guilty.  If you find the defendant

10   guilty, the punishment is for the Judge alone to decide later.

11        Your verdict, whether guilty or not guilty, must be

12   unanimous.  In other words, you must all agree.  Your

13   deliberations are secret and you will never have to explain

14   your verdict to anyone.  Each of you must decide this case for

15   yourself, but only after fully considering the evidence with

16   the other jurors.

17        So you must discuss the case with one another and try

18   to reach an agreement.  While you're discussing the case, don't

19   hesitate to reexamine your own opinion and change your mind if

20   you become convinced that you were wrong; but don't give up

21   your honest beliefs just because others think differently or

22   because you simply want to get the case over with.  Remember

23   that in a very real way, you are judges, judges of the facts.

24   Your only interest is to seek the truth from the evidence in

25   the case.

1          Now, when you get to the jury room, choose one of your

2     members to act as foreperson.  The foreperson will direct your

3     deliberations and will speak for you in court.

4          A verdict form has been prepared for your convenience

5     and I will explain that to you in just a moment.

6          Take the verdict form with you to the jury room.

7          When you've all agreed on the verdict, your foreperson

8     must fill in the form, sign it, date it, and carry it.

9          Then you'll return it to the courtroom.

10          If you wish to communicate with me at any time, please

11     write down your message or question and give it to the Marshal.

12     The Marshal will bring it to me and I will respond as promptly

13     as possible, either in writing or by talking to you in the

14     courtroom, but I caution you not to tell me how many jurors

15     have voted one way or the other at that time.

16          Now, the verdict form, it is two pages in length and it

17     reads as follows:

18          We, the jury, unanimously return the following verdict:

19          Count 1, 1A is the first question:

20          Did the Government prove beyond a reasonable doubt the

21     Defendant, Christopher Tavorris Wilkins, committed forcible

22     assault against a Federal officer with a deadly or dangerous

23     weapon?  There's a box for "yes" or a box for "no."

24          If your answer to question 1A is yes, you move to

25     question 2A.  If your answer to question 1A is no, you move to

question 1B.

1B:  Did the Government prove beyond a reasonable doubt the Defendant, Christopher Tavorris Wilkins, committed forcible assault against a Federal officer without a deadly or dangerous weapon?  There's a box for "yes" or a box for "no."

If your answer to question 1B is yes, you move to question 2A.  If your answer to question 1B is no, you move to question 1C.

And as I said earlier, you will have a copy of this verdict form and it will make sense when you have a way to look at it.

1C:  Did the Government prove beyond a reasonable doubt that Defendant Christopher Tavorris Wilkins committed simple assault against the relevant individual?

There's a box for "yes" and a box for "no."

You then proceed to question 2A, which references Count 2 in the indictment.

2A:  Did the Government prove beyond a reasonable doubt that Defendant Christopher Tavorris Wilkins threatened a Federal law enforcement officer?

There's a box for "yes" and a box for "no."

If your answer to question 2A is yes, you move to question 2B.  If your answer to question 2A is no, this ends your deliberations, your foreperson should skip the remaining questions and sign and date the last page of this verdict form.

1          And finally, question 2B:

2          We, the jury, having found the defendant guilty of

3    threatening a Federal law enforcement officer, further find

4    that defendant either knowingly threatened to murder the

5    individual described in the indictment, or knowingly threatened

6    to assault the individual described in the indictment.

7          And you may select none, one, or both of the categories

8    below.  In selecting each category, if any, you must all agree

9    that the evidence supports the elements of that specific

10   category beyond a reasonable doubt.

11         And then there's a section at the bottom of the

12   document for the foreperson's signature, printed name and date.

13         So now that I've read the jury instructions, which

14   you'll have a written copy of, along with the verdict form, we

15   are going to commence the closing arguments.

16         Mr. Alexander.

17         MR. ALEXANDER:  Yes, Your Honor.

18         Your Honor, if I could access the computer?

19         THE COURT:  Yes, you may.

20         Make sure the jurors can see everything.

21         MR. ALEXANDER:  Your Honor, may I proceed?

22         THE COURT:  You may.

23              GOVERNMENT'S CLOSING ARGUMENT

24         MR. ALEXANDER:  Ladies and gentlemen, from the

25   beginning of this trial, you've seen the evidence and you've

1   heard the testimony of the witnesses, and there are certain

2   things that are undisputed.

3         On October 30, 2019, through November 7, 2019, the jury

4   was convened to preside over the case of the United States of

5   America versus Christopher Tavorris Wilkins, and during the

6   course of that trial witnesses testified, evidence was

7   presented, and the jury took that evidence, took the

8   information and they deliberated.

9         As our justice system requires, they made a decision.

10  They assessed whether or not the defendant was guilty or not

11  guilty.  That is the role of the jury.  It is an incredibly

12  powerful role.  You decide exactly what happens.

13        The prosecutors in this case and in that case do not

14  determine guilty or not guilty, you do.

15        The role of the prosecutor is simply to present the

16  evidence.  The role of the case agent is to investigate.  The

17  role of the judge is to preside over the case.

18        And the role of the defense is simply to be present.

19  They have to do nothing.  They can if they want to, but they

20  have no obligation.

21        It's our burden, the Government's burden, to prove its

22  case beyond a reasonable doubt, and that jury in that case

23  found that the defendant was guilty of Counts 1, 3, 6 and 7.

24        And after the judge thanked them for their service,

25  they walked out of the courtroom.

1          This defendant made the decision to react.  And we see

2   from the video, ladies and gentlemen, exactly what transpires.

3          When the jury was getting up to leave -- in a sign of

4   respect, everyone in the courtroom stood up -- this defendant

5   took his chair, Government's Exhibit 8 -- and you can see it

6   from the video -- he turns it, he stands behind it, and then he

7   turns back, he looks at the U.S. Marshal deputies behind him,

8   and in one swift motion picks up this chair over his head, runs

9   towards AUSA John McMillan, and throws it at him and

10  immediately is tackled, restrained and pulled back, and there

11  was a fight.  He's resisting.  He's not giving up.  He's

12  fighting as hard as he can to get to John McMillan, and he's

13  yelling threat after threat, threatening to kill him, blaming

14  him for what happened.

15         He didn't attack the jury.  He didn't attack the judge.

16  He didn't attack his own defense attorney.  It was always John

17  McMillan, his eyes were on John McMillan the entire time,

18  because it was John McMillan's decision to prosecute him, and

19  that was the target the entire time.

20         In this case, ladies and gentlemen, there are two

21  counts.  Count 1 focuses on forcibly assaulting a federal

22  officer with a deadly or dangerous weapon.

23         The first element is:  Did the Government prove that

24  the defendant forcibly assaulted the person named in the

25  indictment, which is Assistant United States Attorney John

 1   McMillan?

 2        And ladies and gentlemen, a "forcible assault" is an

 3   intentional threat or attempt to cause serious bodily injury

 4   when the ability to do so is apparent and immediate, and in

 5   this case, there was the attempt.

 6        What was he trying to do with this chair?  He wasn't

 7   asking John McMillan, do you need a seat?  He wasn't trying to

 8   move so he has a little bit of room for himself.  He picked it

 9   up in one swift motion and he launched it.

10        This chair, ladies and gentlemen, you will be able to

11   examine it in the courtroom, you can pick it up, you can see

12   how heavy it is, and you can see the impact that it caused, and

13   you heard the testimony of Special Agent Connors of the loud

14   sound she heard.

15        This was not benign, ladies and gentlemen, we're not

16   talking about a pen or a stack of papers or a book, it's a

17   wooden chair; and for a man in leg shackles, the greatest

18   weapon he had was this chair because it would cause the most

19   damage.

20        John McMillan was afraid for his life, based on the

21   Defendant's reaction, the aggression he showed, the rage he

22   showed as he was going forward towards John McMillan.

23        Any displays of force that would cause a reasonable

24   person to expect immediate and serious bodily harm or death is

25   included, ladies and gentlemen.

1            This chair was the weapon of choice.

2            And you can see from the video, ladies and gentlemen,

3    the way he pulled it over his head and was running towards John

4    McMillan, the shear force that caused it to launch, and he was

5    successful in getting that thrown.

6            And you can watch the video, ladies and gentlemen, and

7    examine it, watch his movements, watch what he's thinking.

8            And the number of people it took to restrain him.  You

9    heard testimony, he kept fighting out, he was trying to go at

10   John, that's what the whole point was, he was trying to go at

11   John McMillan.  It took four different officers to restrain

12   him, to confine him, to hold him because he was resisting that

13   much.  That's element one.

14           Now, ladies and gentlemen, the second is the Government

15   has to prove that the target was an employee of the

16   United States performing an official duty.  That includes

17   Assistant United States Attorneys.  That's John McMillan.

18           Now, we know from the jail calls he talks about John

19   McMillan.  You heard Special Agent Connors says, Listen, I

20   listened to the entire call, he doesn't say he was trying to

21   attack me, he didn't say he was trying to attack the jurors, or

22   the judge, or his own attorney.

23           It was John McMillan, the prosecutor, that's where all

24   the animosity and rage was focused on.  And John McMillan was

25   doing his job, prosecuting the case.  He didn't return the

1    verdict.  That was the jury.  They made that decision.  But

2    based upon his decision, John McMillan's decision to prosecute

3    the case, that's what made him the target.

4         Now, ladies and gentlemen, a "deadly or dangerous

5    weapon."  The most important thing in this definition is to

6    understand that it includes any object, any object that can

7    cause death or present a danger of serious bodily injury.  This

8    chair is a dangerous weapon.  This chair is the dangerous

9    weapon, because it can present a danger of serious bodily harm

10   based on its size, based on its weight, based on the way it was

11   thrown.

12        And look at the timing.  He waited while the jurors

13   were walking out.  And why is that significant?  Because all

14   eyes are fixated on the jurors as they walk out of that

15   courtroom, all eyes are watching the jury as they walk out as a

16   sign of respect.

17        John McMillan told you he didn't see the chair being

18   launched; the defendant did not give him a warning, did he?  He

19   didn't say, "McMillan, take this," or, "McMillan, I'm going to

20   kill you," and then throw, because he would have been

21   unsuccessful, McMillan would have seen the chair coming by,

22   been able to step away, block it, whatever.

23        He kept it at that moment because McMillan's attention

24   was diverted, picked up a chair and with one swift motion,

25   threw it.  The weight of this chair and the manner in which it

1    was thrown had one purpose, to kill him or to inflict serious

2    bodily harm.  We know what his intent was, "I'm going to kill

3    you," over and over again, the words he was using, the

4    language, his body language, the resistance.  That was the

5    whole purpose.

6         He wasn't trying to give John a paper cut.  He wasn't

7    trying to give John a little bruise.  He was trying to inflict

8    serious bodily harm.  This is forcible assault with a deadly or

9    dangerous weapon, ladies and gentlemen.

10        A threat or attempt doesn't have to be carried out and

11   the victim doesn't have to be harmed.  The fact that John did

12   not see it doesn't matter.  The fact that John McMillan was not

13   harmed doesn't matter, because this crime focuses on the

14   intentional threat or the attempt to commit this type of harm.

15   You have to remember that, ladies and gentlemen.

16        So, when you go in the back and there's a question of,

17   Well, John McMillan wasn't injured, what do we do?  The answer

18   is you move on, you move forward with your deliberation because

19   that will not control the ultimate verdict, which must be

20   guilty beyond a reasonable doubt, because the Government proved

21   its case on this charge, the picking up of a chair, launching

22   it in a manner in which Christopher Tavorris Wilkins did, that

23   is a forcible assault with a deadly or dangerous weapon.

24        As to Count 2, ladies and gentlemen, threatening to

25   murder or assault a federal law enforcement officer.  There are

two elements.  The defendant knowingly threatened to assault or murder the individual described in the indictment, and the defendant made the threat with the intent to retaliate against such official on account of the performance of his official duties.

Now, ladies and gentlemen, it's undeniable that Assistant U.S. Attorney John McMillan is a federal law enforcement officer, is the Official described in the indictment that would qualify.

Now, although the defendant doesn't have to know McMillan's status, it's as clear as day he knew, he knew the prosecutor, he knew who was presiding on that case, who was handling that matter.  And the definition makes clear, ladies and gentlemen, this was John McMillan in that capacity, and retaliation comes from the fact that it was at the time of the jury verdict being returned.  He didn't do it on day one, or day two, or day three, or day four, or day five.  He waited until the verdict came back, when the jury did its job and found this defendant guilty.

But he didn't focus on the jurors.  He didn't focus on anyone else but John McMillan.  That's retaliation.  He kept saying, "Once I beat this, I'm going after you, I'm going to kill you, once I beat these charges."  Because he was going to fight him.  That is retaliation, ladies and gentlemen.

That is retaliation.

1          Now, ladies and gentlemen, a "threat" is a serious

2     expression of intent to inflict bodily injury or murder that

3     made under circumstance would cause reasonable apprehension in

4     a reasonable person, and this is not mere idle or careless

5     talk, exaggeration or something said in a joking manner.

6          Nothing that Christopher Torres Wilkins said was a

7     joke.  This wasn't just careless.  This wasn't an exaggeration.

8     The throwing of a chair and the launching at him, running at

9     him, having to be restrained by four people, ladies and

10    gentlemen, that's not a joke.

11         "Kill your fuck ass, I'll kill you when I catch you,

12    boy.  Kill your fucking ass.  When I beat this shit, I'm going

13    to kill you.  That's facts, I'm going to show you."

14         Ladies and gentlemen, even though the officers had

15    restrained him at this point and he was fighting, he was

16    resisting, this was a serious expression of a threat.  He

17    wasn't joking.  He didn't mutter under his breath saying, "I'm

18    going to kill you."  No.  He didn't say it in his bedroom in a

19    home miles away, "Man, I'm going to kill John McMillan."

20         He said it in a courtroom staring at him, glaring at

21    him, telling him, "Once these leg irons and once I'm -- are

22    removed and I am released, I'm going to kill you."

23         That's facts.  Ladies and gentlemen, that's facts.

24         But we have to look at everything in context, ladies

25    and gentlemen.  When he threw this chair at AUSA McMillan, the

1   threats immediately came.  He had to be restrained by multiple

2   law enforcement officers.  He blamed AUSA McMillan only after

3   the verdict was returned.

4        Court was still in session.  He was the only prosecutor

5   at that table.  And there is no evidence that he was targeting

6   anyone else.  It's true that his attorney was right next to

7   him, but, ladies and gentlemen, if Wilkins is going to attack

8   his attorney, there's a hundred thousand different ways to do

9   that, he's right there, reach out for him within arm's reach.

10  The attorney was never the objective.  It wasn't Special Agent

11  Connors.  It wasn't the jurors.  It was no one else but AUSA

12  McMillan.

13       Ladies and gentlemen of the jury, throughout the course

14  of this trial you've seen the evidence and heard testimony from

15  the witnesses about what transpired, what they saw, what they

16  observed.  Despite the leg shackles, this defendant was able to

17  do everything he's able to do.

18       Even if a person is able to position themselves with

19  their legs at shoulder length, he still had the ability to lift

20  this chair, pull it over his head and throw it at the

21  prosecutor.  He didn't stop at that moment, he didn't give up,

22  he didn't just fall back and become more compliant.  He was

23  fighting every step of the way.  And even in his jail calls,

24  he's targeting -- talking about John McMillan, "I snapped."

25       Now, ladies and gentlemen, you can listen to the entire

1    call, the Government moved those into evidence and you can

2    listen to it in its entirety, or you can listen to the clips,

3    make it easier for you, Government Exhibit 3C and 4C, because

4    in those clips it talks about his attack.

5         He doesn't say, "I tried to hit my attorney and missed

6    him.  I was just joking.  I don't know why the Marshals were so

7    serious.  I was just... I was just goofing around."

8         Because, ladies and gentlemen, when you listen to the

9    audio, Government's Exhibit 2A, you hear everything that's

10   transpiring.  The transcript is the best indicator of what was

11   said by the person typing it up, but there was times when these

12   people were talking over each other.  So if you have

13   disagreements about whether the transcript captured everything,

14   listen to the audio.  The statements that are on that

15   transcript are absolutely accurate, that's what he says.

16        Every step of the way, you heard testimony that it was

17   the defendant staring down John McMillan the entire time.

18        Ladies and gentlemen of the jury, the threat to murder,

19   the forcible assault with a deadly weapon, deadly or dangerous

20   weapon, that's what we're here for.

21        The Government's presented its evidence, and we ask

22   you, based on the evidence that you've seen, the testimony that

23   you heard, that you make the only finding that is appropriate,

24   and you find the defendant, Christopher Tavorris Wilkins,

25   guilty of Count 1, and that he did use a deadly or dangerous

          weapon, and you find him guilty of Count 2, that he threatened
 1
          to murder Assistant United States Attorney John McMillan and
 2
          threatened to assault him.
 3
                  You've seen the video.  You've heard the recordings.
 4
          You'll have the opportunity to do it again in that deliberation
 5
          room, and this chair will go with you, ladies and gentlemen,
 6
          examine this chair, move the chair, lift the chair, see what
 7
          we're talking about.
 8
                  This defendant weaponized the chair.  He made it into a
 9
          weapon.  And that is why, ladies and gentlemen, we ask that you
10
          find this gentleman guilty beyond a reasonable doubt as to all
11
          counts.
12
                  Ladies and gentlemen of the jury, thank you for your
13
          service.
14
                  Your Honor, with the Court's permission, I would ask to
15
          use the remaining time for rebuttal.
16
                  THE COURT:  All right.  You've used 18 minutes.
17
                  Ladies and gentlemen of the jury, we can either break
18
          now for lunch, or we can conclude all of the closing arguments,
19
          that would take us to, approximately, 1:00.  At that point, you
20
          would commence your deliberations and the Court would order
21
          lunch for you, but I leave that choice up to you.
22
                  I don't know if you all are extremely hungry and want
23
          to break now.  So I will try to gauge your interest by looking
24
          around, do you prefer to break now for lunch or remain in the
25

1    courtroom for, approximately, one additional hour?

2          Are most jurors inclined to stay or -- okay.

3          MALE JUROR:  Would it be a distraction while we had our

4    lunches on the table while we're working?

5          THE COURT:  You have all the time in the world to take

6    your time eating and then deliberate, there's no rush

7    whatsoever.  All right.  Let me just see, would you prefer to

8    continue to stay, yes?  Okay?

9          All right, we're going to do that then, let's continue

10   with closing arguments.

11                    DEFENDANT'S CLOSING ARGUMENT

12         MR. GARLAND:  Members of the jury, my name is Jeffrey

13   Garland, in case you forgot from yesterday.

14         I have come now to argue on behalf of my client,

15   Christopher Wilkins, based upon the evidence that you've

16   received, based upon the instructions of the Court.

17         So, at this point, I will drill down into what we think

18   the evidence shows and what sort of verdict might be

19   supportable here.

20         In this case, one thing is for certain, there was a

21   long jury deliberation on November 7th -- oh, we've heard from

22   different witnesses, they seem to recall it different ways.

23   We've heard that it was all day.  We've heard that it was less

24   than all day.  We've heard there were multiple jury questions.

25   We heard the verdict came back at 6:30.

1          But one thing is for certain, any person who has

2     undergone a jury trial has to go through the stress, the

3     uncertainty, the unnerving nature of a jury trial; and yes, as

4     Mr. Wilkins said in his statement -- you recall the two

5     recorded telephone calls that he made from the jail -- he

6     snapped.

7          And to "snap" is a term that people use.

8          It's the opposite of some type of premeditated,

9     thought-out, intentional act.  We say that -- commonly, people

10    say, "He snapped.  I snapped."  It's the opposite of what's

11    charged in this case.  That's not to say that they gave an

12    award out for what happened in this case.  What's charged in

13    this case are two very serious crimes.

14         I think that if Mr. Wilkins had the intent to do bad

15    things on those telephone calls that went on and on, he never

16    talked about following up on any of that.  The persons he

17    talked to -- I remember the first individual.  The first

18    telephone call says, "Chris, you can't do that."  -- very

19    sympathetic person.

20         What did Chris say in that telephone call?

21         He said, "I hit him in the head with the chair."

22         We know that didn't happen.  That's the sort of

23    exaggeration that the jury instruction actually talks about.

24         Could we turn this on?

25         THE COURT:  Yes.  Jurors, can you see?  Okay.

1          MR. GARLAND:  Part of the jury instruction that you all

2    have already gotten is that a "threat" is a serious expression

3    of intent to inflict bodily injury or murder, made under

4    circumstances that would cause apprehension in a reasonable

5    person, as distinguished from mere idle or careless talk,

6    exaggeration, or something said in a joking manner.

7          Now, again, nobody needs to interrupt court

8    proceedings, nobody needs to throw chairs in court.  But what

9    this jury instruction is saying is that when people say things,

10   it isn't always what they say is what is meant.

11         We use that sort of terminology all the time.  In one

12   context, it means one thing; and in another context, it means

13   something else.  But one thing is for sure, that in this

14   particular context, Mr. Wilkins was under stress.

15         Was it careless talk?  Was it exaggeration?  Was it the

16   kind of joking, like dark joking?  Because if it was truly like

17   a conspiracy, like I'm planning to do this, he didn't say a

18   word about planning to do it or doing anything to further this

19   during these telephone calls, when, obviously, if that was his

20   intent, he could have done it.

21         So I submit to you that what was said here was the

22   spontaneous reaction in a highly stressed situation.

23         Now, let's break down -- drill down even further to

24   what is being alleged here, who said what, and what it all

25   means.

1          The prosecutor in this case, John McMillan, he

2     testified very clearly about things.  Now, he's an experienced

3     prosecutor, he knows what he needs to say, "He was looking at

4     me.  He charged at me.  He ran at me," all of this to convince

5     you that there was a *bona fide* assault, a *bona fide* threat.

6     But we know different.  The video shows different.

7          We heard the testimony of the court security officer.

8     He testified, "I was there, I saw what happened, I grabbed at

9     Mr. Wilkins right away," and you can see it on the video, he

10    pulled him around and he was facedown on the pew.  That's what

11    we know from the evidence in this case; not from what

12    Mr. McMillan says, who's the experienced prosecutor and he

13    knows what to say, he knows the script, he knows how to cook

14    it, and that's what he said, and we know it can't be true, not

15    in its entirety.

16         He's facedown, that is, Mr. Wilkins is facedown;

17    there's two, and then later three, and then later four court

18    security officers, it's on video.  The idea that Mr. McMillan

19    is seeing this guy talk is just so not correct.

20         Now, it's in evidence, the video, you can watch it over

21    and over, it has actual time on it, time sequences.  But that's

22    not the only evidence.  There's other evidence here.

23         There's the sound recording.  One thing that's not done

24    in this case is there's been no effort from the Government --

25    it's their burden of proof, they're the ones that brought this

1    case, they're the ones that have the burden to prove their case

2    beyond a reasonable doubt -- the video has not been linked up

3    to the sound recording.  You can't just listen to the sound

4    recording and say, Oh, at this point in the video, this is what

5    I'm hearing.

6           And that's a deficiency in the evidence in this case.

7    So what do we do about it?  Well, if that deficiency causes a

8    reasonable doubt, then that is a basis for a not guilty verdict

9    in this case.

10          MS. LATTA:  Objection.  That's a misstatement of the

11   rule.

12          THE COURT:  Overruled.

13          Ladies and gentlemen, as I've noted, arguments of

14   counsel are not evidence and you've been instructed on the law

15   as the Court has directed you.

16          Please proceed.

17          MR. GARLAND:  In addition, there's a transcript in this

18   case.  Now let's compare the roles of different people on

19   November 7th.  The role of John McMillan, the prosecutor, who's

20   trying to convict Christopher Wilkins at that time, and the

21   role of the court reporter who is just being paid -- her role

22   is to make an accurate transcript under the circumstances, and

23   there was a recording that she used to assist her in that

24   regard.

25          Compare the transcript that's placed in evidence in

1    this case.  Compare that transcript to the testimony of John

2    McMillan, and I submit to you that you cannot link it together,

3    what Mr. McMillan says does not match up.  In fact, it's not

4    clear from the transcript.

5         There are several statements in the transcripts that

6    you cannot tell who those statements are being made toward or

7    what it was about.  But when you compare what's being said

8    versus what's on the video, what you're seeing is the fact that

9    court security officers are all over this guy.

10        Again, these statements, are these the sort of

11   statements that are mere idle, careless talk, exaggeration by

12   an angry person, very unhappy with the outcome, and is now --

13   and now got court security officers on him?  And not without

14   justification, I do not mean that.

15        There's no justification for disrespecting the

16   authority of the Court in this fashion, but that's not what

17   we're here for.  We're here on whether the requirements of

18   convictions for these crimes have been proved beyond a

19   reasonable doubt.

20        John McMillan says that Mr. Wilkins charged at him,

21   that Mr. Wilkins ran toward him.  True, not true.  We've

22   learned that Mr. Wilkins' legs were bound with chains called

23   "shackles."  We've learned that they can shuffle walk, we've

24   kind of learned that they can walk a little bit.  Can they run?

25   I submit to you they cannot run, but you've got a video that

1    shows what it is that actually happened; and the very athletic

2    court security officer reached out and subdued Mr. Wilkins

3    before he ever had a chance to do what Mr. McMillan was saying.

4        Mr. McMillan's attention was on the jury in front of

5    him.  You see this on the video.  You see that he doesn't see

6    the chair being thrown, he doesn't know.

7        When you look at the transcript that's in evidence in

8    this case -- this is a portion of the transcript, it's in

9    evidence, you'll have it, you'll be able to take it back with

10    you -- and you'll see where Judge Dimitrouleas is telling the

11    jury that, "This is going to conclude your jury service, have a

12    nice evening," and then the court security officer says, "All

13    rise," the jury was excused -- that's in parentheticals -- and

14    then the defendant threw a chair.

15        There is no threat.  There is no statement made before

16    the chair is thrown.  The transcript shows that.  The sound

17    recording shows that.  Once the chair is thrown, it's done.  He

18    no longer has something.  They argued the chair is a weapon,

19    but after the chair is thrown, he is unarmed, no weapon,

20    can't -- he doesn't have a weapon.

21        So there can only be lunging or running, as

22    Mr. McMillan says, after the chair is thrown.  After the chair

23    is thrown, he's unarmed.  So, who was the chair thrown at,

24    because the indictment alleges that the chair was thrown at the

25    prosecutor, John McMillan, who was seated at the prosecutor

1    table.

2          Now, these two chairs are here, they're still here, and

3    when we talked with the court security officer we determined,

4    hypothetically, that Mr. Wilkins would be in this chair,

5    something similar to that, his attorney was here.

6          We learned from the courtroom deputy -- I think the

7    last witness -- she testified that the defense attorney in that

8    case, Ron Chapman, was a tall man, the chair went over him or

9    would have had to go over him in order to get past the

10   prosecutor.

11         Now, the prosecutor is saying -- Mr. McMillan is saying

12   that the chair was thrown in his direction.  But in his

13   direction doesn't really mean a lot.  If a pitcher at a

14   baseball game throws the baseball to the catcher, it's in the

15   same direction as the people in the stand.  Being in the same

16   direction doesn't mean at, it just means toward, and doesn't

17   answer the question with what intent.

18         What we know is that the attorney was here, the defense

19   attorney, and the chair would either have to go through him,

20   hit him, over him.  When that chair -- if you watch the video,

21   which is in evidence, I trust that you will -- I think you'll

22   see that the defense attorney moved out of the way.

23         Now, the argument in this case, the Government supposes

24   that, Well, why would he be mad at his defense attorney?  Well,

25   I don't know, maybe he was found guilty of four felony counts

1      in federal court after a long trial in court.  They just

2      suppose that the chair had to be thrown at the Prosecutor John

3      McMillan as opposed to the defense attorney, who was right

4      there, and who, had he not jumped out of the way, would have

5      been hit with that chair.

6             And I submit to you that that is a supposition, it's

7      not borne out by the proof in this case.  And to the extent

8      that the Government believes, based on eyeball contact, that

9      that's what it meant, it's a failure of proof, it's not proof

10     beyond a reasonable doubt.  And if that chair was targeted at

11     the defense attorney, it's a not guilty as to Mr. Wilkins on

12     that charge, Count 1.

13            Now, there were two people at that prosecutor table.

14     We established that Special Agent Connors was there, as well as

15     the prosecutor.  So they suppose that it was thrown at the

16     prosecutor -- I mean, it would have had to go through the

17     defense attorney, but there are two people at that table and

18     just because John McMillan says he thinks it was thrown at him

19     doesn't make it so, just because he thinks it.

20            And he also thinks that Mr. Wilkins charged him, he ran

21     at him, which, obviously, the video does not support.

22            Is a chair a dangerous or deadly weapon?  Depends on

23     how it's used, the manner of use.  Now, this heavy chair can

24     only be thrown so far, but in this particular case, one thing's

25     for sure, it was thrown in the direction of the defense

1      attorney.  And whatever it is that the prosecutor felt, it was

2      after the fact because his attention was elsewhere.

3            Now, the next part of this charge is focused on what

4      was said.  And what we have here in this transcript that's in

5      evidence, you can see the next phrase, it says, "Kill you fuck

6      ass, I'll kill you when I catch you, boy."

7            Who is that said to?  And I'll submit to you that if

8      you listen to the recording and you compare the recording to

9      the video, that's said after Mr. Wilkins has been tackled, he's

10     in the pew facedown.  There's no statement there that that is

11     directed to any particular person.

12           On the very next page, at the top, we see, "Watch those

13     cuffs."  Now, based on the evidence that we got, what are we

14     talking about, "cuffs"?  Are we talking about handcuffs?  What

15     sort of cuffs?  We're talking about handcuffs, I think that's

16     what that phrase refers to.

17           It's one of the court security officers using the

18     phrase "cuffs" to refer to handcuffs, in the effort to handcuff

19     Mr. Wilkins.  And we know from the other testimony that that

20     happened when Mr. Wilkins was facedown on the pew, that's what

21     we know.

22           And for someone else to come in and say that the

23     statements that Mr. Wilkins made here were directed to someone

24     else when he's facedown on the pew is not supported by the

25     evidence beyond a reasonable doubt.  When the prosecutor, John

1    McMillan, says, "I saw his face when he said that," it's not

2    supported by the evidence.  There's a reasonable doubt.

3    Mr. Wilkins was facedown being handcuffed.  This transcript

4    shows that.

5            The next portion in this transcript refers to, "That

6    black car," right there.  "That black car.  Crack, kill your

7    fucking ass."  What black car?  Whose black car?

8            We heard Prosecutor John McMillan say, "Well, I may

9    have driven by the jail that day, he might have seen me through

10   a window."  Really?  Is that how they prove things?  I drove by

11   there in my car, from how far away, how are you going to see

12   through a windshield?  Was it night or day?  Where was

13   Mr. Wilkins in that jail?  How would he have known to look at

14   the window right at that particular time, how would he know

15   that from that car, from that distance, how could he see in?

16           This is the sort of supposition that was presented as

17   proof, because there's a reference in this transcript to a

18   black car, and what Mr. McMillan wanted you to believe is that

19   that black car was his black car.  Really?  As opposed to

20   anyone else's black car.  But this is just the supposition, the

21   thinking that is going into trying to get Mr. McMillan to

22   direct whatever it is that happened in that court toward who?

23   Mr. Wilkins, who's seated over there.

24           We go on to the next part of this transcript, it says

25   there's indiscernible cross-talk.  Now, if there's

1    indiscernible cross-talk, doesn't that mean that an official

2    court reporter can't make head nor tails out of it?  Then how

3    is someone else to?  How do we know what actually happened?

4          Well, you have a recording, and I agree with the

5    prosecutors in this case, go back, listen to the recording.

6    You see, because you're the triers of fact in this case, you

7    decide, can you hear what was on there?  Can you make something

8    out of it?

9          Because each witness that has come in here and tried to

10    describe what they heard, they seemed to -- and it may just be

11    me -- but it seems to me that every person that is trying to

12    describe something is describing something different.

13          And the words matter.  The words matter.

14          "Is your favorite football team going to kill them this

15    weekend and win?"  That term can be used many different ways.

16    "He's killing me with his jokes."

17          Now, it's the jury instructions that talk about joking

18    around.  I'm not saying that all jokes are funny.  There are

19    many people who are offended by what passes for humor.  There's

20    many people that don't care for the sort of dark comedy, the

21    dark statements, but I would say you have to take the

22    conversations and the meanings in this case with a grain of

23    salt.

24          Mr. Wilkins, you can tell by his telephone calls from

25    the jail, his mannerisms of speaking, you can understand there

1    was never anyone hit over the head with a chair, as the jail

2    calls would say.  That was a pure exaggeration.

3         The next part of this on line 10, it says -- you know,

4    I'm going to skip part of it -- "I ain't did shit wrong, man, I

5    ain't did shit wrong."

6         Just as Mr. Wilkins said in the telephone call, he's

7    frustrated, upset, angry.  That's what you see here.  What is

8    it?  He's maintaining his innocence, he's disappointed that the

9    jury found him guilty on four out of seven counts, that's not

10   guilty on three.

11        The next thing that's attributed to the defendant, the

12   defendant is Mr. Wilkins.  "This fuck little bitch has been

13   chasing me for years."

14        Well, who do we think that is based on the evidence

15   that was presented?  Agent Connor.  She's not the victim

16   alleged in this case.

17        But when we look at the transcript, it refers to "this

18   fuck little bitch," and I submit to you that that is not John

19   McMillan.  If it's not John McMillan, that statement is not

20   directed to John McMillan, and he's not -- and that is,

21   Mr. Wilkins is not guilty.

22        The thing goes on and says, "Indiscernible cross-talk."

23   Well, what does that mean?  That's up to you to decide what it

24   means, that means that the court reporter has training and

25   experience in transcribing and listening and is supplemented by

1    a recording device, she can't make head nor tails out of it.

2          The statement that we have here, "Done got me a life

3    sentence on the house, man.  Fucking life sentence on the

4    house, nigger.  When I beat this shit, I'm going to kill you."

5          Who is that directed to?  It doesn't specifically say.

6          This is what we call an "inference."  How do we infer

7    that that statement, whatever it is, is directed at a

8    particular person?  I submit to you the evidence is that

9    Mr. Wilkins was in the process of being handcuffed behind his

10   back and subdued.  We heard that process.  If those comments

11   were directed toward the people who were doing that, it's a not

12   guilty.

13         We know that's what's going on because as we turn the

14   page of that transcript, we hear Marshal Peters -- now, I don't

15   think we had a Marshal Peters testify, but we had testimony

16   that there was several Marshals there -- and we hear her say,

17   "Stop, stop, don't stomp me."  What does that mean?  It means

18   that the process of subduing Mr. Wilkins is still going on.

19         It means he's still over at the pew.

20         The next statement attributed to Mr. Wilkins is,

21   "That's facts, nigger, I'm going to show you."

22         Show who?  Who's that directed to?

23         Next one is, "I'm going to get that black car."

24         Again, the black car.  What black car?  Whose black

25   car?  When black car?  There's no proof in this case -- other

1    than the supposition that a prosecutor drove by the jail one

2    day -- that Mr. Wilkins would even know who had a black car.

3    I wonder how many people in the world have black cars.

4          Now, the next thing that we see is -- that's attributed

5    to -- we see Marshal Staples, Your Honor, and the Judge, who is

6    referred to as "The Court" says:  "Hold on."

7          And Mr. Wilkins says:  "Thanks for the joke, nigger."

8          Now what does that refer to?  Who is that addressed to?

9    But whatever it is, it's not a threat.

10         We then go into The Court:  "Mr. Wilkins, the jury

11   having found you guilty, I hereby adjudge you guilty."

12         Okay, that's the end of it.  That's the transcript of

13   the official court reporter, that's what we have.

14         What you also have is the video recording, you also

15   have the sound recording.  You take these back there and you

16   can get to decide, is it proof beyond a reasonable doubt that

17   those words are anything other than what the jury instruction

18   refers to as, "Mere idle, careless talk, exaggeration, or

19   something said in a joking manner."

20         Look, you know, with freedom comes responsibility.  We

21   all have to treat each other with respect and dignity.  But

22   sometimes emotions cloud people's judgment and they do things

23   that are clearly wrong.  But being clearly wrong in what you do

24   does not mean guilty of criminal offenses.  They're two

25   different things.

1          In this case, there are different offenses.

2          For Count 1, you have a simple assault.  A "simple

3     assault" is a willful attempt to inflict injury on the person

4     of another, or the threat to inflict injury on the person of

5     another when coupled with an apparent present ability causes a

6     reasonable apprehension of immediate bodily harm.

7          It's right there.

8          In this case, Mr. McMillan didn't even know about the

9     chair until after it landed.  We know that whatever happened

10    after that, Mr. Wilkins had court security officers on him,

11    plus he had shackled feet.

12         What realistic probability of injury was there?

13         And I submit to you that, Number 1, as far as the chair

14    goes, there was no apparent present ability, and there was no

15    reasonable apprehension.  He didn't even know it was happening,

16    he didn't even know.

17         All right.  These jury instructions do tell you about

18    the degree of care that you are supposed to use in deciding a

19    case.  It says that you decide the facts based upon your common

20    sense, your life experiences, the evidence that you've heard,

21    you apply, you know, reasoning to this, but you exercise the

22    same degree of care that you would in the most important of

23    your everyday activities.

24         And what this means is decisions that are important to

25    people, like buying a house, getting married, having children,

1    these are important decisions that people don't just jump into.

2          They don't make these decisions lightly, they try to

3    consider all the factors, they determine, you know, what are

4    the likelihoods, can we do this?  Can we afford this?  Are our

5    jobs secure in the future?

6          That's the kind of care that has to be used in this

7    case to determine the facts, whether the underlying facts have

8    been proven beyond a reasonable doubt.

9          Let's deal with that Count 1.

10         Count 1 charges the assault with a deadly weapon only

11   as John McMillan being a victim.  I submit to you, it's not

12   guilty of that charge because John McMillan -- it's not been

13   proved that John McMillan was the target of that chair, that's

14   Number 1.

15         The actual target could well have been the defense

16   attorney.  And it's not the burden of the defense to prove to

17   you anything.  And I don't take that burden, that burden is on

18   the prosecutors over at that table.

19         The defense attorney, had he not moved out of the way,

20   would have had the chair on him; and I submit to you, that is

21   the reasonable doubt as to that charge, which mainly deals with

22   the act.

23         Now, the secondary part of that is he charged me or he

24   ran at me, according to Mr. McMillan.  That's just not

25   feasible.  I mean, it's not supported by the other testimony,

1    it's not supportable by the facts; and if it happened, there

2    was no weapon.  So if the second part of what Mr. McMillan

3    says -- let's just suppose for a moment it's true -- "he

4    charged at me," but he didn't have a weapon because the chair

5    was gone,  if that's true, if you believe that despite the

6    shackles and despite the presence of court security officers,

7    if you believe that Mr. Wilkins charged at Mr. McMillan, then

8    that would only be a simple assault.  That's all, nothing more.

9         But keep in mind, Mr. McMillan admitted that he knew,

10   he knew that Mr. Wilkins was -- he had these shackles on, he

11   knew the security officers were there, he knew that this was

12   going on in open court proceedings.  I submit to you that would

13   not be a reasonable apprehension of fear, but it's up to you.

14        As to Count 2, Count 2 is all about the threat.  And

15   some of my comments are very similar.  It's who are those

16   statements that we just went through -- we used the transcript

17   to go through them -- but how do we know beyond a reasonable

18   doubt who that was directed to?

19        And I submit to you, the primary evidence of that is

20   the testimony of John McMillan.  He says, "I could see his

21   eyeballs, he was looking at me as he was saying those things."

22        And I submit to you that the evidence actually

23   contradicts that.  That can't be true.  That's the enhancement

24   that somebody's memory has because of their desire to end.

25        In other words, you see what you want to see, you

1    remember what you want to remember.  He's remembering this

2    because it helps build the case.  But we know factually it

3    couldn't happen that way, because at the time Mr. Wilkins was

4    facedown on the pew, and he had various -- he had at least four

5    court security officers all around him.

6           I submit to you that that statement about seeing

7    Mr. Wilkins' eyeballs is not worthy of belief.  There is a

8    reasonable doubt about that.

9           Then we get into the situation about exactly when did

10   the judge -- that would be Judge Dimitrouleas -- when did he

11   intone those words, "I adjudicate you guilty," something that

12   the Court procedures require?  How does that actually tie in

13   the sound recording to the video recording to the transcript?

14          And I submit to you that they don't tie together, that

15   the memories of individuals have been all over the place on

16   this; and that what is worthy of belief is the transcript.  And

17   that based upon this conflict in the evidence -- because that's

18   really what you have, you have each witness seems to remember

19   something, each witness seems to put emphasis on something

20   else, each witness seems to place Mr. Wilkins --

21          THE COURT:  Four minutes.  Excuse me.  Four minutes.

22          MR. GARLAND:  Four minutes, thank you, Judge.

23          Every witness seems to have a different focus on what

24   they remember.  And in ordinary life, we know that's true, we

25   remember those things most important to us, closest to us, but

1    just because we remember them doesn't mean that we remember

2    them accurately.

3          You know, there's car accident cases, you know,

4    somebody supposedly runs a red light and implies the other

5    person has a green light and everybody says they have a green

6    light.  They remember what they want to remember the way they

7    want to remember it.  That's just human nature, and in this

8    situation, that explains why we have disparity between what one

9    witness says happened and another witness says happened and an

10   exact sequence in which those things happen.

11         And I submit to you that this disparity, this conflict

12   in the evidence, the reason that it happens is because the

13   facts are infirm, they're not well-established, it is not a

14   strong foundation upon which to build a verdict; and for these

15   reasons, I would submit to you that Count 2 is not proved

16   beyond a reasonable doubt, that the verdict on Count 2 should

17   be not guilty.

18         There are two options on Count 2, one is to murder and

19   one is to assault.  It does make a difference.  If you feel

20   that it's proved in some regard, you still have to decide to

21   what extent.

22         But I am about to sit down.  The Government does get

23   another shot at trying to argue this case and to make some

24   summation.

25         I ask for you to closely and carefully review this

1    evidence.  I ask you to consider in detail the instructions

2    that the Court's given you, and on behalf of Mr. Wilkins, we

3    trust that, with your full consideration of this, that you all

4    will reach the true and just verdict, we suggest that that

5    verdict is not guilty on both counts.

6            Thank you so much.

7            THE COURT:  Thank you, Mr. Garland.

8            MS. LATTA:  Your Honor, can I trouble the Court for a

9    five-minute warning, if it's not too much trouble?

10           THE COURT:  Yes.

11           MS. LATTA:  Thank you.

12                 GOVERNMENT'S REBUTTAL CLOSING ARGUMENT

13           MS. LATTA:  Folks, at the beginning of the trial,

14   Judge Cannon read a series of instructions to you and one of

15   those instructions was -- and she just read it a moment ago --

16   is that what we say as attorneys is not evidence.

17           Attorneys can repeat evidence, we can make inferences

18   based on evidence, we can make arguments as to evidence, but

19   what we say is not evidence.

20           And I tell you that because Mr. Garland brought up some

21   comments, and what he talked about was how there's no evidence

22   whatsoever that John McMillan was the targeted individual.

23           So here's what I will submit to you:

24           Don't believe the attorneys.  Believe the defendant.

25   Believe every word that he said, because you heard him on the

1    jail calls.  So let's remove the court statements, right, let's

2    assume, let's give it to them that the court statements -- you

3    know what, temporarily, let's say -- let's put those aside for

4    a minute.  Let's talk about what's on the jail calls.

5           There are two sets of calls.  One is 34 minutes, one is

6    12 minutes.  What do we hear on those calls?  And it's hard to

7    hear, but when you sit through it, you're going to learn it,

8    this is what he says:

9           How do we know it's John McMillan?  "The blank got me

10   hot, bro."  He.  "He got me hot."  He.

11          Remember, Mr. Garland got up here a moment ago and said

12   that the threats were made at Sara Connors.  The chair's made

13   to be the defense attorney, "He got me hot.  This cracker,

14   McMillan" -- John McMillan -- "I hit his ass up on the head

15   with a big-ass chair.  He was balling up.  Don't ball up now.

16   Don't ball up.  This is the same prosecutor" -- prosecutor, not

17   ATF special agent -- "prosecutor that's been on all my cases.

18   He's after me.  I'm smart.  Every time I see him, I'm going to

19   hit him in the face."

20          This is on a jail call; right?

21          Do you remember, also, too, what was just said to you a

22   moment ago, if he intended to do this, if he intended to

23   threaten him and say these things, then why were there no

24   threats made on the jail calls?  That's not true.

25          When you listen to the jail calls, I promise you, you

1   will hear this:  "Every time I see him, I'm going to hit him in

2   the face.  He already knows what time it is.  I did it right in

3   front of the jury, I slammed that bitch right up-side his head.

4   Fuck that cracker.  He been chasing me for years.  He been

5   chasing me for years.  It's the prosecutor, he has it out for

6   me.  The prosecutor rigged the jury."

7           And also, too, again, to the point that why aren't

8   there any future threats, why are the threats only made in the

9   courtroom?  Here's another threat on the jail call:

10          "I snapped.  Man, if I ever catch your bloodline,

11  everything.  I don't give a fuck when I get out, it's going

12  down, your whole bloodline going down with you.  Fuck the

13  bloodline."

14          That's what he's saying to a friend he's talking to

15  about McMillan's family.

16          How do we know that the chair is not targeted to the

17  defense attorney, folks?  Because, again, the defendant talks

18  to us on the jail calls.  This is what he says about his

19  attorney -- an individual who he's talking to, a family friend

20  or a girlfriend -- he says, "You cussed out your lawyer?"

21          The defendant says, "No, the prosecutor.  My lawyer did

22  his thing, he showed up.  It's the prosecutor.  They did

23  something behind a blank back, they did something to make them

24  people convict me."

25          There it is, folks.  It is not the defense attorney.

 1    It is not Sara Connors.  It is 100 percent, emphatically,

 2    without a doubt, John McMillan who he's talking about.

 3         So let's move on.  Let's move on to talk about why this

 4    is a deadly weapon, why this is a dangerous weapon, and some

 5    other issues that also opposing counsel brought up.

 6         I know, I know that when you guys came in here and we

 7    heard the indictment and we heard the words "deadly weapon or

 8    dangerous weapon" and we heard what he's accused of, your

 9    thought was probably a gun or a knife or something to the

10    effect that we see everyday in movies or in crimes or in cases.

11    I get that.  That's our human understanding, because that's

12    what we know when registered to be dangerous or deadly weapons.

13         But we also have to remember that when we come in here

14    as jurors, sometimes we're taught new laws, laws that we didn't

15    know before, things about the law that maybe we didn't

16    understand, or that's new to us.

17         For example, a "dangerous weapon" can be something

18    other than what we know to be a knife or a firearm.  A

19    dangerous object can be any objects, a pen, folks, a pen can be

20    a dangerous weapon if -- it's how it was used in a particular

21    way, it's weaponized.  If this pen goes for somebody's eye,

22    that is a dangerous weapon.

23         A pillow.  A pillow over somebody's face.  The things

24    everyday around us, in the courtroom, at home, in a classroom,

25    they can be a dangerous weapon depending on how it is being

1    used.

2           A chair is a deadly weapon or a dangerous weapon --

3    or -- here's why, okay.  There's a lot of talk about how the

4    defendant's efforts failed.  He did.  He didn't get to kill or

5    impose serious bodily injury on John McMillan, thank God.

6           Do you know why?  Because we've got great folks in

7    suits that protect the courtroom and keep everybody in line or

8    on behavior.  But here's what his intent was.

9           When he picked up this chair -- and it's about 40, 50

10   pounds and you're going to be able to hold it for yourself.

11   When he picks up his chair, his intent at that moment is to get

12   to John McMillan.  It's to hurt John McMillan.

13          How is this going to do that?  Because when this, that

14   40 or 50 pounds is flying at your head, when you're not

15   looking, and/or being struck against your head, had he gotten

16   to McMillan, absent court security clotheslining him, that

17   would have caused or could have caused serious bodily injury, a

18   broken bone, a broken nose, knocked him out, part of his skull

19   potentially being broken.

20          So much could have happened when you use this in the

21   manner that he wanted to use it.  He just failed because court

22   security intervened.  That's what's different than simple

23   assault.  "Simple assault's" an injury.  If I take a book and I

24   chuck it at somebody across the table and it hits them on the

25   nose or hits them on the head, they might get bruised.

1          If I take this chair and I bang it over a person's

2     head, and it's an older gentleman, late 50s, early 60s, we know

3     he's been practicing for at least 30, 35 years as a prosecutor,

4     and if I'm doing that with the anger that I have -- because

5     this man just got me some prison time -- what is that going to

6     do to him?  This is not simple assault.  This is not a push,

7     it's not a shove, it's not a scratch that causes injuries.

8          When he lifted that chair, he had every intent to cause

9     serious bodily injury; and if you add that to his statements,

10    "I'm going to kill you," and everything else that you heard a

11    thousand times, there is no doubt, folks, that that man wanted

12    to do just that.

13         Here's what's also interesting.  When we talk about

14    exaggeration on the jail calls, the exaggeration -- he's not

15    exaggerating on the jail call, he's not.  Because what happened

16    was as soon as he's charging McMillan -- whether you folks want

17    to call it charging or you want to call it rushing or you want

18    to call it stepping towards or lunging forward or taking a big

19    stride, whatever, whatever you want to call it -- he is heading

20    in the direction of John McMillan.

21         When he's doing that, right, when he's talking about it

22    on the jail calls, he's talking about how he hit that --

23    whatever he said -- he hit that cracker's ass up in the head,

24    or he slammed that chair against him -- remember, at the time

25    that he's charging John McMillan -- and he's about to do it --

1   he gets bear-hugged, dragged behind the podium, he doesn't know

2   what happened to the chair.

3         He thinks that it actually hit John McMillan in the

4   head.  Why?  Because he's about four feet away from him with

5   the chair over his head and he's lunging towards John McMillan.

6   He thought he succeeded, at least in throwing the chair or

7   getting the chair out of his hands, before officers intervened.

8         And even if you want to believe that he's exaggerating

9   to some extent, because he's proud of what he did, because he's

10  showing off to a friend, because he's bragging, he most

11  certainly, folks, is not exaggerating when he's in court.

12        And when we talk about a true threat, here's some

13  things that I don't have to prove about his verbal threats.

14  Right.  When we talk about reasonable doubt, reasonable doubt

15  as to the elements, not as to every other little question.

16        Not as to why is the audio not mixed up with the video?

17  That's not an element.  Reasonable doubt as to the elements.

18        Here's what I don't have to prove about verbal threats.

19  I don't have to prove that they stop right there.  I don't have

20  to prove that the threat is over once officers intervene.

21        I have to prove that in that moment what he says, is

22  that a true threat coming from him; maybe at a later time, it

23  doesn't end there, it could be an ongoing threat.  It could be

24  a plan down the road for the future.  Did he mean it?

25        Did he mean the threat?  Absolutely.

```
 1              And when we talk about the chair, right, here are ways
 2      where I would tell you this is probably not a deadly weapon or
 3      a dangerous weapon.  If he took the chair and he shoved it
 4      towards him and it hit McMillan.  If he took the chair and he
 5      -- or, rather, if McMillan was in the chair and he tries to
 6      push McMillan out of it.  If he walked by McMillan and the
 7      chair and kick the chair, he's not using the chair as a
 8      dangerous weapon.  How did he use it?  That's everything.
 9              How did he use it?
10              Here's what else I don't have to prove, right, and
11      Judge Cannon said it best.  My burden is heavy, and it should
12      be.  When the United States has the power to accuse, you better
13      believe we should carry that burden, but it's not impossible.
14              Here's what else I don't have to prove to you.  I don't
15      have to prove that he succeeded in what he wanted to do.  I
16      don't have to prove that it was the outcome he wanted.  I don't
17      have to prove that Mr. McMillan was injured.  I don't have to
18      prove that Mr. McMillan was struck in a way.
19              It does not go to the victim.
20              It goes to the defendant, what his intent is, what his
21      actions are, what his apparent ability is, that's what the law
22      is.
23              And here's how we also know that it's a true threat --
24      and I know that I'm bouncing around, but I don't have a whole
25      lot of time, but I'm trying to, you know, spend a little bit of
```

1    time talking about what was said in closing, but here's -- we

2    also know it's a true threat:

3         Think about the context in which it's said, in a

4    federal courtroom -- not in Facebook, not in passing, not in

5    the jail cell, not to the Marshals who escort the defendant

6    up -- in a federal courtroom, to the prosecutor who just got

7    him prison time, who charged him, who had to investigate him,

8    along with Sara Connors, knowing there's cameras, knowing

9    there's probably audio, knowing that this young lady right here

10   is like other court reporters, taking down notes, taking down

11   everything we're saying.

12        He meant it.  It was after he threw the chair, it was

13   after he attempted to charge him.  It's a true threat.

14        Here's what else.  We spent a lot of time talking about

15   the jail calls by way of cross-examination.  What I mean by

16   that is, Mr. Garland artfully asked a lot of folks on

17   cross-examination about the circumstances of the verdict, and

18   it possibly being a hung jury, and we heard on the jail calls

19   the defendant's whole theory of his defense and how he was

20   wrong.  I want to point out one or two things.

21        When we look at the jail calls, the reason why

22   three-quarters of them were not published is because they're

23   irrelevant.  They are irrelevant.

24        Your consideration, folks, is not the United States

25   versus Christopher Wilkins back in 2019 on seven counts.

1    That's been litigated.  A jury found him guilty of some of

2    those counts.  You were not there for those conversations.

3         And I tell you that because I hope that our jurors are

4    not thinking to themselves, do you know what, what if he was

5    wrong, what if the jurors got it wrong and he was so angry,

6    rightfully so, because he's an innocent man.

7         That's not for your consideration.  That's not

8    something for you to feel bad about.  That's not something

9    you're privy to.

10        Your decision is whether or not, on November 7, 2019,

11   the defendant committed the two counts for which he's charged

12   in this case; not whether the jurors got it right or wrong back

13   when, not whether he was wrong.

14        Here's what else in the jail calls that I'm going to

15   ask you not to consider because we hear it a lot.  We've heard

16   about the penalties he's facing.  He talks about it, "I got a

17   life sentence.  I got a max of 50 years, 10 years as to each

18   count."  He's talking about them.

19        I'm going to ask that you follow the instructions that

20   sympathy has no place in this case.  And what I mean by that is

21   this.  I hope that none of our jurors are thinking to

22   themselves, do you know what, Ms. Latta, you know, what if he

23   got a life sentence?  What if he's already facing a lot of

24   time?  This case is a wash.

25        And that's not how this process works.

1          First, you don't know how much time he got.  You don't

2    know what happened to his sentence.  You don't know where

3    that's at, and there's a reason why you don't know where that's

4    at, because you shouldn't know, because that's not a factor for

5    your consideration, right, because that doesn't go to whether

6    or not he committed a crime on this particular day.

7          So I'm going to ask that when you're going back and

8    you're deliberating that you don't think about possible

9    sentences, possible punishments, what happened in his other

10   case.  What you think about is the trial that's before you.

11         THE COURT:  Six minutes.

12         MS. LATTA:  Thank you, Judge.

13         I just want to very, very briefly -- I don't want to

14   spend more than a minute on it -- I want to talk about the leg

15   irons, because it's become a feature in this case.  Every

16   inmate that walks through the door has leg irons, right, that

17   come into court, they have the chains.

18         They walk in by themselves.  They're not carried.

19   They're not held onto.  They walk in and out of court every

20   single day on their own feet just fine.

21         He had what we call "leg irons," he had the chains on

22   him.  It restricts movement to a certain extent.

23         But what did the expert, essentially, in leg irons tell

24   you?  This gentleman, if you remember, Mr. Chipman, he's been

25   doing this for 30 years, he's been in a courtroom for 30 years.

1        He's seen everything.  What did he tell you?

2               Not what the attorneys said, what did he tell you?

3               "I have literally seen people run in them.  I've seen

4        them run.  People even with more restrictions than that, their

5        arms bound, can still do worse or cause disturbances."

6               That's important because when we think about what

7        happened in the courtroom, when we think about what happened to

8        a victim -- and the federal prosecutor is a victim in this

9        case -- a reasonable person in the same situation should be

10       afraid.

11              And at the time, there was certainly not a gentleman in

12       a suit as a United States Marshal standing between the defense

13       table and the prosecution.  You'll see that on the video.

14       There's nobody.  And the tables are going to be a lot closer

15       than what we're looking at here in today's court.

16              You're going to see that Mr. McMillan is probably about

17       four, five feet away from the defendant on video.  And we spent

18       a lot of time talking about the video -- I'm not going to go

19       into it again.  You can watch it, you can pause it, you can

20       rewind, you can slow-motion it.  It speaks for itself.

21              Let me leave you with this:

22              I think for a lot of us, if I remember correctly in

23       jury selection, for most of us it's our first time being on

24       jury duty, and I think some of us have had prior jury duty

25       experience.  And I think you come in, we put on the juror

1    badge.  We're instructed, there's rules, there's regulations,

2    there's objections.  There's new laws we didn't know about.

3    There's arguments and testimony.

4         And I think -- through it all, I think we forget to use

5    our God-given common sense, or maybe you don't know, or maybe

6    you don't not remember to use it, maybe you just don't think

7    you can.  And you can.

8         I ask that when you go back and you deliberate as a

9    group that you sit down and you say, hold on, what just makes

10   sense?  What does my common sense tell me about what happened?

11   Because if it's not common sense and if it doesn't make sense,

12   it's nonsense.

13        Nonsense, like John McMillan was not the person he was

14   talking to.  Nonsense, like this was not a true threat, he

15   didn't mean it.  Nonsense.

16        And when you use your common sense, it's going to tell

17   you this:  That on this particular day a verdict was returned

18   and he didn't like it, and he was guilty and he was looking at

19   a lot of time, and he is furious.  And he's mad at the

20   prosecutor who brought the charges against him, who

21   investigated his case, who had known him for years.

22        And what he does is, knowing that he's facing a lot of

23   time and he's got nothing to lose, he takes the thing that's

24   there, that he has access to, he hurls it over his head and he

25   charges it, because he's got nothing to lose in his mind.

1          And then security is so worried that this is a threat

2     that they have to bear-hug him, throw him over the counter and

3     restrain him, and it takes four folks to do that because one is

4     not enough, because he's trying to get out because he's

5     restraining, because he's trying to get to McMillan, because

6     he's got nothing to lose.

7          And when he's hurling the threats, he means it.  He

8     means it.  And he talks about it still even after that.  And

9     the person he's talking about is John McMillan.  That is what

10    your common sense is going to tell you, and I ask that, based

11    on everything that you have seen, that you find the defendant

12    guilty as to both counts.  Thank you.

13         Thank you, Judge.

14         THE COURT:  Thank you, Ms. Latta.

15         Ladies and gentlemen, you will now go to the jury room

16    and commence your deliberation.  In a few moments, you will be

17    provided with the exhibits that have been introduced in this

18    case, along with some menus to make your lunch selection.

19         There is absolutely no rush, you take all the time that

20    you need.  And that concludes my remarks for the moment.

21         The Court will be in recess during the jury

22    deliberations.

23         All rise for the jury.

24         (Jury exited courtroom at 1:04 p.m. to commence

25    deliberations.)

```
1              THE COURT:  You may be seated.  All right.

2         Does the Government have its exhibits ready to go?

3         MR. ALEXANDER:  Yes, Your Honor.

4         THE COURT:  Do you have a laptop with the thumb drives

5    or whatever other media?

6         MR. ALEXANDER:  Your Honor, I have a laptop that's

7    clean; if defense counsel wants to review, he's welcome to do

8    so to confirm that it's clean.  I also have the exhibits with

9    the flash drives containing each of the admitted recordings.

10        THE COURT:  Mr. Garland, would you have any interest in

11   verifying the state of the laptop?

12        MR. GARLAND:  No, I trust that the representations are

13   correct, Judge.

14        THE COURT:  Okay.  Well, then, Mr. Sweeney, if you

15   could please take possession of the exhibits along with the

16   clean laptop.

17        MR. ALEXANDER:  Your Honor, one thing I would note, I

18   have a sticky note that I've applied to the binder that

19   indicates that the password of the flash drive, it's written on

20   there because each of the flash drives are password-protected.

21   So the jurors just have to know that they need to type that in.

22        THE COURT:  Okay.  Mr. Garland, do you want any

23   additional time to review the binder or its contents?

24        MR. GARLAND:  I've reviewed it, Judge, it's fine.

25        THE COURT:  Okay.  Thank you, Mr. Garland.
```

```
 1              Please leave your cell phone numbers.  This is for

 2    counsel, on the ledge here in front of Ms. Glass' computer so

 3    we may reach you in the event of any juror notes.

 4              Are there any other matters that need to be discussed

 5    at this time before we recess?

 6              MR. ALEXANDER:  Not from the United States, Your Honor.

 7              MR. GARLAND:  Not from the defense, Your Honor.

 8              THE COURT:  All right.  Well, the Court is in recess

 9    during the jury deliberations.

10              COURTROOM DEPUTY:  All rise.

11              (Jury deliberations commencing at 1:06 p.m.)

12              (Recess taken for The Court and Counsel while the jury

13    is deliberating from 1:06 p.m. to 3:41 p.m.)

14              (Jury deliberations concluded at 3:41 p.m.)

15              COURTROOM DEPUTY:  All rise.

16              This Court is back in session.

17              THE COURT:  You may be seated.  All right.

18              All counsel are present, as is the defendant.

19              The Court has received a note that the jury has

20    returned a verdict.

21              So let's call in the jurors.

22              (Brief pause in the proceedings.)

23              (Jury entered courtroom at 3:44 p.m.)

24              THE COURT:  You may be seated.

25              I understand that the jury has returned a verdict.
```

1        Who speaks for the jury as its foreperson?

2        THE JURY FOREPERSON:  I do, Your Honor.

3        THE COURT:  Thank you very much.

4        Has the jury agreed unanimous on its verdict?

5        THE JURY FOREPERSON:  Yes, ma'am.

6        THE COURT:  Please hand the document over to the Madam

7   Clerk.

8        (Verdict handed to the Court Clerk.)

9        THE COURT:  The verdict will now be published.

10       THE COURT CLERK:  United States District Court,

11  Southern District of Florida, Case Number 21-60037-Criminal,

12  Cannon.  United States of America versus Christopher Tavorris

13  Wilkins.

14                        VERDICT

15       THE COURT CLERK:  Verdict Form:

16       We, the jury, unanimously return the following verdict:

17       Count 1:

18       1A:  Did the Government prove beyond a reasonable doubt

19  that Defendant Christopher Tavorris Wilkins committed forcible

20  assault against a Federal prosecutor with a deadly or dangerous

21  weapon?

22       Answer:  Yes.

23       Count 2:

24       2A:  Did the Government prove beyond a reasonable doubt

25  that Defendant Christopher Tavorris Wilkins threatened a

1    Federal law enforcement officer?

2              Answer:  Yes.

3              2B:  We, the jury, having found defendant guilty of

4    threatening a Federal law enforcement officer, further find

5    that defendant knowingly threatened to murder the individual

6    described in the indictment, knowingly threatened to assault

7    the individual described in the indictment.

8              So say we all, signed and dated, at the United States

9    Courthouse, Ft. Pierce, Florida, this 20th day of January,

10   2022, signed by the foreperson.

11             THE COURT:  Thank you, Madam Clerk.

12             Please poll the jurors.

13             THE COURT CLERK:  Juror Number 1, is the verdict as

14   read your true verdict?

15             JUROR NUMBER 1:  Yes.

16             THE COURT CLERK:  Juror Number 2, is the verdict as

17   read your true verdict?

18             JUROR NUMBER 2:  Yes.

19             THE COURT CLERK:  Juror Number 3, is the verdict as

20   read your true verdict?

21             JUROR NUMBER 3:  Yes.

22             THE COURT CLERK:  Juror Number 4, is the verdict as

23   read your true verdict?

24             JUROR NUMBER 4:  Yes.

25             THE COURT CLERK:  Juror Number 5, is the verdict as

```
 1    read your true verdict?

 2             JUROR NUMBER 5:  Yes.

 3             THE COURT CLERK:  Juror Number 6, is the verdict as

 4    read your true verdict?

 5             JUROR NUMBER 6:  Yes.

 6             THE COURT CLERK:  Juror Number 7, is the verdict as

 7    read your true verdict?

 8             JUROR NUMBER 7:  Yeah.

 9             THE COURT:  I'm sorry, I didn't hear the answer to that

10    question, ma'am.

11             JUROR NUMBER 7:  Yes.

12             THE COURT:  Thank you.

13             THE COURT CLERK:  Juror Number 8, is the verdict as

14    read your true verdict?

15             JUROR NUMBER 8:  Yes.

16             THE COURT CLERK:  Juror Number 9, is the verdict as

17    read your true verdict?

18             JUROR NUMBER 9:  Yes.

19             THE COURT CLERK:  Juror Number 10, is the verdict as

20    read your true verdict?

21             JUROR NUMBER 10:  Yes.

22             THE COURT CLERK:  Juror Number 11, is the verdict as

23    read your true verdict?

24             JUROR NUMBER 11:  Yes.

25             THE COURT CLERK:  Juror Number 12, is the verdict as
```

1    read your true verdict?

2           JUROR NUMBER 12:  Yes.

3           THE COURT:  I will now direct the Clerk to file and

4    record the verdict.

5           Ladies and gentlemen of the jury, thank you, on behalf

6    of the entire Southern District of Florida, for your service.

7           We are deeply grateful.

8           I will ask you to retire briefly to the jury

9    deliberations room for a few moments while I take care of a few

10   matters in the courtroom.

11          You will be given certificates as a small appreciation

12   token of your service.

13          Please rise for the jury.

14          (Jury, being excused from service, exited courtroom

15   at 3:49 p.m.)

16          THE COURT:  Mr. Wilkins, the jury having found you

17   guilty, I hereby adjudge you to be guilty on Counts 1 and 2.

18          I'm going to defer sentencing, order a presentence

19   investigation report, and set sentencing for April 1st at

20   2:00 p.m. in the Ft. Pierce Courthouse.

21          Someone from the United States Probation Department

22   will be coming to see you to interview you.

23          I encourage you to be fully open and honest with the

24   probation department so that I may make an appropriate decision

25   in your case, as far as sentencing is concerned.

1          Are there any other matters that need Court resolution

2     at this time?  Mr. Alexander?

3          MR. ALEXANDER:  Not from the United States, Your Honor.

4          THE COURT:  Mr. Garland?

5          MR. GARLAND:  Not from the defense.

6          THE COURT:  Mr. Wilkins is remanded to the custody of

7     the Marshal pending sentencing.

8          Thank you, Mr. Garland, for your able representation

9     and to all the parties for their professionalism during this

10    proceeding.

11         The Court is in recess.

12         COURTROOM DEPUTY:  All rise.

13         (Proceedings concluded at 3:51 p.m.)

14

15              C E R T I F I C A T E

16

17        I hereby certify that the foregoing is an

          accurate transcription of the

18        proceedings in the above-entitled matter.

19

20        December 1st, 2022

21

22                     S/Glenda M. Powers

23                     GLENDA M. POWERS, RPR, CRR, FPR
                       United States District Court
                       400 North Miami Avenue
24                     Miami, Florida  33128

25

**'**

**'80s** [1] - 47:11

**0**

**0:21-CR-60037-AMC-1** [1] - 1:3

**1**

**1** [45] - 1:10, 7:2, 7:3, 7:7, 7:23, 11:2, 11:17, 11:25, 12:3, 12:7, 12:11, 12:17, 60:18, 82:18, 84:17, 84:20, 85:15, 86:24, 86:25, 87:12, 94:23, 96:2, 96:12, 105:2, 105:7, 105:8, 105:21, 107:5, 107:14, 107:21, 108:16, 111:19, 114:23, 115:21, 123:25, 133:12, 140:2, 140:13, 141:9, 141:10, 141:14, 161:17, 162:13, 162:15, 164:17
**10** [9] - 9:23, 10:20, 11:21, 16:11, 82:25, 137:3, 154:17, 163:19, 163:21
**10-minute** [1] - 80:8
**10-year** [2] - 83:25, 84:7
**100** [6] - 4:10, 27:16, 64:12, 65:14, 75:22, 148:1
**10:27** [2] - 80:4, 80:6
**10:28** [1] - 80:10
**10:40** [1] - 80:9
**10:44** [1] - 80:10
**11** [5] - 12:22, 13:1, 13:4, 163:22, 163:24
**111** [2] - 14:2, 84:11
**111(a)(1** [2] - 107:9, 107:12
**111(b)** [1] - 105:5
**113** [1] - 4:12
**1149** [1] - 15:7
**115** [3] - 14:2, 83:21, 84:13
**115(a)(1)(B)** [1] - 13:13
**11:00** [1] - 80:3
**11:11** [1] - 98:12
**11:18** [1] - 98:12
**11:21** [1] - 99:20

**12** [5] - 13:11, 14:8, 146:6, 163:25, 164:2
**125** [1] - 4:15
**1294** [1] - 10:11
**13** [1] - 14:10
**1300** [1] - 10:11
**14** [2] - 14:14, 14:21
**145** [1] - 4:17
**15** [3] - 13:2, 14:22, 98:23
**155** [1] - 35:5
**160** [1] - 4:19
**161** [1] - 4:20
**162** [1] - 4:22
**17** [1] - 3:8
**18** [11] - 3:9, 13:12, 14:2, 81:8, 83:21, 84:12, 105:5, 105:13, 107:8, 107:12, 124:17
**189** [1] - 1:10
**1985** [1] - 47:8
**1:00** [1] - 124:20
**1:04** [1] - 158:24
**1:06** [2] - 160:11, 160:13
**1A** [6] - 80:15, 80:18, 111:19, 111:24, 111:25, 161:18
**1B** [5] - 80:19, 112:1, 112:2, 112:6, 112:7
**1C** [3] - 82:17, 112:8, 112:12
**1st** [2] - 164:19, 165:20

**2**

**2** [41] - 1:14, 7:24, 11:1, 11:2, 11:16, 11:25, 12:10, 12:12, 12:16, 13:12, 15:1, 80:25, 84:17, 84:21, 84:25, 87:16, 88:1, 94:23, 95:5, 95:24, 95:25, 96:10, 96:13, 97:8, 105:11, 105:22, 107:22, 108:18, 112:17, 119:24, 124:1, 142:14, 144:15, 144:16, 144:18, 161:23, 162:16, 162:18, 164:17
**20** [3] - 1:6, 40:18, 96:23
**2000** [1] - 10:12
**2008** [1] - 54:9
**2009** [1] - 22:5
**2019** [15] - 23:16,

24:25, 26:5, 55:7, 59:1, 59:7, 59:17, 65:3, 65:8, 76:16, 114:3, 153:25, 154:10
**2022** [3] - 1:6, 162:10, 165:20
**20th** [1] - 162:9
**21** [1] - 3:12
**21-60037-Criminal** [1] - 161:11
**210** [1] - 87:2
**212** [1] - 34:23
**22** [1] - 13:17
**228** [1] - 10:11
**25/15** [1] - 98:21
**2500** [1] - 2:4
**29** [5] - 87:15, 91:3, 95:3, 96:13, 96:16
**2:00** [1] - 164:20
**2A** [17] - 80:25, 81:1, 81:24, 81:25, 82:3, 82:16, 82:19, 84:2, 111:25, 112:7, 112:16, 112:18, 112:22, 112:23, 123:9, 161:24
**2B** [9] - 81:21, 82:4, 82:10, 82:14, 82:16, 84:5, 112:23, 113:1, 162:3

**3**

**3** [6] - 8:3, 60:18, 105:23, 114:23, 162:19, 162:21
**30** [6] - 59:7, 96:23, 114:3, 150:3, 155:25
**300** [1] - 36:8
**30th** [1] - 65:4
**33** [1] - 3:13
**33128** [2] - 2:15, 165:24
**33132** [1] - 1:22
**33394** [1] - 1:25
**34** [1] - 146:5
**344** [1] - 15:6
**34947-4771** [1] - 2:5
**35** [1] - 150:3
**3:41** [2] - 160:13, 160:14
**3:44** [1] - 160:23
**3:49** [1] - 164:15
**3:51** [2] - 1:9, 165:13
**3C** [1] - 123:3

**4**

**4** [3] - 8:7, 162:22,

162:24
**40** [4] - 97:3, 98:18, 149:9, 149:14
**400** [2] - 2:14, 165:23
**47** [1] - 3:14
**4:00** [1] - 65:15
**4C** [1] - 123:3
**4th** [1] - 1:21

**5**

**5** [3] - 8:11, 162:25, 163:2
**50** [4] - 97:2, 149:9, 149:14, 154:17
**500** [1] - 1:24
**50s** [1] - 150:2
**52** [1] - 3:16
**57** [1] - 5:7
**58** [1] - 5:5
**5:00** [1] - 65:15

**6**

**6** [5] - 8:16, 60:18, 114:23, 163:3, 163:5
**60s** [1] - 150:2
**64** [1] - 3:17
**6:30** [2] - 40:10, 125:25
**6th** [1] - 65:7

**7**

**7** [23] - 5:5, 8:22, 23:16, 24:25, 26:5, 55:6, 55:24, 57:3, 57:23, 58:12, 58:15, 58:17, 59:1, 59:7, 59:16, 60:18, 76:16, 114:3, 114:23, 154:10, 163:6, 163:8, 163:11
**700** [1] - 1:24
**75** [1] - 3:18
**79** [1] - 4:4
**7th** [6] - 65:3, 65:5, 65:11, 66:7, 125:21, 129:19

**8**

**8** [13] - 5:7, 9:2, 9:13, 55:19, 55:24, 55:25, 56:22, 56:25, 57:7, 78:24, 115:5, 163:13, 163:15
**80** [1] - 4:5
**84** [1] - 4:7
**8:15** [1] - 1:9

**8:36** [1] - 1:9
**8:50** [1] - 16:13

**9**

**9** [6] - 9:16, 9:23, 10:20, 11:21, 163:16, 163:18
**924(c** [1] - 81:9
**99** [2] - 1:21, 4:8
**9:08** [1] - 16:16
**9:09** [1] - 16:13

**A**

**a)(1** [1] - 105:5
**a)(1)(B)** [1] - 105:13
**a.m** [12] - 1:9, 1:9, 16:13, 16:16, 80:3, 80:6, 80:10, 98:12, 99:20
**ability** [11] - 20:6, 39:15, 88:23, 103:25, 106:1, 108:3, 116:4, 122:19, 140:5, 140:14, 152:21
**able** [24] - 23:11, 27:10, 29:4, 29:6, 31:18, 34:5, 34:9, 34:15, 37:5, 39:18, 39:19, 44:22, 45:25, 49:18, 55:9, 63:7, 116:10, 118:22, 122:16, 122:17, 122:18, 131:9, 149:10, 165:8
**above-entitled** [1] - 165:18
**absent** [1] - 149:16
**absolutely** [10] - 25:25, 26:15, 29:5, 30:12, 39:3, 44:18, 48:24, 123:15, 151:25, 158:19
**academy** [1] - 23:7
**accept** [1] - 103:9
**accepting** [1] - 96:13
**access** [2] - 113:18, 157:24
**accident** [2] - 109:17, 144:3
**accordance** [1] - 73:2
**according** [1] - 141:24
**accordingly** [1] - 10:15
**account** [4] - 14:19, 108:11, 108:19, 120:4
**accurate** [9] - 18:4,

43:11, 58:7, 66:25, 71:2, 103:9, 123:15, 129:22, 165:17
**accurately** [2] - 104:1, 144:2
**accuse** [1] - 152:10
**accused** [1] - 148:8
**acquittal** [4] - 84:25, 86:10, 87:25, 88:10
**ACQUITTAL** [1] - 4:7
**acronym** [1] - 21:23
**act** [11] - 12:9, 30:14, 38:13, 88:3, 90:10, 95:14, 102:6, 109:15, 111:2, 126:9, 141:22
**acted** [1] - 71:20
**acting** [3] - 38:17, 44:19, 93:24
**action** [1] - 82:25
**actions** [1] - 152:21
**activities** [1] - 140:23
**acts** [3] - 25:21, 89:3, 93:11
**actual** [6] - 82:23, 85:3, 103:2, 128:21, 141:15
**add** [2] - 93:18, 150:9
**addition** [3] - 37:20, 48:18, 129:17
**additional** [4] - 81:21, 84:5, 125:1, 159:23
**address** [1] - 82:3
**addressed** [2] - 87:4, 139:8
**addresses** [1] - 40:16
**addressing** [2] - 13:22, 88:13
**adequately** [1] - 96:15
**adjudge** [2] - 139:11, 164:17
**adjudicate** [3] - 45:7, 72:23, 143:11
**adjudicated** [2] - 45:11, 73:2
**adjudicating** [1] - 50:21
**adjudication** [1] - 75:7
**admission** [1] - 104:7
**admit** [2] - 56:21, 58:11
**admitted** [6] - 57:1, 58:15, 102:12, 102:14, 142:9, 159:9
**advantage** [2] - 39:2, 104:15
**advised** [1] - 57:5
**advisement** [1] - 83:19
**affairs** [1] - 102:7

**affect** [2] - 93:19, 110:2
**affirmed** [1] - 87:9
**afford** [1] - 141:4
**afraid** [2] - 116:20, 156:10
**afterwards** [1] - 79:10
**age** [1] - 35:10
**Agent** [7] - 17:7, 18:21, 20:9, 116:13, 117:19, 122:10, 133:14
**agent** [3] - 114:16, 137:15, 146:17
**AGENT** [2] - 3:7, 17:3
**aggression** [2] - 32:24, 116:21
**aggressive** [1] - 39:16
**ago** [5] - 31:22, 96:9, 145:15, 146:11, 146:22
**agree** [16] - 14:4, 35:9, 42:11, 43:12, 70:1, 71:1, 71:5, 74:22, 83:9, 93:10, 101:9, 109:23, 110:12, 113:8, 136:4
**agreed** [2] - 111:7, 161:4
**agreement** [1] - 110:18
**ahead** [2] - 35:17, 92:4
**aid** [1] - 104:17
**AILEEN** [1] - 1:16
**aim** [1] - 98:20
**ain't** [2] - 137:4, 137:5
**aisle** [2] - 25:19, 44:11
**AJAY** [1] - 1:23
**Ajay** [1] - 6:7
**alarm** [1] - 62:1
**alert** [4] - 39:22, 40:3, 47:13, 62:2
**Alexander** [32] - 3:9, 3:16, 3:18, 6:7, 7:12, 8:18, 8:23, 9:3, 10:20, 11:6, 12:22, 14:10, 14:14, 15:11, 15:16, 16:20, 20:11, 57:2, 67:3, 79:18, 79:23, 81:4, 82:21, 88:13, 91:10, 93:1, 93:18, 94:15, 95:8, 98:17, 113:16, 165:2
**ALEXANDER** [82] - 1:23, 4:12, 6:4, 6:6, 7:5, 7:13, 7:25, 8:4, 8:8, 8:13, 8:19, 8:24, 9:4, 10:21, 11:7, 12:23, 13:14, 14:11, 14:15, 14:23, 15:12,

15:17, 16:21, 18:18, 18:20, 20:9, 20:13, 20:19, 52:7, 52:20, 52:25, 55:17, 55:25, 56:2, 56:20, 57:4, 57:8, 57:19, 57:21, 57:24, 58:1, 58:10, 58:18, 58:20, 63:23, 64:1, 64:20, 65:20, 66:21, 67:4, 76:5, 76:7, 79:13, 79:19, 79:24, 81:6, 82:22, 88:15, 88:21, 89:9, 89:18, 89:21, 89:24, 91:11, 93:2, 93:19, 94:16, 95:9, 96:22, 98:20, 99:3, 99:12, 99:18, 100:2, 113:17, 113:21, 113:24, 159:3, 159:6, 159:17, 160:6, 165:3
**allege** [1] - 109:19
**alleged** [5] - 86:13, 108:24, 109:14, 127:24, 137:16
**alleges** [1] - 131:24
**allow** [2] - 39:15, 104:19
**allows** [2] - 10:4, 13:23
**almost** [1] - 12:20
**alone** [1] - 110:10
**ALSO** [1] - 2:7
**alternative** [3] - 12:3, 109:18, 109:23
**alternatively** [1] - 12:8
**alternatives** [1] - 109:21
**Altman** [10] - 53:5, 53:9, 54:3, 54:4, 54:7, 54:17, 60:4, 65:13, 72:19, 76:9
**Altman's** [6] - 53:25, 55:6, 56:10, 57:9, 58:25, 63:17
**Altonaga's** [2] - 24:2, 31:14
**amendment** [3] - 9:9, 9:21, 9:24
**Amendment** [1] - 9:25
**AMERICA** [1] - 1:5
**America** [3] - 59:8, 114:5, 161:12
**amiss** [1] - 41:2
**amount** [1] - 33:1
**ample** [2] - 93:4, 93:11
**anger** [1] - 150:4
**angry** [3] - 130:12, 137:7, 154:5

**animosity** [1] - 117:24
**answer** [13] - 63:19, 91:22, 104:3, 111:24, 111:25, 112:6, 112:7, 112:22, 112:23, 119:17, 132:17, 162:2, 163:9
**Answer** [1] - 161:22
**apart** [2] - 39:4, 39:6
**apologies** [1] - 89:18
**apologize** [1] - 89:9
**apparent** [7] - 88:24, 106:2, 108:2, 116:4, 140:5, 140:14, 152:21
**appear** [2] - 9:22, 104:2
**appearances** [1] - 6:5
**APPEARANCES** [2] - 1:19, 2:1
**applied** [1] - 159:18
**apply** [2] - 13:4, 33:1, 140:21
**applying** [1] - 49:23
**appointed** [1] - 54:4
**appreciate** [3] - 27:20, 33:6, 52:1
**appreciation** [1] - 164:11
**apprehension** [11] - 85:2, 85:3, 85:7, 85:14, 108:3, 109:6, 121:3, 127:4, 140:6, 140:15, 142:13
**approach** [1] - 57:24
**appropriate** [5] - 9:12, 11:4, 84:23, 123:23, 164:24
**appropriately** [1] - 64:5
**April** [1] - 164:19
**area** [5] - 28:6, 28:7, 63:3, 72:1, 72:3
**argue** [7] - 11:9, 11:10, 11:13, 13:18, 85:1, 125:14, 144:23
**argued** [2] - 14:17, 131:18
**argument** [26] - 9:11, 9:20, 10:9, 11:6, 11:25, 12:17, 13:25, 83:18, 88:16, 90:20, 90:22, 91:6, 91:10, 92:13, 92:22, 94:11, 94:20, 94:23, 94:24, 95:5, 96:2, 96:12, 96:16, 96:19, 100:16, 132:23
**ARGUMENT** [6] -

4:11, 4:14, 4:16, 113:23, 125:11, 145:12
**arguments** [13] - 84:21, 87:14, 88:14, 95:3, 95:23, 96:7, 97:7, 113:15, 124:19, 125:10, 129:13, 145:18, 157:3
**arm's** [1] - 122:9
**armed** [2] - 22:23, 73:16
**arms** [2] - 48:14, 156:5
**Army** [1] - 22:14
**arrested** [2] - 22:19, 104:7
**arrival** [1] - 16:18
**arriving** [1] - 102:19
**artfully** [1] - 153:16
**articulate** [1] - 83:14
**aside** [3] - 9:20, 28:6, 146:3
**ass** [7] - 121:11, 121:12, 134:6, 135:7, 146:14, 146:15, 150:23
**assault** [66] - 10:25, 12:4, 13:6, 13:18, 13:19, 13:21, 14:5, 15:3, 82:13, 82:16, 82:20, 83:1, 83:4, 83:9, 83:23, 83:24, 84:3, 84:9, 85:1, 85:13, 88:22, 89:3, 89:25, 90:7, 90:11, 91:6, 92:1, 93:20, 95:18, 105:8, 105:10, 105:12, 105:17, 105:25, 106:20, 106:21, 107:7, 107:9, 107:10, 107:18, 107:19, 107:23, 107:25, 108:7, 108:16, 111:22, 112:4, 112:14, 113:6, 116:2, 119:8, 119:23, 119:25, 120:1, 123:19, 124:3, 128:5, 140:2, 140:3, 141:10, 142:8, 144:19, 149:23, 150:6, 161:20, 162:6
**assault's** [1] - 149:23
**assaulted** [7] - 105:2, 105:21, 105:22, 106:7, 107:21, 107:23, 115:24

**assaulting** [4] - 9:17, 89:1, 105:15, 115:21
**asserts** [1] - 103:2
**assessed** [1] - 114:10
**assigned** [3] - 7:15, 51:23, 55:2
**assist** [3] - 31:15, 62:15, 129:23
**Assistant** [12] - 6:7, 13:6, 61:20, 86:12, 106:11, 107:7, 107:10, 109:1, 115:25, 117:17, 120:7, 124:2
**assisting** [1] - 31:2
**assume** [7] - 15:10, 39:15, 66:19, 66:24, 99:10, 102:16, 146:2
**assuming** [1] - 67:15
**assumption** [1] - 67:4
**ATF** [1] - 146:17
**athletic** [1] - 131:1
**attack** [9] - 19:19, 93:8, 115:15, 115:16, 117:21, 122:7, 123:4
**attempt** [16] - 12:4, 33:22, 88:23, 89:4, 89:25, 90:5, 90:8, 106:1, 106:22, 106:23, 107:25, 116:3, 116:5, 119:10, 119:14, 140:3
**attempted** [3] - 49:24, 89:15, 153:13
**attempting** [2] - 12:9, 45:1
**attention** [11] - 17:20, 19:24, 23:16, 32:3, 40:24, 43:20, 59:6, 59:16, 118:23, 131:4, 134:2
**attorney** [48] - 27:2, 28:3, 41:17, 41:23, 42:16, 42:19, 42:21, 43:13, 43:19, 61:19, 67:25, 68:4, 68:17, 68:19, 68:25, 69:4, 69:6, 69:16, 70:10, 73:25, 77:6, 78:5, 85:24, 92:25, 93:3, 100:13, 115:16, 117:22, 122:6, 122:8, 122:10, 123:5, 132:5, 132:7, 132:18, 132:19, 132:22, 132:24, 133:3, 133:11, 133:17, 134:1,

141:16, 141:19, 146:13, 147:17, 147:19, 147:25
**Attorney** [10] - 13:7, 61:20, 86:12, 106:11, 107:7, 107:11, 109:1, 115:25, 120:7, 124:2
**attorney's** [1] - 42:19
**Attorney's** [4] - 1:21, 1:23, 76:11, 106:12
**Attorneys** [2] - 6:7, 117:17
**attorneys** [4] - 145:16, 145:17, 145:24, 156:2
**attributed** [3] - 137:11, 138:20, 139:4
**audio** [4] - 123:9, 123:14, 151:16, 153:9
**August** [1] - 22:5
**AUSA** [8] - 1:20, 1:23, 90:5, 92:3, 115:9, 121:25, 122:2, 122:11
**authority** [2] - 10:9, 130:16
**authorized** [1] - 109:2
**available** [1] - 98:15
**Avenue** [2] - 2:4, 2:14, 165:23
**avoid** [1] - 99:16
**award** [1] - 126:12
**aware** [5] - 18:10, 46:7, 49:8, 74:13, 83:6
**ax** [1] - 39:24

---

# B

**B.S** [1] - 40:1
**backwards** [2] - 30:4, 43:17
**bad** [2] - 126:14, 154:8
**badge** [1] - 157:1
**ball** [2] - 146:15, 146:16
**balling** [1] - 146:15
**bang** [1] - 150:1
**Bar** [3] - 25:7, 44:23, 71:25
**barrier** [1] - 25:19
**baseball** [2] - 132:14
**based** [31] - 13:2, 50:8, 51:6, 53:11, 53:12, 72:23, 85:20, 87:2, 90:17, 91:23, 92:3, 93:5, 95:15,

101:4, 102:2, 116:20, 118:2, 118:10, 123:22, 125:15, 125:16, 133:8, 134:13, 137:14, 140:19, 143:17, 145:18, 158:10
**basis** [4] - 48:23, 86:10, 95:3, 129:8
**basketball** [2] - 34:25, 39:8
**bathroom** [1] - 80:8
**bear** [2] - 151:1, 158:2
**bear-hug** [1] - 158:2
**bear-hugged** [1] - 151:1
**beat** [6] - 61:14, 78:4, 120:22, 120:23, 121:12, 138:4
**become** [3] - 110:20, 122:22, 155:15
**becoming** [1] - 22:11
**bedroom** [1] - 121:18
**BEFORE** [1] - 1:16
**began** [1] - 59:6
**begin** [1] - 100:24
**beginning** [3] - 59:20, 113:25, 145:13
**behalf** [5] - 6:8, 84:25, 125:14, 145:2, 164:5
**behavior** [1] - 149:8
**behind** [22] - 19:20, 25:3, 25:6, 25:7, 25:10, 25:11, 25:15, 28:3, 34:6, 34:9, 35:23, 36:1, 36:3, 62:10, 69:12, 69:22, 71:8, 115:6, 115:7, 138:9, 147:23, 151:1
**belief** [2] - 143:7, 143:16
**beliefs** [1] - 110:21
**believes** [1] - 133:8
**belongs** [2] - 41:16, 41:17
**below** [1] - 113:8
**bench** [6] - 28:14, 30:5, 30:7, 30:24, 31:4, 54:5
**benign** [1] - 116:15
**beside** [1] - 45:13
**best** [5] - 32:3, 42:23, 43:9, 123:10, 152:11
**Beth** [1] - 54:10
**better** [4] - 25:21, 27:21, 48:15, 152:12
**between** [6] - 11:18, 68:24, 82:13, 85:24, 144:8, 156:12

**beyond** [35] - 81:15, 81:17, 83:8, 83:12, 101:2, 101:19, 101:24, 102:5, 102:9, 105:20, 106:5, 107:13, 107:20, 108:14, 108:21, 109:12, 109:21, 111:20, 112:2, 112:12, 112:18, 113:10, 114:22, 119:20, 124:11, 129:2, 130:18, 133:10, 134:25, 139:16, 141:8, 142:17, 144:16, 161:18, 161:24
**big** [5] - 31:9, 69:17, 69:18, 146:15, 150:18
**big-ass** [1] - 146:15
**bigger** [1] - 27:11
**binder** [2] - 159:18, 159:23
**binding** [1] - 102:15
**bit** [9] - 25:3, 26:20, 27:21, 37:2, 42:23, 65:4, 116:8, 130:24, 152:25
**bitch** [3] - 137:12, 137:18, 147:3
**black** [17] - 32:4, 61:15, 135:6, 135:7, 135:18, 135:19, 135:20, 138:23, 138:24, 138:25, 139:2, 139:3
**blamed** [1] - 122:2
**blaming** [1] - 115:13
**blank** [2] - 146:9, 147:23
**block** [1] - 118:22
**bloodline** [3] - 147:10, 147:12, 147:13
**Bloom** [1] - 54:10
**blue** [5] - 25:4, 25:5, 34:18, 34:19, 35:15
**bodily** [28] - 88:23, 89:4, 89:16, 90:1, 90:5, 90:14, 90:25, 91:13, 91:22, 92:17, 106:1, 106:4, 106:17, 106:22, 108:4, 109:5, 116:3, 116:24, 118:7, 118:9, 119:2, 119:8, 121:2, 127:3, 140:6, 149:5, 149:17, 150:9
**body** [11] - 31:5, 34:3,

35:23, 35:24, 36:3, 36:9, 39:2, 62:8, 64:16, 77:16, 119:4
**bodysuits** [1] - 48:13
**bona** [2] - 128:5
**bone** [1] - 149:18
**book** [4] - 79:7, 91:17, 116:16, 149:23
**borne** [1] - 133:7
**bottom** [2] - 63:21, 113:11
**Boulevard** [1] - 1:24
**bouncing** [1] - 152:24
**bound** [2] - 130:22, 156:5
**box** [13] - 45:18, 48:15, 61:4, 63:14, 82:3, 111:23, 112:5, 112:15, 112:21
**boy** [2] - 121:12, 134:6
**bragging** [1] - 151:10
**branch** [1] - 22:13
**brandished** [1] - 81:10
**break** [9] - 16:4, 16:9, 18:7, 80:3, 80:8, 124:18, 124:24, 124:25, 127:23
**breaking** [3] - 27:20, 27:21, 107:1
**breath** [1] - 121:17
**brief** [2] - 98:9, 160:22
**Brief** [4] - 32:16, 46:20, 57:20, 63:25
**briefed** [1] - 94:17
**briefly** [6] - 18:18, 54:14, 71:22, 97:6, 155:13, 164:8
**bring** [6] - 37:18, 41:3, 44:23, 47:12, 99:2, 111:12
**bringing** [3] - 34:2, 34:3, 44:25
**bro** [1] - 146:10
**broach** [1] - 86:24
**broken** [4] - 82:14, 149:18, 149:19
**Brooke** [1] - 6:8
**BROOKE** [1] - 1:20
**brought** [10] - 33:15, 45:17, 45:19, 45:23, 72:4, 75:6, 128:25, 145:20, 148:5, 157:20
**Broward** [2] - 1:24, 57:14
**bruise** [1] - 119:7
**bruised** [1] - 149:25
**build** [2] - 143:2, 144:14
**building** [2] - 57:10,

58:25
**Building** [2] - 57:11, 58:22
**burden** [12] - 10:4, 100:14, 101:23, 114:21, 128:25, 129:1, 141:16, 141:17, 152:11, 152:13
**butt** [1] - 36:21
**butts** [1] - 49:20
**buying** [1] - 140:25
**BY** [27] - 2:13, 4:12, 4:15, 4:17, 17:6, 18:20, 21:15, 24:23, 26:18, 27:9, 28:19, 32:17, 33:11, 38:15, 47:2, 52:25, 56:2, 57:8, 57:21, 58:1, 58:20, 64:1, 64:25, 65:24, 66:23, 67:7, 76:7

## C

**calmed** [1] - 46:1
**cameras** [1] - 153:8
**Cannon** [3] - 145:14, 152:11, 161:12
**CANNON** [1] - 1:16
**cannot** [4] - 101:17, 130:2, 130:6, 130:25
**capacity** [6] - 21:22, 21:23, 23:19, 53:14, 76:8, 120:14
**captured** [1] - 123:13
**car** [18] - 61:15, 135:6, 135:7, 135:11, 135:15, 135:18, 135:19, 135:20, 138:23, 138:24, 138:25, 139:2, 144:3
**care** [6] - 104:9, 136:20, 140:18, 140:22, 141:6, 164:9
**career** [1] - 54:13
**carefully** [3] - 100:9, 102:3, 144:25
**careless** [7] - 109:7, 121:4, 121:7, 127:5, 127:15, 130:11, 139:18
**carried** [6] - 28:11, 88:2, 90:9, 106:23, 119:10, 155:18
**carry** [3] - 81:11, 111:8, 152:13
**carrying** [2] - 29:19, 106:9
**cars** [1] - 139:3

**Case** [1] - 161:11
**CASE** [1] - 1:3
**case** [98] - 10:10, 25:21, 26:25, 30:19, 38:12, 41:18, 42:6, 43:13, 46:11, 48:21, 67:9, 67:17, 74:3, 74:18, 81:15, 83:5, 83:12, 85:4, 85:18, 86:14, 86:16, 87:1, 87:4, 87:11, 87:19, 89:6, 89:12, 90:1, 91:21, 92:2, 92:13, 93:8, 96:15, 97:16, 98:1, 100:22, 102:4, 102:12, 102:17, 103:23, 110:6, 110:14, 110:17, 110:18, 110:22, 110:25, 114:4, 114:13, 114:16, 114:17, 114:22, 115:20, 116:5, 117:25, 118:3, 119:21, 120:12, 125:13, 125:20, 126:11, 126:12, 126:13, 128:1, 128:11, 128:24, 129:1, 129:6, 129:9, 129:18, 130:1, 131:8, 132:8, 132:23, 133:7, 133:24, 136:5, 136:6, 136:22, 137:16, 138:25, 140:1, 140:8, 140:19, 141:7, 143:2, 144:23, 154:12, 154:20, 154:24, 155:10, 155:15, 156:9, 157:21, 158:18, 164:25
**cases** [4] - 106:25, 144:3, 146:17, 148:10
**catch** [3] - 121:11, 134:6, 147:10
**catcher** [1] - 132:14
**categories** [1] - 113:7
**category** [2] - 113:8, 113:10
**catty** [1] - 63:6
**catty-cornered** [1] - 63:6
**caused** [4] - 116:12, 117:4, 149:17
**causes** [4] - 108:3, 129:7, 140:5, 150:7

**caution** [3] - 104:8, 110:4, 111:14
**cell** [3] - 31:20, 153:5, 160:1
**certain** [11] - 25:23, 30:10, 48:3, 74:18, 87:7, 105:7, 109:10, 114:1, 125:20, 126:1, 155:22
**certainly** [5] - 18:6, 86:8, 93:13, 151:11, 156:11
**certificates** [3] - 73:6, 75:20, 164:11
**certify** [1] - 165:16
**chain** [1] - 103:4
**chained** [2] - 48:10, 48:19
**chains** [12] - 28:23, 29:2, 29:4, 29:6, 38:2, 38:4, 48:18, 49:3, 51:7, 130:22, 155:17, 155:21
**chair** [179] - 17:22, 17:23, 17:24, 17:25, 18:2, 18:4, 18:5, 18:7, 18:10, 18:11, 18:22, 19:15, 19:18, 20:7, 24:7, 26:13, 27:7, 27:10, 27:12, 27:13, 27:14, 27:15, 27:17, 27:24, 28:5, 28:6, 28:10, 29:8, 29:9, 29:18, 29:19, 41:16, 41:17, 42:18, 42:19, 42:24, 44:13, 48:20, 55:10, 55:13, 55:14, 56:3, 56:9, 56:10, 56:25, 61:7, 62:4, 62:7, 67:19, 67:22, 67:24, 68:3, 68:4, 69:2, 69:8, 69:10, 69:20, 69:21, 69:22, 69:25, 70:3, 70:6, 70:9, 71:19, 73:9, 73:14, 73:16, 75:4, 76:23, 76:24, 77:14, 78:1, 78:17, 78:23, 79:9, 85:5, 85:19, 85:21, 85:23, 85:25, 86:5, 86:6, 86:8, 86:18, 86:23, 88:18, 90:3, 90:21, 91:8, 91:19, 91:21, 91:25, 92:6, 92:7, 92:13, 92:19, 92:25, 93:3, 93:21, 96:6, 115:5, 115:8, 116:6, 116:10, 116:17, 116:18, 117:1,

118:8, 118:17, 118:21, 118:24, 118:25, 119:21, 121:8, 121:25, 122:20, 124:6, 124:7, 124:9, 126:21, 131:6, 131:14, 131:16, 131:17, 131:18, 131:19, 131:22, 131:23, 131:24, 132:4, 132:8, 132:12, 132:19, 132:20, 133:2, 133:5, 133:10, 133:22, 133:23, 137:1, 140:9, 140:13, 141:13, 141:20, 142:4, 146:15, 147:16, 149:2, 149:9, 149:11, 150:1, 150:8, 150:24, 151:2, 151:5, 151:6, 151:7, 152:1, 152:3, 152:4, 152:5, 152:7, 153:12
**chair's** [1] - 146:12
**chair-throwing** [1] - 92:25
**chairs** [28] - 25:2, 41:13, 41:15, 42:3, 42:12, 43:4, 44:10, 51:15, 51:20, 51:21, 51:22, 51:23, 54:23, 55:1, 55:2, 55:3, 55:5, 56:13, 63:16, 63:20, 63:22, 68:2, 68:7, 92:8, 127:8, 132:2
**challenges** [1] - 14:20
**chambers** [3] - 53:12, 53:17, 59:3
**chance** [4] - 51:2, 67:9, 70:23, 131:3
**change** [1] - 110:19
**changed** [2] - 43:7, 71:6
**Chapman** [23] - 43:13, 43:19, 43:25, 69:9, 69:13, 69:16, 69:21, 69:22, 69:24, 70:1, 70:4, 70:6, 70:8, 70:10, 70:15, 70:17, 77:6, 85:25, 86:15, 86:17, 86:19, 132:8
**Chapman's** [1] - 69:17
**character** [1] - 85:21
**CHARGE** [3] - 3:3, 4:10, 100:19

**charge** [13] - 6:18, 6:20, 80:13, 86:25, 89:15, 90:17, 101:12, 119:21, 133:12, 134:3, 141:12, 141:21, 153:13
**charged** [17] - 15:8, 105:7, 107:1, 107:3, 107:5, 107:14, 110:5, 126:11, 126:12, 128:4, 130:20, 133:20, 141:23, 142:4, 142:7, 153:7, 154:11
**charges** [14] - 9:8, 10:13, 13:20, 45:11, 61:14, 104:23, 105:2, 105:11, 109:9, 109:24, 120:23, 141:10, 157:20, 157:25
**charging** [5] - 85:10, 94:8, 150:16, 150:17, 150:25
**chasing** [3] - 137:13, 147:4, 147:5
**check** [2] - 73:5, 82:3
**chest** [1] - 29:19
**children** [1] - 140:25
**Chipman** [9] - 20:14, 20:19, 21:6, 21:7, 33:12, 71:13, 71:20, 71:25, 92:7
**CHIPMAN** [3] - 3:11, 21:6, 21:13
**chipman** [7] - 21:6, 21:16, 26:19, 30:10, 32:18, 94:6, 155:24
**choice** [2] - 117:1, 124:22
**choke** [1] - 49:24
**choose** [2] - 30:20, 111:1
**chose** [2] - 30:22, 101:17
**Chris** [2] - 126:18, 126:20
**CHRISTOPHER** [1] - 1:8
**Christopher** [20] - 6:13, 24:9, 59:8, 62:5, 64:3, 77:3, 111:21, 112:3, 112:13, 112:19, 114:5, 119:22, 121:6, 123:24, 125:15, 129:20, 153:25, 161:12, 161:19, 161:25

**chuck** [1] - 149:24
**Circuit** [5] - 10:9, 10:12, 14:1, 15:6, 87:9
**circumstance** [2] - 39:22, 121:3
**circumstances** [8] - 91:4, 97:19, 103:5, 104:12, 109:5, 127:4, 129:22, 153:17
**circumstantial** [3] - 102:25, 103:4, 103:7
**cite** [1] - 10:11
**civil** [1] - 53:18
**clarify** [1] - 12:18
**clarity** [1] - 6:21
**classroom** [1] - 148:24
**clause** [1] - 9:25
**clean** [3] - 159:7, 159:8, 159:16
**clear** [7] - 14:1, 14:4, 81:3, 99:8, 120:11, 120:13, 130:4
**clearly** [6] - 18:5, 63:7, 104:3, 128:2, 139:23
**Clerk** [5] - 76:17, 161:7, 161:8, 162:11, 164:3
**CLERK** [14] - 161:10, 161:15, 162:13, 162:16, 162:19, 162:22, 162:25, 163:3, 163:6, 163:13, 163:16, 163:19, 163:22, 163:25
**Clerk's** [1] - 54:14
**client** [2] - 97:17, 125:14
**clips** [2] - 123:2, 123:4
**close** [8] - 25:15, 25:16, 25:19, 27:3, 69:12, 70:17, 96:23, 109:13
**closely** [1] - 144:25
**closer** [3] - 63:10, 65:14, 156:14
**closest** [1] - 143:25
**closing** [2] - 96:19, 97:1, 100:12, 100:13, 100:15, 113:15, 124:19, 125:10, 153:1
**CLOSING** [6] - 4:11, 4:14, 4:16, 113:23, 125:11, 145:12
**clotheslining** [1] - 149:16

**cloud** [1] - 139:22
**Code** [8] - 11:15, 13:12, 81:8, 84:13, 105:5, 105:13, 107:9, 107:12
**colored** [1] - 24:17
**combined** [1] - 92:8
**comedy** [1] - 136:20
**coming** [7] - 18:6, 30:1, 39:25, 50:24, 118:21, 151:22, 164:22
**commence** [5] - 100:17, 113:15, 124:21, 158:16, 158:24
**COMMENCED** [1] - 4:19
**commencing** [1] - 160:11
**comments** [6] - 39:25, 96:1, 138:10, 142:15, 145:21
**commit** [1] - 119:14
**committed** [9] - 109:10, 109:13, 109:19, 111:21, 112:3, 112:13, 154:11, 155:6, 161:19
**common** [8] - 102:3, 102:23, 140:19, 157:5, 157:10, 157:11, 157:16, 158:10
**commonly** [1] - 126:9
**commotion** [1] - 18:5
**communicate** [1] - 111:10
**compact** [1] - 35:8
**compare** [6] - 67:15, 129:18, 129:25, 130:1, 130:7, 134:8
**complain** [1] - 7:20
**completed** [2] - 11:20, 100:23
**compliant** [1] - 122:22
**complying** [1] - 28:18
**component** [2] - 11:17, 12:15
**computer** [2] - 113:18, 160:2
**concept** [1] - 85:1
**concerned** [2] - 102:24, 164:25
**concerning** [2] - 102:1, 103:14
**concert** [1] - 22:1
**conclude** [4] - 91:5, 93:13, 124:19,

131:11
**concluded** [3] - 33:12, 160:14, 165:13
**concludes** [1] - 158:20
**concluding** [1] - 97:11
**conclusion** [1] - 83:10
**conclusions** [1] - 102:24
**conditional** [3] - 88:4, 88:5, 88:6
**conference** [2] - 6:18, 80:13
**CONFERENCE** [1] - 3:3
**confine** [1] - 117:12
**confirm** [5] - 55:9, 55:13, 56:10, 60:16, 159:8
**conflict** [2] - 143:17, 144:11
**conflicts** [1] - 92:11
**confusing** [1] - 13:22
**confusion** [1] - 14:6
**conjunctive** [2] - 10:13, 109:20
**connection** [1] - 65:25
**Connor** [1] - 137:15
**CONNORS** [2] - 3:7, 17:3
**Connors** [11] - 16:19, 17:7, 18:21, 20:9, 116:13, 117:19, 122:11, 133:14, 146:12, 148:1, 153:8
**consequently** [1] - 85:15
**consider** [11] - 101:17, 102:11, 103:8, 104:8, 104:11, 105:7, 109:25, 110:8, 141:3, 145:1, 154:15
**consideration** [4] - 145:3, 153:24, 154:7, 155:5
**considered** [3] - 10:8, 97:7, 102:4
**considering** [4] - 89:6, 89:10, 102:22, 110:15
**consistent** [1] - 13:10
**conspiracy** [1] - 127:17
**constitute** [3] - 85:13, 88:7, 91:9
**constitutes** [1] - 91:5
**constraints** [1] - 64:9
**constructive** [3] - 9:9, 9:21, 9:24

**contact** [2] - 30:7, 133:8
**containing** [1] - 159:9
**contention** [1] - 11:24
**contents** [1] - 159:23
**context** [5] - 121:24, 127:12, 127:14, 153:3
**continue** [4] - 16:19, 31:1, 125:8, 125:9
**CONTINUED** [2] - 2:1, 17:5
**continued** [4] - 3:8, 4:1, 17:4, 19:11
**contradicts** [1] - 142:23
**contrast** [1] - 84:11
**control** [19] - 26:1, 26:3, 28:1, 31:13, 31:19, 33:2, 36:9, 36:22, 36:24, 37:18, 41:3, 41:9, 45:1, 45:23, 49:25, 50:1, 72:4, 74:16, 119:19
**controlling** [2] - 23:6, 32:2
**convened** [1] - 114:4
**convenience** [1] - 111:4
**conversations** [2] - 136:22, 154:2
**convict** [2] - 129:20, 147:24
**conviction** [3] - 10:14, 84:3, 109:22
**convictions** [1] - 130:18
**convince** [1] - 128:4
**convinced** [3] - 102:8, 102:10, 110:20
**convincing** [1] - 102:6
**cook** [1] - 128:13
**copies** [2] - 6:19, 100:7
**copy** [4] - 6:22, 104:25, 112:9, 113:14
**corner** [1] - 77:25
**cornered** [1] - 63:6
**correct** [64] - 7:15, 17:24, 18:22, 19:16, 19:22, 20:1, 33:17, 34:11, 37:19, 38:3, 39:9, 40:14, 40:20, 41:1, 41:4, 41:7, 41:12, 42:4, 42:13, 42:14, 42:17, 43:8, 44:4, 44:24, 45:5, 45:9, 48:7, 48:9, 49:7, 49:13, 56:16,

58:23, 59:5, 60:3, 60:19, 60:21, 61:21, 64:18, 65:6, 66:2, 67:22, 67:23, 68:11, 68:23, 69:5, 70:8, 73:20, 74:8, 74:21, 76:17, 76:25, 77:2, 77:15, 78:21, 78:22, 78:24, 79:2, 79:12, 82:22, 97:9, 99:11, 99:12, 128:19, 159:13
**Correction** [1] - 47:7
**correction** [3] - 22:10, 22:12, 23:4
**correctly** [3] - 30:13, 36:4, 156:22
**correspond** [1] - 12:16
**couched** [1] - 10:24
**Counsel** [1] - 160:12
**counsel** [17] - 11:10, 17:11, 17:13, 18:21, 49:20, 51:16, 54:24, 55:2, 56:14, 63:17, 77:7, 87:6, 129:14, 148:5, 159:7, 160:2, 160:18
**counsel's** [2] - 25:15, 25:16
**count** [6] - 47:7, 81:9, 104:24, 109:24, 154:18, 161:23
**Count** [65] - 11:1, 11:2, 11:16, 11:17, 11:25, 12:3, 12:7, 12:9, 12:10, 12:11, 12:12, 12:16, 12:17, 13:12, 15:1, 80:15, 80:18, 80:19, 80:25, 82:18, 84:17, 84:20, 84:21, 84:25, 85:15, 86:24, 86:25, 87:12, 87:16, 88:1, 94:23, 95:5, 95:24, 95:25, 96:2, 96:10, 96:12, 96:13, 97:8, 105:2, 105:7, 105:8, 105:11, 107:5, 107:14, 111:19, 112:17, 115:21, 119:24, 123:25, 124:1, 133:12, 140:2, 141:9, 141:10, 142:14, 144:15, 144:16, 144:18, 161:17
**counter** [1] - 158:2
**Counts** [3] - 60:18, 114:23, 164:17

counts [12] - 60:20, 104:24, 105:14, 115:21, 124:12, 132:25, 137:9, 145:5, 153:25, 154:2, 154:11, 158:12

County [1] - 57:14

coupled [2] - 108:2, 140:5

course [11] - 17:10, 35:19, 59:14, 64:2, 66:6, 73:24, 78:3, 88:2, 96:14, 114:6, 122:13

Court [38] - 2:13, 2:14, 6:1, 53:6, 54:8, 57:5, 73:3, 76:17, 82:23, 87:9, 91:6, 92:12, 94:13, 94:18, 97:13, 97:19, 98:14, 98:21, 98:22, 100:5, 124:21, 125:16, 129:15, 130:16, 139:6, 139:10, 143:12, 145:8, 158:21, 160:8, 160:12, 160:16, 160:19, 161:8, 161:10, 165:1, 165:11, 165:23

COURT [185] - 1:1, 6:3, 6:5, 6:11, 6:15, 7:6, 7:10, 7:16, 7:22, 8:1, 8:3, 8:5, 8:7, 8:9, 8:11, 8:14, 8:16, 8:20, 8:22, 8:25, 9:2, 9:5, 9:11, 9:16, 10:1, 10:8, 10:22, 11:5, 11:14, 11:23, 12:14, 12:24, 13:3, 13:9, 13:15, 13:25, 14:10, 14:12, 14:14, 14:16, 14:21, 14:24, 15:5, 15:13, 15:15, 15:18, 15:20, 15:24, 16:2, 16:8, 16:15, 16:17, 16:22, 17:1, 18:16, 20:11, 20:15, 20:20, 20:22, 21:8, 21:11, 24:22, 26:23, 32:15, 33:8, 38:9, 46:22, 52:2, 52:6, 52:9, 52:19, 52:21, 55:20, 55:23, 56:1, 56:23, 56:25, 57:6, 57:25, 58:13, 58:15, 58:19, 63:24, 64:22, 65:21, 66:22, 67:2, 67:5, 76:3, 79:15, 79:18,

79:20, 79:23, 80:1, 80:7, 80:12, 80:17, 80:22, 81:2, 81:22, 82:2, 82:6, 82:12, 83:17, 84:11, 87:14, 88:11, 88:16, 89:8, 89:17, 89:19, 89:23, 90:19, 92:9, 93:10, 94:2, 94:20, 94:25, 95:2, 95:20, 96:3, 96:11, 96:20, 96:24, 97:2, 97:23, 98:3, 98:6, 98:9, 98:14, 98:24, 99:1, 99:4, 99:6, 99:10, 99:13, 99:19, 99:21, 100:1, 100:3, 100:20, 113:19, 113:22, 124:17, 125:5, 126:25, 129:12, 143:21, 145:7, 145:10, 155:11, 158:14, 159:1, 159:4, 159:10, 159:14, 159:22, 159:25, 160:8, 160:17, 160:24, 161:3, 161:6, 161:9, 161:10, 161:15, 162:11, 162:13, 162:16, 162:19, 162:22, 162:25, 163:3, 163:6, 163:9, 163:12, 163:13, 163:16, 163:19, 163:22, 163:25, 164:3, 164:16, 165:4, 165:6

court [70] - 6:2, 22:21, 24:20, 25:8, 30:14, 41:23, 44:17, 46:7, 46:8, 47:4, 47:21, 48:1, 48:8, 48:23, 62:14, 62:16, 62:19, 62:20, 62:23, 64:6, 65:25, 66:3, 66:5, 66:7, 66:12, 66:15, 66:20, 66:25, 71:9, 71:12, 72:4, 72:11, 72:22, 74:13, 80:9, 80:11, 86:3, 97:17, 111:3, 122:4, 127:7, 127:8, 128:7, 128:17, 129:21, 130:9, 130:13, 131:2, 131:12, 132:3, 133:1, 134:17, 135:22, 136:2, 137:24, 139:13, 140:10, 142:6, 142:12,

143:5, 146:1, 146:2, 149:16, 149:21, 151:11, 153:10, 155:17, 155:19, 156:15

court's [1] - 98:13

Court's [9] - 14:18, 26:16, 55:17, 94:2, 95:2, 97:5, 101:11, 124:15, 145:2

Courthouse [5] - 57:11, 58:5, 58:22, 162:9, 164:20

courthouse [1] - 58:7, 106:15, 108:5

courtroom [104] - 16:16, 17:17, 18:25, 19:1, 22:20, 22:22, 22:23, 23:2, 23:5, 23:7, 23:19, 23:24, 24:2, 24:6, 24:10, 24:12, 24:24, 25:1, 25:13, 26:1, 26:3, 27:4, 29:1, 31:9, 31:14, 31:15, 31:20, 34:17, 37:9, 37:10, 40:1, 40:24, 41:24, 42:1, 42:2, 42:10, 44:20, 45:3, 47:10, 47:12, 47:13, 50:2, 50:10, 51:15, 53:5, 53:14, 53:16, 53:17, 53:19, 53:23, 54:2, 54:6, 54:9, 54:11, 54:13, 54:14, 54:16, 54:18, 54:21, 55:6, 55:10, 56:11, 57:9, 58:25, 59:13, 60:25, 63:1, 63:4, 63:9, 63:12, 63:13, 63:17, 66:1, 68:12, 68:13, 70:16, 70:21, 73:7, 75:17, 76:8, 80:6, 92:8, 94:10, 99:20, 111:9, 111:14, 114:25, 115:4, 116:11, 118:15, 121:20, 125:1, 132:6, 147:9, 148:24, 149:7, 153:4, 153:6, 155:25, 156:7, 158:24, 160:23, 164:10, 164:14

COURTROOM [13] - 6:2, 16:12, 16:14, 20:24, 21:4, 52:12, 52:16, 80:11, 98:11, 98:13, 160:10, 160:15, 165:12

courtroom's [1] - 86:15

courtrooms [4] - 22:1, 47:6, 47:15, 49:15

cover [1] - 64:11

covered [2] - 82:17, 96:16

covers [1] - 107:1

crack [1] - 135:6

cracker [5] - 29:16, 32:4, 46:3, 146:13, 147:4

cracker's [1] - 150:23

credibility [1] - 8:11

crime [20] - 13:19, 83:13, 105:6, 105:16, 105:19, 107:2, 107:3, 107:4, 107:14, 108:7, 108:13, 109:9, 109:13, 109:24, 109:25, 110:2, 110:3, 119:13, 155:6

crimes [9] - 11:14, 15:8, 84:12, 104:23, 110:5, 110:7, 126:13, 130:18, 148:10

criminal [7] - 53:18, 66:12, 88:19, 90:21, 106:14, 109:3, 139:24

CROSS [3] - 17:5, 33:10, 64:24

Cross [3] - 3:8, 3:13, 3:17

cross [6] - 18:21, 135:25, 136:1, 137:22, 153:15, 153:17

Cross-Examination [3] - 3:8, 3:13, 3:17

CROSS-EXAMINATION [3] - 17:5, 33:10, 64:24

cross-examination [3] - 18:21, 153:15, 153:17

cross-talk [3] - 135:25, 136:1, 137:22

CRR [2] - 2:13, 165:22

CSO [4] - 31:9, 36:8, 38:12, 45:16

cuffed [1] - 49:17

cuffs [4] - 134:13, 134:14, 134:15, 134:18

current [2] - 53:4, 83:16

cussed [1] - 147:20

custody [2] - 73:24, 165:6

customarily [1] - 46:7

customary [2] - 41:23, 41:24

cut [1] - 119:6

## D

daily [1] - 48:23

damage [1] - 116:19

Dana [11] - 25:14, 31:7, 33:21, 34:7, 35:11, 35:15, 36:2, 36:13, 36:14, 36:16, 47:3

danger [5] - 91:13, 92:16, 106:17, 118:7, 118:9

dangerous [51] - 9:7, 9:8, 9:18, 10:6, 10:7, 12:15, 13:8, 80:16, 80:19, 80:21, 85:19, 85:20, 86:8, 86:9, 91:9, 91:12, 91:22, 92:15, 105:3, 105:9, 105:16, 105:17, 105:24, 106:16, 107:8, 107:11, 107:15, 111:22, 112:4, 115:22, 118:4, 118:8, 119:9, 119:23, 123:19, 123:25, 133:22, 148:4, 148:8, 148:12, 148:17, 148:19, 148:20, 148:22, 148:25, 149:2, 152:3, 152:8, 161:20

dark [4] - 24:17, 127:16, 136:20, 136:21

date [9] - 56:8, 62:25, 109:10, 109:11, 109:13, 111:8, 112:25, 113:12

dated [2] - 55:16, 162:8

DAY [1] - 1:14

deadly [44] - 9:7, 9:8, 9:18, 10:5, 10:6, 12:15, 13:8, 80:16, 80:19, 80:21, 85:19, 85:20, 86:8, 86:9, 91:9, 91:12, 92:15, 105:3, 105:9, 105:16, 105:17, 105:24, 106:16,

107:8, 107:11,
107:15, 111:22,
112:4, 115:22,
118:4, 119:8,
119:23, 123:19,
123:25, 133:22,
141:10, 148:4,
148:7, 148:12,
149:2, 152:2, 161:20
**deal** [1] - 141:9
**deals** [1] - 141:21
**death** [9] - 90:14,
90:25, 91:13, 92:16,
95:14, 106:4,
106:17, 116:24,
118:7
**december** [1] - 165:20
**decide** [13] - 101:1,
103:10, 103:15,
104:9, 110:8,
110:10, 110:14,
114:12, 136:7,
137:23, 139:16,
140:19, 144:20
**decides** [1] - 38:13
**deciding** [2] - 100:21,
140:18
**decision** [16] - 15:6,
81:19, 98:3, 98:7,
101:4, 101:18,
102:20, 103:12,
114:9, 115:1,
115:18, 118:1,
118:2, 154:10,
164:24
**decision-making** [1] -
81:19
**decisions** [4] -
104:11, 140:24,
141:1, 141:2
**deductions** [1] -
102:23
**deemed** [1] - 7:16
**deeply** [1] - 164:7
**defend** [1] - 39:11
**defendant** [102] - 24:3,
24:21, 26:12, 29:8,
29:18, 51:16, 62:5,
64:3, 73:24, 76:13,
76:21, 77:3, 78:23,
81:10, 83:12, 85:10,
88:25, 89:3, 89:15,
90:4, 90:10, 91:23,
91:25, 92:14, 92:23,
93:14, 93:16, 93:21,
94:3, 95:6, 95:17,
95:25, 96:5, 101:2,
101:6, 101:12,
101:13, 101:14,
101:16, 101:17,

101:20, 102:8,
104:6, 104:9,
104:24, 105:2,
105:6, 105:11,
105:19, 105:21,
105:24, 106:7,
106:8, 106:19,
106:25, 107:3,
107:4, 107:5,
107:15, 107:16,
107:18, 107:21,
108:13, 108:16,
108:18, 108:23,
110:1, 110:4, 110:6,
110:9, 113:2, 113:4,
114:10, 114:23,
115:1, 115:4,
115:24, 118:18,
120:1, 120:3,
120:10, 120:19,
122:16, 123:17,
123:24, 124:9,
131:14, 137:11,
137:12, 145:24,
147:17, 147:21,
152:20, 153:5,
154:11, 156:17,
158:11, 160:18,
162:3, 162:5
**Defendant** [7] - 77:6,
111:21, 112:3,
112:13, 112:19,
161:19, 161:25
**DEFENDANT** [6] - 1:9,
2:3, 4:8, 98:2, 98:5,
98:8
**Defendant's** [1] -
116:21
**defendant's** [11] -
20:6, 25:9, 63:5,
63:14, 75:6, 86:3,
94:13, 101:24,
102:1, 149:4, 153:19
**DEFENDANT'S** [2] -
4:14, 125:11
**defendants** [1] - 48:10
**defense** [47] - 25:1,
28:3, 41:17, 43:13,
43:19, 49:20, 51:23,
51:18, 67:25, 68:4,
68:25, 69:4, 69:6,
69:16, 70:10, 76:13,
77:6, 77:7, 83:20,
87:11, 87:25, 97:16,
99:5, 99:8, 99:25,
100:13, 114:18,
115:16, 132:7,
132:18, 132:22,
132:24, 133:3,
133:11, 133:17,

133:25, 141:15,
141:16, 141:19,
146:13, 147:17,
147:25, 153:19,
156:12, 159:7,
160:7, 165:5
**defer** [1] - 164:18
**deficiency** [2] - 129:6,
129:7
**definition** [10] - 88:22,
89:25, 90:12, 90:17,
91:12, 91:24, 92:21,
101:22, 118:5,
120:13
**definitions** [1] - 95:16
**degree** [2] - 140:18,
140:22
**delay** [1] - 99:17
**deliberate** [4] - 15:9,
65:10, 125:6, 157:8
**deliberated** [1] - 114:8
**deliberating** [3] -
100:8, 155:8, 160:13
**deliberation** [4] -
119:18, 124:5,
125:21, 158:16
**deliberations** [14] -
100:17, 100:25,
104:17, 105:1,
110:13, 111:3,
112:24, 124:21,
158:22, 158:25,
160:9, 160:11,
160:14, 164:9
**DELIBERATIONS** [1] -
4:19
**denied** [1] - 80:22
**deny** [1] - 11:19
**denying** [3] - 94:13,
94:14, 94:18
**Department** [1] -
164:21
**department** [1] -
164:24
**depicted** [1] - 71:1
**depiction** [1] - 58:7
**deputies** [1] - 115:7
**deputy** [16] - 31:12,
37:15, 44:19, 53:5,
53:14, 53:16, 54:3,
54:6, 54:9, 54:11,
54:13, 54:14, 59:13,
66:1, 76:8, 132:6
**DEPUTY** [14] - 2:9,
6:2, 16:12, 16:14,
20:24, 21:4, 52:12,
52:16, 80:11, 98:11,
98:13, 160:10,
160:15, 165:12
**Deputy** [9] - 6:9,

25:13, 37:17, 41:11,
45:15, 49:23, 71:20,
71:25
**derogatory** [1] - 70:19
**describe** [7] - 55:1,
63:1, 63:18, 73:1,
136:10, 136:12
**described** [16] - 35:3,
42:18, 44:25, 66:1,
86:5, 95:18, 95:19,
105:22, 107:22,
108:17, 113:5,
113:6, 120:2, 120:8,
162:6, 162:7
**describing** [1] -
136:12
**descriptions** [1] - 92:3
**desire** [1] - 142:24
**desk** [1] - 62:1
**despite** [4] - 19:18,
122:16, 142:5, 142:6
**detail** [2] - 22:22,
145:1
**detailed** [1] - 105:14
**details** [1] - 74:14
**detained** [1] - 104:8
**detectors** [1] - 47:11
**determination** [1] -
83:8
**determine** [8] - 81:12,
95:17, 107:5,
107:17, 110:6,
114:14, 141:3, 141:7
**determined** [1] - 132:3
**device** [3] - 37:21,
37:23, 138:1
**differ** [2] - 94:21,
104:4
**difference** [5] - 7:19,
48:24, 95:7, 103:6,
144:19
**differences** [1] - 11:18
**different** [24] - 9:23,
10:7, 11:8, 18:7,
24:1, 30:11, 40:7,
48:22, 54:20, 84:6,
93:15, 117:11,
122:8, 125:22,
128:6, 129:18,
136:12, 136:15,
139:25, 140:1,
143:23, 149:22
**differentiate** [1] -
82:12
**differently** [1] - 110:21
**difficult** [3] - 37:4,
75:2, 89:19
**dignity** [1] - 139:21
**Dimitrouleas** [13] -
45:4, 45:6, 45:11,

45:20, 60:2, 60:6,
72:23, 73:2, 73:5,
75:7, 75:19, 131:10,
143:10
**DIRECT** [2] - 21:14,
52:24
**Direct** [2] - 3:12, 3:16
**direct** [8] - 31:1, 88:6,
102:25, 103:1,
103:7, 111:2,
135:22, 164:3
**directed** [12] - 31:24,
74:19, 86:23,
129:15, 134:11,
134:23, 137:20,
138:5, 138:7,
138:11, 138:22,
142:18
**directing** [2] - 32:23,
92:24
**direction** [23] - 24:7,
27:8, 27:25, 28:2,
70:5, 70:6, 70:9,
70:10, 70:13, 73:19,
79:10, 85:6, 85:23,
86:19, 86:21, 86:22,
93:15, 132:12,
132:13, 132:15,
132:16, 133:25,
150:20
**directly** [6] - 25:3,
29:14, 63:10, 70:15,
92:2, 104:3
**disadvantage** [1] -
38:12
**disagreement** [1] - 7:1
**disagreements** [1] -
123:13
**disappointed** [1] -
137:8
**disbelieve** [1] - 103:12
**discuss** [3] - 10:19,
15:20, 110:17
**discussed** [1] - 160:4
**discussing** [1] -
110:18
**discussion** [2] - 6:25,
11:20
**DISCUSSIONS** [1] -
4:5
**discussions** [1] -
100:24
**disjunctive** [2] - 9:12,
10:16
**dismiss** [2] - 94:14,
94:19
**disparity** [2] - 144:8,
144:11
**display** [2] - 90:24,
106:3

**displayed** [2] - 92:1, 106:20
**displays** [2] - 90:12, 116:23
**disprove** [1] - 103:5
**disregard** [2] - 101:10, 102:18
**disrespecting** [1] - 130:15
**distance** [4] - 25:17, 68:7, 78:20, 135:15
**distinctions** [1] - 12:16
**distinguished** [2] - 109:6, 127:5
**distraction** [1] - 125:3
**District** [10] - 2:14, 53:6, 53:7, 53:9, 54:8, 57:16, 161:10, 161:11, 164:6, 165:23
**DISTRICT** [3] - 1:1, 1:1, 1:16
**district** [2] - 21:24, 21:25
**disturbance** [1] - 49:18
**disturbances** [2] - 48:1, 156:5
**diverted** [1] - 118:24
**divide** [1] - 97:4
**dividing** [1] - 44:23
**division** [5] - 7:8, 7:11, 7:14, 7:17, 7:23
**DIVISION** [1] - 1:2
**docket** [1] - 53:20
**docketed** [1] - 6:20
**document** [3] - 6:24, 113:12, 161:6
**Done** [1] - 138:2
**done** [5] - 93:12, 109:15, 127:20, 128:23, 131:17
**door** [4] - 32:13, 51:5, 62:18, 155:16
**doors** [1] - 50:24
**double** [7] - 87:12, 94:11, 94:19, 94:24, 95:4, 96:2, 96:10
**doubt** [48] - 81:15, 81:17, 83:8, 83:12, 101:3, 101:20, 101:22, 101:24, 101:25, 102:2, 102:5, 102:9, 105:20, 106:5, 107:13, 107:20, 108:15, 108:21, 109:12, 109:22,

111:20, 112:2, 112:12, 112:18, 113:10, 114:22, 119:20, 124:11, 129:2, 129:8, 130:19, 133:10, 134:25, 135:2, 139:16, 141:8, 141:21, 142:18, 143:8, 144:16, 148:2, 150:11, 151:14, 151:17, 161:18, 161:24
**down** [30] - 13:7, 30:23, 31:11, 33:4, 33:13, 36:6, 36:17, 36:19, 36:25, 37:15, 46:1, 50:5, 62:3, 66:14, 69:14, 89:8, 89:17, 111:11, 123:17, 125:17, 127:23, 144:22, 147:12, 151:24, 153:10, 157:9
**draft** [4] - 6:20, 10:20, 13:11, 97:8
**drafted** [1] - 84:20
**dragged** [1] - 151:1
**draw** [3] - 23:16, 59:6, 59:16
**dressed** [2] - 22:25, 64:5
**drill** [3] - 69:14, 125:17, 127:23
**drive** [2] - 32:4, 159:19
**driven** [1] - 135:9
**drives** [3] - 159:4, 159:9, 159:20
**drove** [2] - 135:10, 139:1
**DSO** [2] - 21:23, 22:8
**ducked** [1] - 69:7
**due** [2] - 9:24, 10:3
**duplicitous** [1] - 11:11
**during** [27] - 16:3, 17:10, 18:21, 23:17, 40:23, 44:12, 59:11, 59:13, 62:4, 62:19, 64:2, 64:4, 66:6, 74:2, 78:3, 88:2, 92:1, 102:19, 104:14, 104:17, 104:25, 106:20, 114:5, 127:19, 158:21, 160:9, 165:9
**duties** [7] - 23:11, 105:4, 105:18, 108:10, 108:12, 108:20, 120:5
**duty** [10] - 15:9,

100:20, 105:23, 106:7, 106:10, 106:13, 107:24, 117:16, 156:24

---

# E

**early** [1] - 150:2
**easier** [1] - 123:3
**East** [1] - 1:24
**eating** [1] - 156:6
**effect** [5] - 32:1, 61:17, 84:2, 89:13, 148:10
**effort** [2] - 128:24, 134:18
**efforts** [1] - 149:4
**eight** [1] - 35:7
**either** [12] - 22:9, 82:10, 83:8, 83:15, 84:6, 101:5, 103:6, 107:6, 111:13, 113:4, 124:18, 132:19
**either/or** [1] - 13:24
**element** [7] - 12:11, 12:12, 88:25, 89:11, 115:23, 117:13, 151:17
**elements** [8] - 11:8, 12:2, 12:10, 90:18, 113:9, 120:1, 151:15, 151:17
**Eleventh** [5] - 10:9, 10:12, 14:1, 15:6, 87:9
**elsewhere** [2] - 19:24, 134:2
**embarrass** [1] - 23:12
**embarrassed** [1] - 23:15
**emotions** [1] - 139:22
**emphasis** [3] - 89:2, 90:10, 143:19
**emphasize** [1] - 104:20
**emphatically** [1] - 148:1
**employed** [3] - 21:18, 53:6, 54:8
**employee** [4] - 106:6, 106:9, 106:13, 117:15
**employment** [1] - 54:7
**encourage** [1] - 164:23
**end** [5] - 45:18, 65:15, 139:12, 142:24, 151:23
**ended** [2] - 59:7, 61:3

**ends** [1] - 112:23
**enforcement** [18] - 22:6, 22:9, 78:11, 83:13, 97:12, 105:12, 108:6, 108:8, 108:22, 108:25, 109:2, 112:20, 113:3, 119:25, 120:8, 122:2, 162:1, 162:4
**engage** [1] - 109:2
**enhanced** [1] - 84:14
**enhancement** [1] - 142:23
**enhancements** [4] - 82:5, 87:1, 87:3, 87:7
**enhancing** [1] - 82:9
**ensure** [1] - 76:15
**entail** [1] - 53:15
**entered** [3] - 16:16, 99:20, 160:23
**enters** [1] - 42:1
**entire** [6] - 115:17, 115:19, 117:20, 122:25, 123:17, 164:6
**entirety** [3] - 64:4, 123:2, 128:15
**entitled** [2] - 104:20, 165:18
**erroneous** [1] - 13:23
**error** [1] - 7:8
**escort** [3] - 16:22, 31:19, 153:5
**escorted** [1] - 51:10
**especially** [1] - 15:1
**ESQ** [1] - 2:3
**essence** [1] - 87:17
**essentially** [8] - 11:1, 11:2, 30:6, 53:25, 84:16, 94:12, 95:15, 155:23
**establish** [2] - 86:8, 86:22
**established** [4] - 10:12, 89:12, 133:14, 144:13
**estimate** [1] - 38:19
**estimated** [3] - 36:13, 36:15, 47:3
**Ettinger** [1] - 15:6
**evening** [3] - 40:11, 60:5, 131:12
**event** [4] - 43:7, 44:12, 93:12, 160:3
**events** [1] - 87:5
**everyday** [3] - 140:23, 148:10, 148:24
**EVIDENCE** [1] - 3:4

**evidence** [99] - 43:9, 56:22, 57:1, 57:7, 58:12, 58:17, 67:20, 73:14, 85:4, 85:7, 85:18, 85:22, 86:6, 86:7, 86:14, 86:16, 86:20, 87:19, 87:22, 89:6, 90:1, 90:16, 92:10, 92:11, 93:2, 93:4, 93:5, 93:11, 94:3, 94:4, 95:24, 96:5, 97:21, 101:4, 101:13, 101:15, 102:4, 102:11, 102:13, 102:14, 102:22, 102:25, 103:1, 103:4, 103:7, 103:8, 103:9, 104:5, 104:6, 104:8, 104:11, 104:18, 109:25, 110:6, 110:15, 110:24, 113:9, 113:25, 114:6, 114:7, 114:16, 122:5, 122:14, 123:1, 123:21, 123:22, 125:15, 125:18, 128:11, 128:20, 128:22, 129:6, 129:14, 129:25, 131:7, 131:9, 132:21, 134:5, 134:13, 134:25, 135:2, 137:14, 138:8, 140:20, 142:19, 142:22, 143:17, 144:12, 145:1, 145:16, 145:17, 145:18, 145:19, 145:21
**exact** [3] - 43:9, 109:11, 144:10
**exactly** [7] - 43:3, 72:8, 90:2, 94:17, 114:12, 115:2, 143:9
**exaggerating** [3] - 150:15, 151:8, 151:11
**exaggeration** [11] - 109:7, 121:5, 121:7, 126:23, 127:6, 127:15, 130:11, 137:2, 139:18, 150:14
**examination** [4] - 16:19, 18:21, 153:15, 153:17
**Examination** [8] - 3:8, 3:9, 3:12, 3:13, 3:14,

3:16, 3:17, 3:18
**EXAMINATION** [8] -
17:5, 18:19, 21:14,
33:10, 47:1, 52:24,
64:24, 76:6
**examine** [3] - 116:11,
117:7, 124:7
**example** [9] - 10:10,
11:16, 19:19, 30:13,
41:14, 47:9, 81:8,
94:7, 148:17
**examples** [1] - 42:12
**exceed** [1] - 83:1
**excellent** [1] - 6:15
**except** [3] - 82:25,
102:17, 107:14
**exception** [1] - 56:4
**excessive** [2] - 49:24,
97:2
**exclude** [1] - 101:25
**excuse** [3] - 20:15,
20:16, 143:21
**excused** [12] - 20:16,
20:18, 41:22, 52:3,
52:5, 79:15, 79:17,
79:18, 79:20, 79:22,
131:13, 164:14
**exercise** [1] - 140:21
**Exhibit** [14] - 55:19,
55:24, 56:22, 56:25,
57:3, 57:7, 57:23,
58:12, 58:15, 58:17,
78:24, 115:5, 123:3,
123:9
**EXHIBIT** [1] - 5:2
**exhibit** [4] - 5:5, 5:7,
56:4, 57:2
**exhibiting** [1] - 62:13
**EXHIBITS** [1] - 5:4
**exhibits** [7] - 53:21,
99:15, 102:14,
158:17, 159:2,
159:8, 159:15
**exited** [5] - 26:7,
40:24, 80:6, 158:24,
164:14
**exiting** [5] - 17:17,
18:25, 24:6, 27:4,
61:4
**expect** [4] - 90:13,
90:25, 106:3, 116:24
**experience** [9] - 22:6,
22:9, 28:25, 47:7,
47:15, 49:15, 51:6,
137:25, 156:25
**experienced** [2] -
128:2, 128:12
**experiences** [1] -
140:20
**expert** [1] - 155:23

**explain** [4] - 33:14,
101:8, 110:13, 111:5
**explains** [1] - 144:8
**expression** [4] -
109:4, 121:2,
121:16, 127:2
**extensive** [1] - 23:9
**extent** [6] - 14:17,
88:3, 133:7, 144:21,
151:9, 155:22
**extremely** [1] - 124:23
**eye** [4] - 26:8, 26:9,
40:24, 148:21
**eyeball** [1] - 133:8
**eyeballs** [2] - 142:21,
143:7
**eyes** [5] - 18:24,
19:23, 115:17,
118:14, 118:15
**eyewitness** [1] - 103:3

# F

**F.3d** [2] - 10:11, 15:7
**face** [11] - 36:17,
36:19, 36:20, 36:25,
72:9, 75:2, 135:1,
146:19, 147:2,
148:23
**Facebook** [1] - 153:4
**facedown** [18] - 33:19,
36:5, 36:11, 36:20,
37:8, 72:4, 72:7,
74:23, 75:1, 75:5,
128:10, 128:16,
134:10, 134:20,
134:24, 135:3, 143:4
**facie** [2] - 89:12, 93:8
**facing** [6] - 36:20,
37:15, 63:13,
154:16, 154:23,
157:22
**fact** [21] - 19:18,
19:19, 19:23, 36:8,
50:17, 86:21, 91:1,
92:4, 92:6, 93:3,
93:16, 97:11, 103:2,
103:5, 119:11,
119:12, 120:15,
130:3, 130:8, 134:2,
136:6
**factor** [3] - 50:11,
82:9, 155:4
**factors** [1] - 141:3
**facts** [19] - 91:4,
92:18, 101:2,
102:20, 103:4,
105:20, 107:13,
107:19, 108:14,
110:23, 121:13,

121:23, 138:21,
140:19, 141:7,
142:1, 144:13
**factual** [2] - 93:14,
102:17
**factually** [1] - 143:2
**fail** [1] - 96:12
**failed** [3] - 86:11,
149:4, 149:21
**fails** [3] - 85:7, 96:12,
101:20
**failure** [1] - 133:9
**fair** [15] - 17:22, 18:1,
18:11, 19:21, 25:6,
28:2, 36:18, 41:20,
47:18, 49:8, 58:7,
68:5, 71:2, 72:10,
73:8
**fall** [1] - 122:22
**familiar** [6] - 28:20,
49:5, 51:15, 54:17,
54:20, 54:23
**family** [4] - 25:9, 26:1,
147:15, 147:19
**far** [9] - 24:16, 39:4,
64:16, 78:20, 81:25,
133:24, 135:11,
140:13, 164:25
**fashion** [2] - 84:13,
130:16
**fast** [4] - 27:16, 61:24,
69:8, 89:21
**favor** [4] - 24:14,
89:11, 92:12, 93:7
**favorable** [3] - 89:7,
92:10, 93:6
**favorite** [1] - 136:14
**fear** [9] - 18:1, 18:4,
18:11, 18:22, 19:15,
19:20, 85:2, 85:3,
142:13
**feasible** [1] - 141:25
**feature** [1] - 155:15
**Federal** [35] - 9:17,
46:7, 57:11, 58:5,
58:22, 65:25, 97:11,
105:3, 105:9,
105:12, 105:15,
105:16, 105:23,
106:12, 106:14,
106:15, 107:23,
107:24, 108:5,
108:6, 108:7, 108:8,
108:22, 108:24,
109:1, 109:3,
111:22, 112:4,
112:20, 113:3,
161:20, 162:1, 162:4
**federal** [8] - 105:17,
115:21, 119:25,

120:7, 133:1, 153:4,
153:6, 156:8
**feet** [9] - 28:15,
28:22, 28:23, 28:24,
29:2, 37:21, 37:23,
38:4, 38:21, 38:22,
38:23, 39:4, 49:25,
86:3, 140:11, 151:4,
155:20, 156:17
**fell** [1] - 85:25
**felonies** [1] - 84:6
**felony** [3] - 83:24,
83:25, 132:25
**felt** [1] - 134:1
**few** [10] - 16:9, 23:25,
61:10, 62:21, 62:25,
97:13, 103:16,
158:16, 164:9
**fide** [2] - 128:5
**Fifth** [1] - 9:25
**fight** [2] - 115:11,
120:24
**fighting** [6] - 33:5,
78:10, 115:12,
117:9, 121:15,
122:23
**file** [1] - 164:3
**filed** [3] - 7:10, 7:14,
7:17
**fill** [1] - 111:8
**final** [4] - 15:15, 83:18,
98:15, 100:15
**finality** [1] - 81:18
**finalize** [3] - 84:18,
97:6, 97:14
**finally** [2] - 46:1, 113:1
**findings** [2] - 53:20,
84:5
**fine** [5] - 26:23, 81:20,
83:15, 155:20,
159:24
**finish** [1] - 50:21,
66:22, 75:7, 80:13
**finished** [1] - 62:23
**firearm** [4] - 81:10,
81:11, 148:18
**firm** [1] - 76:13
**first** [19] - 16:4, 16:9,
17:16, 19:3, 28:14,
41:2, 69:3, 75:4,
75:22, 82:11, 88:25,
96:23, 107:16,
111:19, 115:23,
126:17, 155:1,
156:23
**fit** [2] - 35:1, 35:2
**five** [10] - 9:22, 23:5,
35:7, 47:8, 54:10,
98:21, 120:17,
145:9, 156:17

**five-and-a-half** [1] -
54:10
**five-minute** [2] -
98:21, 145:9
**fixated** [3] - 18:24,
19:23, 118:14
**flash** [3] - 159:9,
159:19, 159:20
**flimsy** [1] - 51:21
**floor** [1] - 48:19
**FLORIDA** [1] - 1:1
**Florida** [12] - 1:5,
1:22, 1:25, 2:5, 2:15,
53:7, 57:16, 58:23,
161:11, 162:9,
164:6, 165:24
**flying** [1] - 149:14
**focus** [10] - 7:1, 32:2,
43:15, 43:20, 44:5,
89:14, 90:15,
120:20, 143:23
**focused** [3] - 40:25,
117:24, 134:3
**focuses** [4] - 91:16,
95:10, 115:21,
119:13
**focusing** [3] - 80:13,
88:25, 89:15
**folks** [19] - 22:22,
29:1, 31:16, 32:8,
48:13, 48:18, 49:3,
49:17, 145:13,
147:17, 147:25,
148:19, 149:6,
150:11, 150:16,
151:11, 153:16,
153:24, 158:3
**follow** [4] - 23:25,
101:8, 101:9, 154:19
**following** [8] - 17:9,
105:20, 107:6,
107:19, 108:14,
111:18, 126:16,
161:16
**follows** [4] - 17:4,
21:13, 52:23, 111:17
**foot** [3] - 34:22, 35:7
**foot-eight** [1] - 35:7
**foot-seven** [1] - 35:7
**foot-three** [1] - 34:22
**football** [1] - 136:14
**Footnote** [2] - 13:2,
13:17
**FOR** [3] - 1:20, 2:3,
4:7
**force** [14] - 30:10,
30:15, 30:19, 30:21,
30:22, 33:1, 33:22,
49:23, 49:24, 90:13,
90:24, 106:3,

116:23, 117:4
**forced** [1] - 98:6
**forcible** [20] - 10:24, 12:4, 12:7, 88:22, 89:24, 90:7, 91:6, 92:1, 93:20, 105:8, 105:25, 106:20, 106:21, 111:21, 112:3, 116:2, 119:8, 119:23, 123:19, 161:19
**forcibly** [11] - 9:17, 89:1, 89:3, 90:11, 105:2, 105:15, 105:16, 105:21, 106:7, 115:21, 115:24
**foregoing** [1] - 165:16
**foreperson** [7] - 59:23, 111:2, 111:7, 112:24, 161:1, 162:10
**FOREPERSON** [2] - 161:2, 161:5
**foreperson's** [1] - 113:12
**forget** [1] - 157:4
**forgot** [1] - 125:13
**Form** [1] - 161:15
**form** [20] - 14:3, 15:16, 15:21, 16:3, 16:9, 80:13, 80:15, 80:18, 82:10, 84:20, 96:5, 97:5, 97:14, 111:4, 111:6, 111:8, 111:16, 112:10, 112:25, 113:14
**FORM** [1] - 4:5
**formal** [1] - 101:12
**format** [1] - 81:23
**formulation** [1] - 83:16
**Fort** [12] - 7:8, 7:11, 7:14, 7:17, 53:13, 54:12, 54:16, 57:10, 57:12, 58:5, 58:22, 59:3
**forth** [3] - 84:12, 84:14, 90:18
**forward** [9] - 43:16, 90:17, 93:21, 94:8, 94:9, 116:22, 119:18, 150:18
**foundation** [1] - 144:14
**four** [18] - 13:7, 27:6, 31:18, 32:8, 44:10, 117:11, 120:17, 121:9, 128:17, 132:25, 137:9,

143:4, 143:21, 143:22, 151:4, 156:17, 158:3
**FPR** [2] - 2:13, 165:22
**framed** [1] - 10:16
**free** [2] - 51:12, 64:16
**freedom** [1] - 139:20
**friend** [3] - 147:14, 147:19, 151:10
**front** [12] - 35:23, 42:13, 44:9, 45:20, 63:3, 63:5, 63:10, 77:16, 77:25, 131:4, 147:3, 160:2
**frustrated** [1] - 137:7
**FT** [1] - 1:2
**Ft** [5] - 1:5, 1:25, 2:5, 162:9, 164:20
**fuck** [7] - 121:11, 134:5, 137:12, 137:18, 147:4, 147:11, 147:12
**fucking** [3] - 121:12, 135:7, 138:3
**full** [2] - 31:18, 145:3
**fully** [4] - 79:18, 94:10, 110:15, 164:23
**funny** [1] - 136:18
**furious** [1] - 157:19
**furniture** [1] - 54:20
**future** [4] - 88:3, 141:5, 147:8, 151:24

---

## G

**gain** [3] - 28:1, 31:18, 41:9
**gallery** [1] - 25:6
**galley** [3] - 25:4, 28:14, 63:14
**game** [1] - 132:14
**garland** [3] - 17:1, 165:4, 165:8
**GARLAND** [74] - 2:3, 4:15, 6:12, 7:7, 7:20, 8:2, 8:6, 8:10, 8:15, 8:21, 9:1, 9:6, 9:15, 9:22, 10:2, 10:23, 11:22, 12:1, 12:25, 13:5, 13:16, 14:9, 14:13, 14:17, 14:25, 15:14, 15:19, 15:23, 15:25, 16:6, 17:2, 17:6, 18:15, 33:9, 33:11, 38:15, 46:19, 46:21, 55:22, 56:24, 58:14, 64:23, 64:25, 65:24, 66:23, 67:7, 75:25, 80:15, 80:18, 80:24, 81:24, 82:5,

82:7, 83:20, 84:24, 87:16, 94:23, 95:1, 95:22, 96:9, 96:18, 96:25, 97:17, 99:5, 99:9, 99:24, 125:12, 127:1, 129:17, 143:22, 159:12, 159:24, 160:7, 165:5
**Garland** [65] - 2:4, 3:8, 3:13, 3:17, 6:11, 6:13, 6:16, 7:6, 7:19, 8:1, 8:5, 8:9, 8:14, 8:20, 8:25, 9:5, 9:14, 9:19, 10:17, 10:19, 10:22, 11:21, 12:24, 13:15, 14:8, 14:12, 14:16, 14:24, 15:13, 15:18, 15:22, 16:5, 18:16, 19:14, 33:8, 46:22, 50:3, 55:21, 58:13, 64:22, 76:3, 76:18, 78:16, 80:14, 81:22, 83:17, 84:22, 88:11, 94:20, 95:21, 96:8, 96:17, 96:24, 97:16, 99:6, 99:7, 99:23, 125:13, 145:7, 145:20, 146:11, 153:16, 159:10, 159:22, 159:25
**Garland's** [2] - 11:6, 92:23
**gate** [1] - 50:25
**gather** [2] - 16:10, 97:15
**gauge** [1] - 124:24
**general** [3] - 14:2, 15:7, 85:22
**gentleman** [6] - 24:16, 24:19, 124:11, 150:2, 155:24, 156:11
**gentlemen** [38] - 16:18, 80:2, 99:23, 100:3, 113:24, 115:2, 115:20, 116:2, 116:10, 116:15, 116:25, 117:2, 117:6, 117:14, 118:4, 119:9, 119:15, 119:24, 120:6, 120:14, 120:24, 121:1, 121:10, 121:14, 121:23, 121:25, 122:7, 122:13, 122:25, 123:8, 123:18, 124:6, 124:10,

124:13, 124:18, 129:13, 158:15, 164:5
**girlfriend** [1] - 147:20
**given** [11] - 12:3, 12:9, 15:25, 20:2, 28:25, 92:15, 97:19, 104:25, 145:2, 157:5, 164:11
**glaring** [1] - 121:20
**glass** [1] - 160:2
**GLENDA** [2] - 2:13, 165:22
**God** [4] - 21:2, 52:14, 149:5, 157:5
**God-given** [1] - 157:5
**goofing** [1] - 123:7
**GOVERNMENT** [2] - 1:20, 4:4
**Government** [63] - 7:4, 7:24, 8:12, 11:9, 11:13, 11:24, 13:13, 14:22, 20:14, 20:19, 52:6, 52:7, 56:20, 58:10, 61:7, 61:8, 61:13, 61:19, 62:7, 62:11, 70:5, 70:16, 70:19, 78:9, 79:25, 83:11, 89:7, 89:12, 92:11, 92:12, 93:6, 93:10, 96:22, 97:4, 99:10, 100:1, 100:11, 101:1, 101:7, 101:19, 104:6, 106:5, 106:18, 108:14, 108:21, 109:10, 109:12, 111:20, 112:2, 112:12, 112:18, 115:23, 117:14, 119:20, 123:1, 123:3, 128:24, 132:23, 133:8, 144:22, 159:2, 161:18, 161:24
**Government's** [26] - 55:19, 55:24, 56:21, 56:25, 57:7, 57:23, 58:11, 58:15, 58:17, 63:11, 63:12, 70:18, 74:13, 78:23, 81:15, 86:11, 89:11, 93:7, 96:15, 100:14, 101:23, 101:25, 114:21, 115:5, 123:9, 123:21
**GOVERNMENT'S** [6] - 3:4, 4:11, 4:16, 5:4, 113:23, 145:12

**grab** [7] - 27:10, 30:20, 31:4, 33:18, 44:22, 71:25, 78:23
**grabbed** [13] - 24:6, 27:7, 27:17, 28:9, 28:13, 30:3, 30:23, 33:15, 42:25, 43:18, 62:10, 72:6, 128:8
**grabs** [1] - 27:24
**grain** [1] - 136:22
**grand** [1] - 10:3
**granted** [1] - 47:14
**grateful** [1] - 164:7
**gray** [1] - 24:19
**great** [2] - 104:9, 149:6
**greater** [1] - 104:21
**greatest** [1] - 116:17
**green** [4] - 55:3, 55:4, 144:5
**grind** [1] - 39:24
**ground** [1] - 94:1
**grounds** [2] - 88:9, 94:19, 96:2
**group** [1] - 157:9
**guess** [2] - 32:25, 78:1
**guilt** [4] - 101:13, 101:19, 101:24, 102:1
**guilty** [64] - 12:7, 12:8, 45:8, 45:11, 60:18, 60:20, 72:23, 73:2, 81:1, 81:25, 82:8, 84:9, 101:2, 101:21, 102:9, 105:6, 105:19, 107:4, 107:6, 107:16, 107:18, 107:19, 108:13, 110:1, 110:7, 110:9, 110:10, 110:11, 113:2, 114:10, 114:11, 114:14, 114:23, 119:20, 120:19, 123:25, 124:1, 124:11, 129:8, 132:25, 133:11, 137:9, 137:10, 137:21, 138:12, 139:11, 139:24, 141:12, 143:11, 144:17, 145:5, 154:1, 157:18, 158:12, 162:3, 164:17
**gun** [2] - 47:12, 148:9
**guy** [7] - 29:21, 31:9, 33:3, 51:13, 77:11, 128:19, 130:9
**guys** [3] - 30:23,

32:21, 148:6

# H

**hairs** [1] - 30:8
**half** [1] - 54:10
**hallway** [1] - 62:22
**hand** [6] - 20:24,
  48:11, 53:25, 64:13,
  85:12, 161:6
**handcuff** [6] - 33:22,
  34:6, 34:9, 35:23,
  36:2, 134:18
**handcuffed** [3] -
  72:11, 135:3, 138:9
**handcuffs** [9] - 31:8,
  35:19, 36:1, 48:16,
  49:14, 134:14,
  134:15, 134:18
**handed** [4] - 59:23,
  59:24, 161:8
**handle** [1] - 53:21
**handling** [1] - 120:13
**hands** [5] - 48:17,
  49:19, 49:25, 73:10,
  151:7
**hard** [4] - 36:9, 36:18,
  115:12, 146:6
**harm** [13] - 19:21,
  19:24, 77:11, 90:14,
  90:25, 106:4, 108:4,
  116:24, 118:9,
  119:2, 119:8,
  119:14, 140:6
**harmed** [2] - 119:11,
  119:13
**head** [27] - 29:20,
  29:21, 29:22, 36:21,
  49:20, 49:25, 61:11,
  77:14, 90:4, 115:8,
  117:3, 122:20,
  126:21, 136:2,
  137:1, 138:1,
  146:14, 147:3,
  149:14, 149:15,
  149:25, 150:2,
  150:23, 151:4,
  151:5, 157:24
**head-butt** [1] - 36:21
**head-butts** [1] - 49:20
**heading** [1] - 150:19
**hear** [13] - 10:1, 80:17,
  84:23, 100:12,
  123:9, 136:7,
  138:14, 138:16,
  146:6, 146:7, 147:1,
  154:15, 163:9
**heard** [36] - 17:16,
  17:19, 19:2, 19:3,
  20:2, 22:16, 32:1,

75:15, 96:6, 114:1,
  116:13, 116:14,
  117:9, 117:19,
  122:14, 123:16,
  123:23, 124:4,
  125:21, 125:23,
  125:24, 125:25,
  128:7, 135:8,
  136:10, 138:10,
  140:20, 145:25,
  148:7, 148:8,
  150:10, 153:18,
  154:15
**hearing** [3] - 88:19,
  95:6, 129:5
**heavier** [2] - 27:12,
  51:24
**heavy** [10] - 51:19,
  63:20, 79:9, 86:5,
  90:3, 92:6, 101:23,
  116:12, 133:23,
  152:11
**height** [2] - 29:19,
  35:3
**held** [3] - 31:10, 65:25,
  155:19
**help** [5] - 21:2, 35:12,
  41:9, 52:14, 53:17
**helped** [1] - 27:25
**helps** [4] - 26:19,
  27:20, 31:8, 143:2
**hereby** [3] - 139:11,
  164:17, 165:16
**hesitate** [1] - 110:19
**hesitation** [1] - 102:7
**high** [3] - 39:22, 40:3,
  47:13
**highly** [1] - 127:22
**himself** [1] - 116:8
**hit** [15] - 18:5, 77:24,
  78:1, 123:5, 126:21,
  132:20, 133:5,
  137:1, 146:14,
  146:19, 147:1,
  150:22, 150:23,
  151:3, 152:4
**hits** [2] - 149:24,
  149:25
**hoist** [1] - 90:4
**Hold** [1] - 139:6
**hold** [4] - 67:2,
  117:12, 149:10,
  157:9
**holding** [3] - 31:20,
  36:6, 36:9
**holstered** [1] - 55:4
**home** [2] - 121:19,
  148:24
**honest** [2] - 110:21,
  164:23

**honestly** [1] - 42:21
**Honor** [90] - 6:6, 6:12,
  7:5, 7:13, 7:25, 8:2,
  8:4, 8:6, 8:8, 8:10,
  8:13, 8:15, 8:19,
  8:21, 8:24, 9:1, 9:4,
  9:6, 9:15, 10:21,
  10:23, 11:7, 12:23,
  13:14, 13:16, 14:11,
  14:13, 14:15, 14:23,
  15:12, 15:14, 16:21,
  17:2, 18:18, 20:10,
  20:13, 20:17, 32:14,
  52:7, 52:20, 55:17,
  55:25, 56:20, 57:4,
  57:19, 57:24, 58:10,
  58:18, 63:23, 64:20,
  76:5, 79:14, 79:16,
  79:19, 79:21, 79:24,
  81:6, 82:22, 84:24,
  88:8, 88:15, 88:21,
  89:21, 91:11, 93:2,
  93:19, 94:16, 95:9,
  96:22, 97:22, 98:20,
  98:22, 99:3, 99:12,
  99:18, 99:24, 100:2,
  113:17, 113:18,
  113:21, 124:15,
  139:5, 145:8, 159:3,
  159:6, 159:17,
  160:6, 160:7, 161:2,
  165:3
**Honorable** [3] - 53:5,
  53:8, 54:10
**HONORABLE** [1] -
  1:16
**hope** [2] - 154:3,
  154:21
**hot** [3] - 146:10,
  146:13
**hour** [1] - 125:1
**house** [3] - 138:3,
  138:4, 140:25
**hug** [1] - 158:2
**hugged** [1] - 151:1
**human** [2] - 144:7,
  148:11
**humor** [1] - 136:19
**hundred** [1] - 122:8
**hung** [1] - 153:18
**hungry** [1] - 124:23
**HUNTLEY** [1] - 2:3
**hurled** [1] - 90:21
**hurling** [1] - 158:7
**hurls** [1] - 157:24
**hurt** [3] - 22:10, 50:9,
  149:12
**hypothetically** [2] -
  69:24, 132:4

# I

**idea** [3] - 13:17, 85:22,
  128:18
**identical** [1] - 11:15
**identification** [1] -
  24:21
**identify** [2] - 24:20,
  97:10
**idle** [5] - 109:7, 121:4,
  127:5, 130:11,
  139:18
**if/then** [1] - 88:5
**imagine** [2] - 35:1,
  59:3
**immediate** [9] - 88:24,
  90:13, 90:25, 106:2,
  106:4, 108:3, 116:4,
  116:24, 140:6
**immediately** [5] -
  41:8, 44:16, 44:19,
  115:10, 122:1
**impact** [1] - 116:12
**impartially** [1] - 102:3
**impede** [1] - 108:8
**implicated** [1] - 83:4
**implies** [1] - 144:4
**important** [9] - 91:15,
  102:7, 103:11,
  118:5, 140:22,
  140:24, 141:1,
  143:25, 156:6
**impose** [1] - 149:5
**imposed** [1] - 87:13
**impossible** [1] -
  152:13
**impress** [1] - 103:18
**impressions** [1] -
  104:21
**imprisonment** [1] -
  83:1
**in-court** [1] - 24:20
**incapable** [1] - 93:24
**incarcerated** [1] -
  47:18
**incident** [3] - 43:1,
  60:24, 61:1
**incidents** [2] - 23:5,
  25:25
**inclined** [1] - 125:2
**include** [1] - 56:17
**included** [15] - 12:12,
  12:19, 13:6, 14:21,
  76:21, 82:17, 84:16,
  95:16, 105:8,
  106:25, 107:2,
  107:6, 107:10,
  107:17, 116:25
**includes** [8] - 11:16,
  90:12, 90:23, 91:12,

102:13, 106:2,
  117:16, 118:6
**including** [2] - 10:10,
  104:12
**inclusion** [1] - 8:18
**incorrect** [2] - 7:11,
  84:19
**incredibly** [3] - 79:9,
  91:15, 114:11
**independent** [1] -
  104:18
**indicate** [1] - 99:8
**indicated** [1] - 97:18
**indicates** [2] - 92:5,
  159:19
**indicative** [1] - 89:11
**indicator** [1] - 123:10
**indicted** [1] - 10:2
**indictment** [28] - 9:7,
  9:10, 10:13, 15:8,
  86:13, 88:20, 94:14,
  94:19, 101:12,
  104:23, 104:25,
  105:22, 107:22,
  108:17, 109:9,
  109:19, 109:24,
  110:5, 112:17,
  113:5, 113:6,
  115:25, 120:2,
  120:9, 131:24,
  148:7, 162:6, 162:7
**indiscernible** [3] -
  135:25, 136:1,
  137:22
**individual** [19] - 49:18,
  74:16, 83:3, 93:23,
  93:25, 95:11, 95:18,
  95:19, 107:22,
  108:17, 112:14,
  113:5, 113:6, 120:2,
  126:17, 145:22,
  147:19, 162:5, 162:7
**individually** [1] -
  60:14
**individuals** [2] -
  30:14, 143:15
**indulge** [1] - 98:22
**infer** [1] - 138:6
**inference** [1] - 138:6
**inferences** [5] - 89:7,
  89:10, 93:7, 96:14,
  145:17
**infirm** [1] - 144:13
**inflict** [10] - 106:22,
  107:25, 108:1,
  109:4, 119:1, 119:7,
  121:2, 127:3, 140:3,
  140:4
**influenced** [2] - 101:5,
  104:19

**information** [1] - 114:8
**initial** [1] - 83:11
**injured** [5] - 90:7, 90:9, 106:24, 119:17, 152:17
**injuries** [1] - 150:7
**injury** [25] - 88:23, 89:5, 89:16, 90:1, 90:5, 91:14, 91:22, 92:17, 106:1, 106:17, 106:22, 108:1, 109:5, 116:3, 118:7, 121:2, 127:3, 140:3, 140:4, 140:12, 149:5, 149:17, 149:23, 150:9
**inmate** [7] - 28:20, 48:4, 48:22, 49:6, 49:9, 94:7, 155:16
**inmates** [6] - 28:25, 47:18, 47:21, 48:6, 49:11, 49:15
**innocence** [2] - 101:15, 137:8
**innocent** [2] - 101:14, 154:6
**inquire** [3] - 15:11, 97:20, 99:6
**inquiring** [1] - 80:24
**inside** [2] - 31:12, 31:13
**inspect** [1] - 55:5
**inspected** [2] - 55:9, 56:9
**instance** [3] - 74:3, 83:5, 91:2
**instead** [1] - 82:7
**instruct** [2] - 100:5, 100:21
**instructed** [4] - 12:6, 100:4, 129:14, 157:1
**instruction** [17] - 7:3, 8:12, 8:23, 9:17, 9:20, 10:15, 10:24, 12:2, 13:22, 14:20, 15:10, 90:6, 95:17, 126:23, 127:1, 127:9, 139:17
**instructions** [24] - 6:20, 6:25, 10:20, 12:11, 13:11, 90:18, 97:8, 97:14, 98:16, 100:6, 100:7, 100:23, 101:10, 101:11, 102:18, 105:14, 113:13, 125:16, 136:17, 140:17, 145:1,

145:14, 145:15, 154:19
**insufficient** [4] - 85:19, 86:7, 87:23, 95:24
**intended** [2] - 146:22
**intent** [20] - 13:19, 14:2, 14:3, 15:7, 87:23, 108:8, 108:10, 108:18, 109:4, 119:2, 120:3, 121:2, 126:14, 127:3, 127:20, 132:17, 149:8, 149:11, 150:8, 152:20
**intentional** [11] - 10:25, 12:4, 88:22, 90:12, 90:24, 105:25, 106:2, 106:21, 116:3, 119:14, 126:9
**intentionally** [4] - 89:4, 91:25, 106:19, 109:16
**interchangeable** [1] - 95:13
**interest** [4] - 103:22, 110:24, 124:24, 159:10
**interesting** [1] - 150:13
**interfere** [2] - 39:14, 108:9
**interfered** [1] - 20:6
**interpretation** [1] - 102:21
**interrupt** [2] - 23:25, 127:7
**intervene** [1] - 151:20
**intervened** [2] - 149:22, 151:7
**interview** [1] - 164:22
**intimidate** [1] - 108:9
**intone** [1] - 143:11
**introduced** [1] - 158:17
**introduction** [1] - 9:2
**investigate** [2] - 114:16, 153:7
**investigated** [1] - 157:21
**investigation** [1] - 164:19
**involve** [3] - 87:21, 88:3
**involves** [1] - 85:1
**involving** [1] - 61:1
**irons** [9] - 93:17, 93:20, 93:25, 94:5,

121:21, 155:15, 155:16, 155:21, 155:23
**irrelevant** [2] - 153:23
**Island** [1] - 2:4
**issue** [3] - 91:8, 94:12, 102:17
**issued** [1] - 94:18
**issues** [1] - 148:5
**items** [1] - 54:21
**itself** [11] - 57:10, 58:8, 82:23, 86:22, 88:18, 89:14, 91:8, 91:19, 94:5, 95:14, 156:20

## J

**J-A-C-O-B-Y** [1] - 52:18
**J.M** [2] - 92:24, 93:12
**jacket** [1] - 24:17
**JACOBY** [2] - 3:15, 52:22
**Jacoby** [18] - 52:8, 52:18, 53:1, 53:3, 54:2, 54:16, 57:9, 57:22, 58:2, 58:21, 61:22, 63:16, 64:2, 64:19, 76:8, 79:13, 79:15, 79:18
**jail** [24] - 96:5, 117:18, 122:23, 126:5, 135:9, 135:13, 136:25, 137:1, 139:1, 146:1, 146:4, 146:20, 146:24, 146:25, 147:9, 147:18, 150:14, 150:15, 150:22, 153:5, 153:15, 153:18, 153:21, 154:14
**January** [2] - 1:6, 162:9
**JEFFREY** [1] - 2:3
**Jeffrey** [3] - 2:4, 6:13, 125:12
**jeopardy** [7] - 87:12, 94:12, 94:19, 94:24, 95:4, 96:2, 96:10
**job** [3] - 41:5, 117:25, 120:18
**jobs** [1] - 141:5
**John** [71] - 17:14, 50:16, 50:23, 61:19, 61:20, 78:21, 85:5, 86:1, 86:12, 93:4, 93:9, 93:22, 115:9, 115:12, 115:16,

115:17, 115:18, 115:25, 116:7, 116:20, 116:22, 117:3, 117:10, 117:11, 117:17, 117:18, 117:23, 117:24, 118:2, 118:17, 119:6, 119:7, 119:11, 119:12, 119:17, 120:7, 120:14, 120:21, 121:19, 122:24, 123:17, 124:2, 128:1, 129:19, 130:1, 130:20, 131:25, 133:2, 133:18, 134:25, 135:8, 137:18, 137:19, 137:20, 141:11, 141:12, 141:13, 142:20, 145:22, 146:9, 146:14, 148:2, 149:5, 149:12, 150:20, 150:25, 151:3, 151:5, 157:13, 158:9
**joke** [3] - 121:7, 121:10, 139:7
**jokes** [2] - 136:16, 136:18
**joking** [9] - 109:8, 121:5, 121:17, 123:6, 127:6, 127:16, 136:17, 139:19
**JUDGE** [1] - 1:16
**judge** [18] - 7:7, 14:17, 14:25, 15:23, 26:16, 26:22, 45:3, 46:21, 52:1, 53:16, 72:20, 81:24, 83:20, 114:17, 114:24, 115:15, 117:22, 143:10
**Judge** [62] - 12:1, 16:7, 18:15, 20:21, 21:10, 24:2, 31:14, 33:9, 40:15, 45:4, 45:6, 45:11, 45:20, 46:19, 50:20, 52:4, 53:9, 53:25, 54:3, 54:4, 54:6, 54:17, 55:6, 56:10, 57:9, 58:25, 59:24, 60:1, 60:2, 60:4, 60:6, 62:24, 63:3, 63:5, 63:17, 64:23, 65:13, 72:19, 72:23, 73:1, 73:5, 74:1, 74:12,

75:7, 75:19, 76:9, 80:15, 87:4, 89:9, 89:18, 110:10, 131:10, 139:5, 143:10, 143:22, 145:14, 152:11, 155:12, 158:13, 159:13, 159:24
**judges** [3] - 54:12, 110:23
**judgment** [5] - 84:25, 86:10, 87:25, 88:9, 139:22
**JUDGMENT** [1] - 4:7
**jump** [1] - 141:1
**jumped** [2] - 35:13, 133:4
**juror** [13] - 60:14, 65:18, 92:4, 156:25, 160:3, 162:19, 162:22, 162:25, 163:6, 163:13, 163:16, 163:19, 163:22
**Juror** [4] - 162:13, 162:16, 163:3, 163:25
**JUROR** [14] - 125:3, 162:15, 162:18, 162:21, 162:24, 163:2, 163:5, 163:8, 163:11, 163:15, 163:18, 163:21, 163:24, 164:2
**jurors** [31] - 16:10, 27:4, 27:6, 37:10, 53:21, 53:22, 60:16, 61:4, 62:20, 62:21, 73:6, 97:15, 104:20, 110:16, 111:14, 113:20, 117:21, 118:12, 118:14, 120:20, 122:11, 125:2, 126:25, 148:14, 154:3, 154:5, 154:12, 154:21, 159:21, 160:21, 162:12
**JURY** [6] - 4:10, 4:19, 4:22, 100:19, 161:2, 161:5
**Jury** [4] - 158:24, 160:11, 160:14, 160:23
**jury** [138] - 1:13, 10:3, 10:15, 12:2, 12:6, 12:10, 13:23, 14:4, 16:16, 17:17, 18:25, 19:1, 24:4, 24:6, 26:7, 26:8, 28:8,

28:12, 40:4, 40:15, 40:18, 40:24, 41:22, 42:1, 45:18, 53:3, 59:23, 60:8, 60:11, 60:12, 60:13, 60:14, 60:22, 60:24, 61:3, 61:4, 61:6, 62:22, 63:14, 65:7, 65:17, 65:19, 68:12, 71:9, 73:4, 73:5, 75:10, 75:11, 75:13, 75:18, 75:19, 76:18, 80:5, 80:6, 80:25, 81:9, 81:14, 81:24, 83:7, 85:16, 90:18, 91:5, 92:14, 93:13, 95:11, 95:16, 97:9, 97:14, 98:16, 99:2, 99:13, 99:16, 99:20, 100:4, 100:6, 100:20, 100:24, 111:1, 111:6, 111:18, 113:2, 113:13, 114:3, 114:7, 114:11, 114:22, 115:3, 115:15, 118:1, 118:15, 120:16, 120:18, 122:13, 123:18, 124:13, 124:18, 125:12, 125:21, 125:24, 126:2, 126:3, 126:23, 127:1, 127:9, 131:4, 131:11, 131:13, 136:17, 137:9, 139:10, 139:17, 140:17, 147:3, 147:6, 153:18, 154:1, 156:23, 156:24, 158:15, 158:21, 158:23, 160:9, 160:12, 160:19, 160:25, 161:1, 161:4, 161:16, 162:3, 164:5, 164:8, 164:13, 164:14, 164:16
**jury's** [1] - 12:3
**just..** [1] - 123:7
**justice** [1] - 114:9
**justification** [2] - 130:14, 130:15

**K**

**keep** [6] - 38:5, 38:6, 41:5, 77:16, 142:9, 149:7
**keeping** [1] - 66:4

**kept** [5] - 26:9, 30:25, 117:9, 118:23, 120:21
**KEVIN** [1] - 2:9
**Kevin** [1] - 6:9
**kick** [1] - 152:7
**kicking** [3] - 31:6, 31:11, 36:7
**kidnap** [2] - 83:4
**kill** [32] - 19:13, 32:6, 32:7, 61:13, 61:15, 61:16, 78:4, 78:6, 87:18, 87:20, 95:6, 95:12, 115:13, 118:20, 119:1, 119:2, 120:23, 121:11, 121:12, 121:13, 121:18, 121:19, 121:22, 134:6, 135:6, 136:14, 138:4, 149:4, 150:10
**Kill** [1] - 134:5
**killing** [2] - 87:21, 136:16
**killings** [1] - 87:21
**kind** [17] - 19:5, 23:23, 24:1, 24:9, 26:8, 27:4, 32:20, 34:4, 37:9, 40:2, 45:17, 55:4, 56:3, 81:13, 127:16, 130:24, 141:6
**knife** [2] - 148:9, 148:18
**knock** [2] - 36:22, 49:21
**knocked** [1] - 149:18
**knowing** [4] - 153:8, 153:9, 157:22
**knowingly** [10] - 95:17, 98:4, 107:21, 108:16, 109:15, 113:4, 113:5, 120:1, 162:5, 162:6
**knowledge** [3] - 23:10, 66:10, 103:2
**known** [3] - 74:10, 135:13, 157:21
**knows** [5] - 128:3, 128:13, 147:2

**L**

**label** [2] - 55:16, 56:7
**labeled** [1] - 99:15
**lack** [2] - 85:7, 87:23
**ladies** [38] - 16:17, 80:2, 99:22, 100:3, 113:24, 115:2,

115:20, 116:2, 116:10, 116:15, 116:25, 117:2, 117:6, 117:14, 118:4, 119:9, 119:15, 119:24, 120:6, 120:13, 120:24, 121:1, 121:9, 121:14, 121:23, 121:24, 122:7, 122:13, 122:25, 123:8, 123:18, 124:6, 124:10, 124:13, 124:18, 129:13, 158:15, 164:5
**lady** [6] - 25:4, 25:17, 34:18, 35:15, 35:16, 153:9
**laid** [1] - 33:4
**land** [2] - 33:19, 77:23
**landed** [5] - 30:5, 34:3, 77:24, 77:25, 140:9
**language** [5] - 15:4, 84:18, 95:15, 119:4
**laptop** [4] - 159:4, 159:6, 159:11, 159:16
**large** [3] - 55:2, 71:17, 71:18
**last** [5] - 13:7, 21:5, 52:17, 112:25, 132:7
**lasted** [1] - 65:4
**late** [1] - 150:2
**LATTA** [26] - 1:20, 4:17, 21:10, 21:12, 21:15, 24:20, 24:23, 26:16, 26:18, 26:22, 26:24, 27:9, 28:19, 32:14, 32:17, 38:8, 46:24, 47:2, 51:25, 98:22, 98:25, 129:10, 145:8, 145:11, 145:13, 155:12
**Latta** [6] - 3:12, 3:14, 6:8, 88:13, 154:22, 158:14
**LAUDERDALE** [1] - 1:2
**Lauderdale** [13] - 1:25, 7:8, 7:11, 7:14, 7:17, 53:13, 54:12, 54:16, 57:10, 57:12, 58:6, 58:22, 59:3
**launch** [3] - 62:8, 86:5, 117:4
**launched** [2] - 116:9, 118:18

**launches** [1] - 90:4
**launching** [2] - 119:21, 121:8
**law** [35] - 10:10, 22:6, 22:9, 78:11, 83:13, 90:23, 97:9, 97:11, 100:5, 100:21, 101:8, 101:9, 101:11, 101:13, 102:18, 105:12, 106:14, 107:1, 108:6, 108:8, 108:22, 108:24, 109:1, 109:2, 109:3, 112:20, 113:3, 119:25, 120:7, 122:2, 129:14, 148:15, 152:21, 162:1, 162:4
**laws** [3] - 148:14, 157:2
**lawyer** [2] - 147:20, 147:21
**lawyers** [1] - 102:14
**layout** [1] - 54:17
**lead** [1] - 92:20
**learn** [2] - 39:1, 146:7
**learned** [6] - 23:8, 91:2, 130:22, 130:23, 130:24, 132:6
**least** [7] - 27:12, 77:16, 78:11, 89:14, 143:4, 150:3, 151:6
**leather** [1] - 55:4
**leave** [6] - 65:13, 71:9, 115:3, 124:22, 156:21, 160:1
**leaves** [1] - 42:1
**leaving** [3] - 19:1, 68:12, 76:19
**ledge** [1] - 160:2
**left** [6] - 24:16, 27:5, 63:5, 63:12, 73:9, 75:12
**leg** [25] - 37:25, 38:1, 38:2, 38:14, 38:19, 47:21, 48:6, 48:18, 49:12, 64:9, 73:22, 78:19, 86:2, 93:17, 93:20, 93:25, 94:5, 116:17, 121:21, 122:16, 155:14, 155:16, 155:21, 155:23
**legal** [1] - 103:6
**legally** [3] - 84:19, 95:7, 95:9
**legs** [7] - 31:11, 36:9, 64:8, 74:6, 122:19,

130:22
**length** [5] - 38:19, 77:16, 97:3, 111:16, 122:19
**less** [2] - 25:1, 125:23
**lesser** [11] - 10:4, 12:19, 13:6, 82:17, 84:16, 105:8, 106:25, 107:2, 107:6, 107:10, 107:17
**lesser-included** [10] - 12:19, 13:6, 82:17, 84:16, 105:8, 106:25, 107:2, 107:6, 107:10, 107:17
**letters** [1] - 40:7
**level** [11] - 30:10, 30:19, 30:20, 30:22, 32:20, 48:3, 48:21, 62:12, 84:6, 84:7
**levels** [1] - 83:21
**liability** [2] - 88:20, 90:22
**life** [8] - 34:25, 116:20, 138:2, 138:3, 140:20, 143:24, 154:17, 154:23
**lift** [4] - 63:22, 92:5, 122:19, 124:7
**lifted** [4] - 42:18, 71:19, 77:14, 150:8
**light** [7] - 51:22, 89:6, 92:10, 93:6, 144:4, 144:5, 144:6
**lightly** [2] - 36:23, 141:2
**likelihood** [1] - 86:4
**likelihoods** [1] - 141:4
**limit** [1] - 39:17
**limited** [1] - 94:6
**line** [2] - 137:3, 149:7
**link** [1] - 130:2
**linked** [1] - 129:2
**list** [2] - 57:2, 57:4
**listen** [12] - 67:9, 67:12, 100:9, 122:25, 123:2, 123:8, 123:14, 129:3, 134:8, 136:5, 146:25
**Listen** [1] - 117:19
**listened** [3] - 17:9, 46:11, 117:20
**listening** [1] - 137:25
**literally** [1] - 156:3
**litigated** [1] - 154:1
**live** [1] - 66:15
**located** [5] - 57:10,

57:11, 57:14, 70:8,
72:9
**locked** [1] - 43:23
**look** [18] - 27:5, 31:14,
75:21, 75:23, 78:5,
81:8, 88:21, 89:24,
91:17, 95:16,
112:10, 118:12,
121:24, 131:7,
135:13, 137:17,
139:20, 153:21
**looked** [6] - 26:7,
26:14, 27:5, 27:15,
27:16, 67:14
**looking** [15] - 17:17,
19:1, 26:6, 29:9,
29:14, 29:15, 78:8,
78:12, 95:15,
124:24, 128:3,
142:21, 149:15,
156:15, 157:18
**looks** [3] - 12:1, 84:2,
115:7
**loose** [3] - 31:6, 32:24,
50:9
**lose** [4] - 26:1, 157:23,
157:25, 158:6
**loud** [4] - 19:2, 19:5,
100:10, 116:13
**lunch** [4] - 124:19,
124:22, 124:25,
158:18
**lunches** [1] - 125:4
**lunging** [4] - 93:21,
131:21, 150:18,
151:5
**lying** [1] - 43:21

**M**

**ma'am** [59] - 11:22,
14:9, 16:23, 21:19,
22:8, 22:25, 23:4,
23:13, 23:18, 23:20,
23:22, 24:1, 24:11,
24:13, 25:8, 25:25,
26:21, 27:25, 28:4,
28:8, 28:16, 28:21,
28:24, 29:3, 29:10,
30:8, 30:16, 30:18,
31:23, 32:10, 32:12,
33:7, 46:24, 47:20,
47:23, 47:25, 48:2,
48:5, 48:12, 48:15,
48:20, 49:2, 49:4,
49:10, 49:16, 49:19,
50:7, 50:10, 50:14,
50:17, 50:24, 51:9,
51:12, 51:18, 65:1,
95:22, 96:18, 161:5,

163:10
**mad** [2] - 132:24,
157:19
**Madam** [2] - 161:6,
162:11
**maintain** [1] - 74:16
**maintaining** [2] - 23:6,
137:8
**maintains** [1] - 83:20
**MALE** [1] - 125:3
**man** [12] - 33:19,
35:21, 47:7, 69:17,
116:17, 132:8,
137:4, 138:3,
147:10, 150:5,
150:11, 154:6
**Man** [1] - 121:19
**manage** [2] - 53:23
**manner** [14] - 84:20,
85:21, 91:20, 91:23,
92:19, 93:12, 109:8,
118:25, 119:22,
121:5, 127:6,
133:23, 139:19,
149:21
**mannerisms** [1] -
136:25
**mark** [2] - 55:13, 56:9
**marked** [5] - 55:18,
56:21, 57:3, 57:23,
58:11
**marking** [1] - 56:3
**married** [1] - 140:25
**MARSHAL** [1] - 2:9
**Marshal** [12] - 22:16,
23:8, 23:10, 25:13,
111:11, 111:12,
115:7, 138:14,
138:15, 139:5,
156:12, 165:7
**Marshals** [18] - 6:10,
20:8, 21:21, 22:2,
22:3, 22:4, 22:7,
22:15, 23:17, 38:11,
62:9, 62:15, 62:17,
74:11, 74:12, 123:6,
138:16, 153:5
**Marshals'** [3] - 31:13,
61:25, 74:14
**mask** [3] - 21:8, 25:5,
52:11
**match** [1] - 130:3
**material** [2] - 11:18,
55:4
**matter** [15] - 7:17,
36:7, 36:23, 50:17,
87:9, 94:17, 103:15,
106:10, 108:25,
119:12, 119:13,
120:13, 136:13,

165:18
**matters** [7] - 62:25,
65:25, 91:20,
102:22, 160:4,
164:10, 165:1
**max** [1] - 154:17
**maximum** [1] - 39:2
**McMillan** [111] - 17:14,
29:12, 29:15, 30:2,
31:25, 50:16, 50:19,
50:23, 50:25, 51:3,
61:19, 61:20, 77:24,
77:25, 78:2, 78:9,
78:12, 78:21, 85:5,
85:9, 86:1, 86:12,
88:17, 90:20, 93:4,
93:9, 93:22, 95:25,
115:9, 115:12,
115:17, 116:1,
116:7, 116:20,
116:22, 117:4,
117:11, 117:17,
117:19, 117:23,
117:24, 118:17,
118:19, 118:21,
119:12, 119:17,
120:7, 120:14,
120:21, 121:19,
121:25, 122:2,
122:12, 122:24,
123:17, 124:2,
128:1, 128:12,
128:18, 129:19,
130:2, 130:3,
130:20, 131:3,
131:22, 131:25,
132:11, 133:3,
133:18, 135:1,
135:8, 135:18,
135:21, 137:19,
137:20, 140:8,
141:11, 141:12,
141:13, 141:24,
142:2, 142:7, 142:9,
142:20, 145:22,
146:9, 146:14,
148:2, 149:5,
149:12, 149:16,
150:16, 150:20,
150:25, 151:3,
151:5, 152:4, 152:5,
152:6, 152:17,
152:18, 156:16,
157:13, 158:5, 158:9
**McMillan's** [6] -
115:18, 118:2,
118:23, 120:11,
131:4, 147:15
**mean** [35] - 19:24,
27:11, 33:14, 34:2,

36:20, 38:7, 43:15,
46:2, 47:8, 51:12,
51:13, 61:2, 63:20,
68:9, 70:14, 75:15,
78:16, 82:2, 103:9,
130:14, 132:13,
132:16, 133:16,
136:1, 137:23,
138:17, 139:24,
141:25, 144:1,
151:24, 151:25,
153:15, 154:20,
157:15
**meanings** [1] - 136:22
**means** [20] - 10:13,
10:15, 19:23, 38:10,
84:14, 91:24, 92:15,
106:16, 109:15,
127:12, 127:25,
132:16, 137:24,
138:17, 138:19,
140:24, 158:7, 158:8
**meant** [4] - 87:24,
127:10, 133:9,
153:12
**meantime** [1] - 97:15
**media** [1] - 159:5
**melding** [1] - 82:16
**members** [4] - 26:1,
100:20, 111:2,
125:12
**memories** [2] -
104:21, 143:15
**memorize** [1] - 100:8
**memory** [4] - 46:16,
103:24, 104:16,
142:24
**men** [1] - 71:17
**mentioned** [2] - 24:8,
31:21
**menus** [1] - 158:18
**Mere** [1] - 139:18
**mere** [4] - 109:7,
121:4, 127:5, 130:11
**message** [1] - 111:11
**met** [2] - 89:12, 97:17
**metal** [1] - 47:11
**Miami** [9] - 1:22, 2:14,
2:15, 53:12, 54:10,
54:12, 59:4, 165:23,
165:24
**mic** [1] - 26:24
**might** [5] - 43:10,
88:3, 125:18, 135:9,
149:25
**miles** [1] - 121:19
**military** [2] - 22:10,
22:11
**mind** [7] - 20:4, 27:19,
28:17, 74:20,

110:19, 142:9,
157:25
**minute** [5] - 98:21,
98:23, 145:9, 146:4,
155:14
**minutes** [15] - 16:10,
16:11, 40:18, 97:2,
97:3, 98:18, 98:23,
98:24, 124:17,
143:21, 143:22,
146:5, 146:6, 155:11
**misdemeanor** [7] -
81:1, 81:25, 83:6,
83:23, 84:4, 85:15,
85:17
**missed** [1] - 123:5
**misstatement** [1] -
129:10
**mistake** [1] - 109:16
**mixed** [1] - 151:16
**moment** [27] - 6:23,
15:23, 20:2, 23:12,
31:21, 32:14, 46:19,
57:19, 59:19, 61:22,
61:24, 63:23, 70:19,
76:23, 88:18, 90:21,
96:9, 111:5, 118:23,
122:21, 142:3,
145:15, 146:11,
146:22, 149:11,
151:21, 158:20
**momentarily** [1] -
98:10
**moments** [4] - 91:2,
97:13, 158:16, 164:9
**momentum** [3] -
28:11, 30:4, 49:3
**Monday** [2] - 67:13,
70:25
**monitor** [3] - 31:12,
31:14, 58:21
**monitoring** [1] - 29:1
**months** [1] - 87:2
**moreover** [1] - 90:6
**morning** [22] - 6:3,
6:4, 6:6, 6:11, 6:12,
6:15, 16:4, 16:17,
16:23, 16:24, 17:7,
17:8, 20:20, 20:21,
21:16, 21:17, 52:9,
53:1, 53:2, 65:1,
65:2, 80:3
**most** [16] - 54:13,
62:21, 78:8, 86:14,
89:7, 92:10, 93:6,
102:7, 104:15,
116:18, 118:5,
125:2, 140:22,
143:25, 151:10,
156:23

**motion** [14] - 11:4, 73:18, 87:15, 91:3, 92:23, 93:24, 94:14, 94:19, 96:13, 115:8, 116:9, 118:24, 156:20
**MOTION** [1] - 4:7
**motions** [1] - 84:23
**move** [24] - 27:24, 29:6, 43:13, 49:1, 49:3, 50:13, 50:16, 50:18, 69:25, 84:24, 86:10, 92:22, 94:9, 111:24, 111:25, 112:6, 112:7, 112:22, 116:8, 119:18, 124:7, 148:3
**moved** [7] - 43:16, 43:19, 69:21, 123:1, 132:22, 141:19
**movement** [9] - 22:20, 27:20, 36:10, 38:18, 39:17, 39:25, 94:6, 155:22
**movements** [2] - 48:14, 117:7
**moves** [3] - 56:21, 58:11, 87:25
**movies** [1] - 148:10
**moving** [9] - 27:22, 28:5, 28:15, 29:9, 29:22, 86:17, 93:24, 94:8, 95:5
**MR** [154] - 4:12, 4:15, 6:4, 6:6, 6:12, 7:5, 7:7, 7:13, 7:20, 7:25, 8:2, 8:4, 8:6, 8:8, 8:10, 8:13, 8:15, 8:19, 8:21, 8:24, 9:1, 9:4, 9:6, 9:15, 9:22, 10:2, 10:21, 10:23, 11:7, 11:22, 12:1, 12:23, 12:25, 13:5, 13:14, 13:16, 14:9, 14:11, 14:13, 14:15, 14:17, 14:23, 14:25, 15:12, 15:14, 15:17, 15:19, 15:23, 15:25, 16:6, 16:21, 17:2, 17:6, 18:15, 18:18, 18:20, 20:9, 20:13, 20:19, 33:9, 33:11, 38:15, 46:19, 46:21, 52:7, 52:20, 52:25, 55:17, 55:22, 55:25, 56:2, 56:20, 56:24, 57:4, 57:8, 57:19, 57:21, 57:24, 58:1, 58:10, 58:14, 58:18, 58:20, 63:23, 64:1,

64:20, 64:23, 64:25, 65:20, 65:24, 66:21, 66:23, 67:4, 67:7, 75:25, 76:5, 76:7, 79:13, 79:19, 79:24, 80:15, 80:18, 80:24, 81:6, 81:24, 82:5, 82:7, 82:22, 83:20, 84:24, 87:16, 88:15, 88:21, 89:9, 89:18, 89:21, 89:24, 91:11, 93:2, 93:19, 94:16, 94:23, 95:1, 95:9, 95:22, 96:9, 96:18, 96:22, 96:25, 97:17, 98:20, 99:3, 99:5, 99:9, 99:12, 99:18, 99:24, 100:2, 113:17, 113:21, 113:24, 125:12, 127:1, 129:17, 143:22, 159:3, 159:6, 159:12, 159:17, 159:24, 160:6, 160:7, 165:3, 165:5
**MS** [25] - 4:17, 21:10, 21:12, 21:15, 24:20, 24:23, 26:16, 26:18, 26:22, 26:24, 27:9, 28:19, 32:14, 32:17, 38:8, 46:24, 47:2, 51:25, 98:22, 98:25, 129:10, 145:8, 145:11, 145:13, 155:12
**multi** [1] - 11:11
**multiple** [5] - 92:8, 109:18, 109:20, 122:1, 125:24
**multiplicitous** [1] - 11:12
**murder** [32] - 13:18, 13:21, 14:5, 15:2, 82:13, 83:3, 83:9, 83:25, 87:17, 87:20, 87:22, 87:23, 87:24, 95:7, 95:10, 95:18, 105:12, 108:8, 108:17, 109:5, 113:4, 119:25, 120:2, 121:2, 123:18, 124:2, 127:3, 144:18, 162:5
**murders** [1] - 87:21
**must** [34] - 36:8, 100:21, 101:1, 101:4, 101:5, 101:8, 101:9, 101:10, 101:19, 101:20,

102:11, 103:8, 103:9, 104:8, 104:9, 104:11, 104:16, 104:17, 104:19, 106:5, 106:18, 107:5, 107:17, 108:21, 109:25, 110:2, 110:8, 110:11, 110:12, 110:14, 110:17, 111:8, 113:8, 119:19
**mutter** [1] - 121:17

## N

**N.E** [1] - 1:21
**name** [10] - 21:4, 21:5, 22:16, 24:8, 31:10, 52:16, 52:17, 56:7, 113:12, 125:12
**named** [2] - 85:24, 115:24
**nature** [6] - 15:7, 84:15, 90:15, 97:10, 126:3, 144:7
**near** [1] - 50:22
**necessarily** [2] - 18:3, 103:15
**necessary** [5] - 72:22, 81:18, 84:5, 101:2, 107:13
**need** [12] - 39:4, 50:19, 62:2, 81:4, 81:16, 83:14, 100:8, 116:7, 158:20, 159:21, 160:4, 165:1
**needed** [1] - 45:20
**needs** [7] - 81:3, 82:12, 82:14, 82:15, 127:7, 127:8, 128:3
**negate** [1] - 88:19
**negates** [1] - 90:21
**never** [7] - 49:24, 85:5, 110:8, 110:13, 120:10, 126:15, 137:1
**new** [3] - 148:14, 148:16, 157:2
**next** [28] - 17:14, 20:12, 24:19, 25:12, 27:15, 27:17, 35:14, 42:16, 42:24, 52:6, 68:19, 70:8, 70:15, 77:12, 78:21, 91:8, 92:22, 122:6, 134:3, 134:5, 134:12, 135:5, 135:24, 137:3, 137:11, 138:20, 138:23, 139:4

**nice** [1] - 131:12
**nigger** [3] - 138:4, 138:21, 139:7
**night** [1] - 135:12
**NO** [1] - 1:3
**nobody** [3] - 127:7, 127:8, 156:14
**noise** [2] - 17:19, 19:4
**nomenclature** [1] - 82:9
**none** [2] - 113:7, 154:21
**nonsense** [4] - 157:12, 157:13, 157:14, 157:15
**normal** [2] - 24:2, 73:23
**normally** [2] - 25:18, 73:23
**North** [2] - 2:14, 165:23
**nose** [2] - 149:18, 149:25
**note** [11] - 8:23, 10:23, 11:7, 11:18, 15:5, 57:2, 84:21, 96:4, 159:17, 159:18, 160:19
**note-taking** [1] - 8:23
**noted** [4] - 8:16, 13:1, 13:25, 129:13
**notes** [9] - 82:23, 90:6, 104:14, 104:16, 104:17, 104:20, 153:10, 160:3
**nothing** [13] - 7:20, 18:15, 21:2, 30:2, 46:21, 51:25, 52:14, 114:19, 121:6, 142:8, 157:23, 157:25, 158:6
**notice** [4] - 10:3, 26:11, 98:21, 98:23
**noticed** [1] - 87:10
**November** [17] - 23:16, 24:25, 26:5, 55:6, 59:1, 59:7, 59:16, 65:3, 65:5, 65:7, 65:11, 66:7, 76:16, 114:3, 125:21, 129:19, 154:10
**Number** [19] - 105:22, 105:23, 107:22, 108:18, 140:13, 141:14, 161:11, 162:13, 162:16, 162:19, 162:22, 162:25, 163:3,

163:6, 163:13, 163:16, 163:19, 163:22, 163:25
**NUMBER** [13] - 162:15, 162:18, 162:21, 162:24, 163:2, 163:5, 163:8, 163:11, 163:15, 163:18, 163:21, 163:24, 164:2
**number** [7] - 87:2, 103:14, 104:24, 105:21, 107:21, 108:16, 117:8
**numbers** [1] - 160:1

## O

**object** [15] - 9:23, 14:19, 15:4, 91:12, 91:15, 91:16, 91:17, 91:18, 91:21, 92:16, 94:1, 106:16, 118:6, 148:19
**objection** [40] - 7:3, 7:24, 8:12, 8:18, 8:24, 9:1, 9:4, 9:6, 9:8, 9:19, 10:17, 11:19, 12:22, 12:25, 13:10, 13:13, 13:16, 14:11, 14:13, 14:15, 14:22, 15:10, 15:12, 15:14, 15:17, 15:19, 15:22, 38:8, 55:21, 55:22, 56:23, 56:24, 58:13, 58:14, 58:16, 65:20, 66:21, 67:2, 81:23, 129:10
**objections** [8] - 9:13, 14:18, 14:25, 15:3, 16:3, 80:14, 80:20, 157:2
**objective** [1] - 122:10
**objects** [1] - 148:19
**obligation** [1] - 114:20
**obscenities** [5] - 27:18, 29:14, 29:16, 46:1, 46:2
**observe** [2] - 62:5, 104:1
**observed** [1] - 122:16
**observing** [1] - 61:23
**obtained** [1] - 10:14
**obviously** [5] - 74:20, 78:21, 83:4, 127:19, 133:21
**occasion** [1] - 48:10
**occasioned** [1] - 84:1
**occupation** [1] - 53:4
**occurred** [3] - 19:6,

107:23, 109:11
**October** [3] - 59:7, 65:4, 114:3
**OF** [4] - 1:1, 1:5, 4:7, 4:22
**offended** [1] - 136:19
**offense** [13] - 11:9, 13:6, 13:12, 82:17, 83:6, 83:22, 84:16, 90:23, 107:2, 107:10, 107:17, 109:11, 109:19
**offenses** [8] - 11:8, 11:18, 12:19, 105:8, 106:25, 107:6, 139:24, 140:1
**offers** [1] - 104:6
**office** [2] - 31:13, 53:23
**Office** [7] - 1:21, 1:23, 54:15, 61:25, 74:14, 76:11, 106:12
**officer** [43] - 9:17, 21:24, 21:25, 22:9, 22:10, 22:12, 23:4, 33:12, 62:14, 62:16, 74:13, 83:13, 86:15, 97:12, 105:3, 105:4, 105:9, 105:12, 105:15, 105:17, 105:18, 105:23, 106:8, 106:12, 107:24, 108:6, 108:8, 108:22, 108:25, 109:2, 111:22, 112:4, 112:20, 113:3, 115:22, 119:25, 120:8, 128:7, 131:2, 131:12, 132:3, 162:1, 162:4
**Officer** [2] - 37:16, 92:6
**officers** [18] - 71:9, 71:12, 72:5, 72:11, 86:4, 117:11, 121:14, 122:2, 128:18, 130:9, 130:13, 134:17, 140:10, 142:6, 142:11, 143:5, 151:7, 151:20
**Official** [6] - 2:13, 108:11, 108:19, 108:23, 108:25, 120:8
**official** [17] - 66:19, 66:25, 105:4, 105:18, 105:23, 106:7, 106:10,

106:13, 107:24, 108:10, 108:11, 108:20, 117:16, 120:4, 136:1, 139:13
**Official's** [2] - 108:9, 108:11
**often** [1] - 29:1
**old** [1] - 63:22
**older** [1] - 150:2
**omit** [1] - 95:23
**once** [16] - 18:4, 19:2, 20:2, 20:5, 32:19, 35:18, 50:1, 71:22, 73:9, 73:16, 120:22, 120:23, 121:21, 131:17, 151:20
**one** [67] - 6:23, 10:15, 12:1, 13:24, 26:8, 30:22, 32:18, 40:23, 41:16, 41:17, 44:9, 44:10, 45:25, 46:19, 47:24, 51:20, 55:5, 57:19, 68:3, 71:12, 71:15, 76:23, 77:1, 82:11, 83:23, 83:24, 84:8, 95:24, 96:25, 103:18, 107:2, 107:7, 109:21, 110:2, 110:17, 111:1, 111:15, 113:7, 115:8, 116:9, 117:13, 118:24, 119:1, 120:16, 122:11, 125:1, 125:20, 126:1, 127:11, 127:12, 127:13, 128:23, 133:24, 134:17, 138:23, 139:1, 144:8, 144:18, 144:19, 145:14, 146:5, 153:20, 158:3, 159:17
**ones** [2] - 128:25, 129:1
**ongoing** [1] - 151:23
**open** [3] - 50:25, 142:12, 164:23
**opening** [1] - 50:24
**operate** [1] - 84:13
**operates** [1] - 76:16
**opinion** [3] - 13:23, 102:17, 110:19
**opportunity** [5] - 41:2, 100:15, 103:25, 104:16, 124:5
**opposed** [3] - 13:1, 133:3, 135:19
**opposing** [1] - 148:5
**opposite** [3] - 27:3,

126:8, 126:10
**opposition** [1] - 84:21
**options** [1] - 144:18
**order** [10] - 6:1, 69:2, 81:18, 88:12, 94:13, 94:18, 99:16, 124:21, 132:9, 164:18
**orders** [1] - 53:19
**ordinary** [1] - 143:24
**organize** [1] - 53:17
**organized** [2] - 81:20, 99:15
**otherwise** [4] - 7:9, 34:5, 64:16, 93:24
**outburst** [1] - 31:1
**outcome** [3] - 103:22, 130:12, 152:16
**outlined** [1] - 81:13
**outside** [1] - 79:17
**overall** [1] - 97:19
**overlooked** [1] - 96:8
**overruled** [5] - 14:18, 38:9, 65:21, 67:5, 129:12
**own** [8] - 6:22, 102:7, 102:20, 102:21, 110:19, 115:16, 117:22, 155:20

**P**

**P.A** [1] - 2:4
**p.m** [10] - 1:9, 158:24, 160:11, 160:13, 160:14, 160:23, 164:15, 164:20, 165:13
**PAGE** [2] - 3:6, 4:2
**Page** [14] - 7:2, 7:3, 7:7, 7:23, 7:24, 8:22, 9:13, 12:22, 13:1, 13:4, 13:11, 14:8, 14:14, 14:22
**page** [13] - 8:3, 8:7, 8:11, 8:16, 9:2, 9:16, 14:10, 14:21, 15:15, 112:25, 134:12, 138:14
**pages** [1] - 111:16
**Pages** [4] - 1:10, 9:23, 10:20, 11:21
**paid** [1] - 129:21
**Palm** [1] - 54:13
**paper** [3] - 6:19, 79:3, 119:6
**papers** [1] - 116:16
**paragraph** [3] - 13:3, 13:5, 80:25
**parallel** [1] - 30:1

**parentheticals** [1] - 131:13
**part** [19] - 22:8, 40:4, 41:5, 43:25, 48:12, 72:17, 75:9, 85:8, 85:9, 103:13, 127:1, 134:3, 135:24, 137:3, 137:4, 141:23, 142:2, 149:18
**particular** [31] - 10:4, 14:19, 15:4, 16:2, 28:7, 30:19, 36:2, 37:24, 44:12, 45:19, 46:11, 48:21, 49:9, 73:19, 73:22, 81:23, 83:5, 85:11, 88:18, 90:21, 92:24, 103:15, 103:20, 127:14, 133:24, 134:11, 135:14, 138:8, 148:20, 155:6, 157:17
**particularly** [1] - 23:1
**parties** [9] - 8:16, 16:11, 94:18, 96:20, 98:10, 98:15, 99:15, 165:9
**parties'** [1] - 12:21
**partner** [5] - 25:13, 31:7, 33:21, 34:5, 34:7
**pass** [1] - 69:3
**passes** [1] - 136:19
**passing** [1] - 153:4
**password** [2] - 159:19, 159:20
**password-protected** [1] - 159:20
**past** [1] - 132:9
**path** [1] - 50:23
**patience** [1] - 99:22
**pause** [6] - 32:16, 46:20, 57:20, 63:25, 156:19, 160:22
**pay** [1] - 32:3
**pen** [6] - 79:5, 91:17, 116:16, 148:19, 148:21
**penalties** [2] - 84:15, 154:16
**penalty** [3] - 13:20, 82:24, 87:12
**pending** [2] - 87:6, 165:7
**people** [26] - 22:18, 26:2, 36:18, 41:24, 42:15, 43:4, 47:18, 117:8, 121:9, 123:12, 126:7,

126:9, 127:9, 129:18, 132:15, 133:13, 133:17, 136:19, 136:20, 138:11, 139:3, 140:25, 141:1, 147:24, 156:3, 156:4
**people's** [1] - 139:22
**per** [1] - 97:3
**perceive** [1] - 95:12
**perceived** [1] - 92:14
**perceives** [1] - 89:2
**percent** [5] - 27:16, 64:12, 65:14, 75:22, 148:1
**perception** [1] - 89:14
**perform** [1] - 23:11
**performance** [4] - 108:9, 108:11, 108:19, 120:4
**performing** [6] - 105:4, 105:18, 105:23, 106:6, 107:24, 117:16
**perhaps** [1] - 104:15
**permanent** [1] - 94:1
**permission** [3] - 26:17, 55:18, 124:15
**permit** [1] - 16:3
**permitted** [1] - 104:14
**person** [42] - 26:1, 38:6, 38:13, 39:18, 49:20, 74:15, 76:24, 77:1, 85:2, 86:4, 89:1, 89:2, 90:13, 90:25, 91:4, 92:20, 103:1, 105:21, 105:22, 106:3, 107:23, 108:1, 108:2, 109:6, 115:24, 116:24, 121:4, 122:18, 123:11, 126:1, 126:19, 127:5, 130:12, 134:11, 136:11, 138:8, 140:3, 140:4, 144:5, 156:9, 157:13, 158:9
**person's** [5] - 38:4, 39:14, 75:1, 75:2, 150:1
**personal** [1] - 103:22
**personnel** [6] - 22:20, 25:8, 37:10, 38:11, 41:23, 80:9
**persons** [2] - 25:9, 126:16
**persuasive** [1] - 91:7
**Peters** [3] - 45:15, 138:14, 138:15

**pew** [25] - 34:13, 34:16, 34:20, 36:5, 36:11, 36:17, 36:19, 36:25, 37:12, 37:15, 45:1, 45:13, 72:1, 72:3, 72:4, 74:24, 75:1, 75:5, 75:9, 128:10, 134:10, 134:20, 134:24, 138:19, 143:4
**pews** [1] - 37:13
**phone** [4] - 62:2, 62:17, 65:13, 160:1
**photo** [1] - 58:2
**photograph** [1] - 57:22
**photograph** [1] - 91:15, 92:15, 134:5, 134:16, 134:18
**phrase** [5] - 91:15, 92:15, 134:5, 134:16, 134:18
**phraseology** [1] - 95:13
**physical** [3] - 12:9, 30:6, 77:11
**pick** [3] - 50:2, 90:2, 116:11
**picked** [8] - 26:12, 44:13, 44:14, 61:6, 86:18, 116:8, 118:24, 149:9
**picking** [1] - 119:21
**picks** [3] - 29:8, 115:8, 149:11
**piece** [1] - 79:3
**pieces** [1] - 18:7
**Pierce** [4] - 1:5, 2:5, 162:9, 164:20
**pillow** [2] - 148:23
**pin** [2] - 10:11, 33:4
**pitcher** [1] - 132:13
**place** [6] - 41:8, 86:2, 87:5, 143:15, 143:20, 154:20
**placed** [2] - 49:14, 129:25
**PLAINTIFF** [1] - 1:6
**plan** [1] - 151:24
**planning** [2] - 127:17, 127:18
**play** [1] - 34:24
**played** [2] - 38:25, 39:1
**plus** [1] - 140:11
**podium** [3] - 51:1, 63:11, 151:1
**point** [47] - 11:3, 11:13, 22:19, 24:14, 25:18, 31:16, 33:15, 34:10, 34:12, 36:17, 37:6, 37:7, 37:8, 39:22, 44:22, 45:6,

125:7
**preferable** [1] - 16:5
**prejudice** [1] - 101:6
**preliminary** [1] - 6:25
**premeditated** [1] - 126:8
**preparation** [2] - 66:16, 70:24
**prepare** [1] - 53:19
**prepared** [5] - 25:23, 66:11, 66:19, 66:24, 111:4
**presence** [3] - 75:12, 86:3, 142:6
**present** [28] - 11:17, 12:10, 12:16, 54:24, 55:10, 55:15, 56:14, 59:11, 60:6, 62:21, 63:17, 66:8, 83:17, 91:13, 91:22, 92:16, 94:9, 100:11, 100:15, 106:17, 108:3, 114:15, 114:18, 118:7, 118:9, 140:5, 140:14, 160:18
**PRESENT** [1] - 2:7
**presented** [9] - 12:2, 82:10, 92:18, 93:14, 101:5, 114:7, 123:21, 135:16, 137:15
**presentence** [1] - 164:18
**preserved** [1] - 10:18
**preside** [2] - 114:4, 114:17
**presiding** [1] - 120:12
**presumes** [1] - 101:13
**pretrial** [1] - 13:17
**pretty** [19] - 19:3, 22:25, 29:21, 31:7, 33:3, 35:1, 35:2, 35:8, 37:11, 39:4, 39:18, 44:11, 51:12, 51:21, 51:22, 69:17, 72:7, 72:12, 78:19
**prevent** [3] - 38:16, 71:20, 94:7
**previous** [3] - 14:20, 22:8, 87:10
**previously** [5] - 13:1, 17:3, 54:9, 56:21, 58:11
**prima** [2] - 89:12, 93:8
**primary** [1] - 142:19
**printed** [2] - 56:7, 113:12
**priority** [1] - 104:18
**prison** [3] - 87:2,

150:5, 153:7
**prisoners** [1] - 22:20
**privy** [1] - 154:9
**probability** [1] - 140:12
**Probation** [1] - 164:21
**probation** [1] - 164:24
**problem** [1] - 87:12
**problems** [1] - 84:8
**procedure** [2] - 35:22, 35:25
**procedures** [2] - 73:3, 143:12
**proceed** [11] - 11:24, 16:6, 17:1, 21:10, 33:8, 52:20, 82:3, 90:17, 112:16, 113:21, 129:16
**proceeding** [4] - 46:5, 66:10, 88:2, 165:10
**proceedings** [18] - 32:16, 46:8, 46:20, 53:18, 53:23, 57:20, 62:24, 63:25, 66:3, 66:13, 66:14, 74:2, 100:5, 127:8, 142:12, 160:22, 165:13, 165:18
**process** [9] - 9:25, 10:3, 19:6, 39:25, 40:23, 138:9, 138:10, 138:18, 154:25
**produce** [1] - 101:15
**professionalism** [1] - 165:9
**promise** [1] - 146:25
**prompt** [1] - 16:18
**promptly** [1] - 111:12
**pronounce** [1] - 62:25
**proof** [18] - 10:5, 10:14, 85:7, 87:23, 100:14, 101:23, 101:25, 102:5, 103:4, 107:13, 128:25, 133:7, 133:9, 135:17, 138:25, 139:16
**properly** [2] - 10:16, 99:15
**property** [3] - 106:15, 107:23, 108:5
**prosecutable** [1] - 88:7
**prosecute** [3] - 106:14, 115:18, 118:2
**prosecuting** [1] - 117:25
**prosecution** [11] -

24:7, 27:8, 28:12, 29:23, 32:25, 51:24, 56:17, 87:6, 97:19, 109:3, 156:13
**prosecutor** [48] - 17:14, 19:12, 19:13, 29:12, 41:24, 50:9, 68:21, 68:24, 69:3, 70:11, 74:9, 74:19, 78:20, 79:10, 85:5, 86:1, 96:6, 114:15, 117:23, 120:12, 122:4, 122:21, 128:1, 128:3, 128:12, 129:19, 131:25, 132:10, 132:11, 133:13, 133:15, 133:16, 134:1, 134:25, 139:1, 146:16, 146:17, 147:5, 147:6, 147:21, 147:22, 150:3, 153:6, 156:8, 157:20, 161:20
**Prosecutor** [3] - 31:24, 133:2, 135:8
**prosecutor's** [2] - 85:23, 86:21
**prosecutors** [6] - 42:6, 49:5, 49:8, 114:13, 136:5, 141:18
**protect** [1] - 149:7
**protected** [1] - 159:20
**proud** [1] - 151:9
**prove** [37] - 10:5, 10:6, 83:11, 86:11, 101:14, 101:19, 101:24, 103:5, 106:5, 106:18, 107:14, 108:21, 109:11, 109:12, 111:20, 112:2, 112:12, 112:18, 114:21, 115:23, 117:15, 129:1, 135:10, 141:16, 151:13, 151:18, 151:19, 151:20, 151:21, 152:10, 152:14, 152:15, 152:16, 152:17, 152:18, 161:18, 161:24
**proved** [9] - 101:1, 102:8, 107:20, 109:21, 119:20, 130:18, 141:13, 144:15, 144:20

50:5, 50:12, 50:20, 63:8, 72:10, 73:4, 75:10, 75:21, 78:5, 80:24, 83:18, 84:19, 84:24, 85:11, 91:10, 93:17, 94:16, 94:21, 95:20, 96:4, 96:20, 99:7, 100:17, 103:15, 117:10, 121:15, 124:20, 125:17, 129:4, 147:7, 153:20
**pointed** [2] - 7:21, 50:4
**police** [1] - 22:9
**policy** [1] - 64:10
**poll** [2] - 53:22, 162:12
**polled** [4] - 60:11, 60:22, 60:24, 61:3
**POLLING** [1] - 4:22
**polling** [4] - 60:12, 60:13, 60:14, 61:6
**portion** [2] - 100:12, 131:8, 135:5
**posed** [2] - 44:16, 44:19
**position** [9] - 25:22, 28:9, 39:2, 39:9, 39:12, 41:3, 41:13, 77:5, 122:18
**positioned** [2] - 24:25, 63:2
**possessed** [3] - 81:10, 91:25, 106:19
**possession** [2] - 73:11, 159:15
**possibilities** [1] - 93:14
**possibility** [2] - 51:6, 88:1
**possible** [5] - 37:18, 101:24, 111:13, 155:8, 155:9
**possibly** [1] - 153:18
**posture** [1] - 39:15
**potential** [1] - 93:14
**potentially** [1] - 149:19
**pounds** [4] - 35:5, 36:8, 149:10, 149:14
**power** [1] - 152:12
**powerful** [1] - 114:12
**POWERS** [2] - 2:13, 165:22
**Powers** [1] - 165:21
**practicing** [1] - 150:3
**pre** [1] - 6:20
**pre-charge** [1] - 6:20
**preclude** [1] - 93:20
**prefer** [2] - 124:25,

**proven** [3] - 81:15, 105:20, 141:8
**proves** [1] - 108:14
**provide** [3] - 22:1, 22:19, 105:14
**provided** [2] - 92:4, 158:17
**provision** [1] - 82:24
**proximity** [1] - 69:12
**publish** [2] - 58:18, 59:25
**published** [2] - 153:22, 161:9
**publishing** [2] - 60:6, 61:5
**pull** [6] - 30:4, 31:4, 34:4, 71:25, 122:20
**pulled** [4] - 72:6, 115:10, 117:3, 128:10
**pulling** [1] - 30:7
**pulls** [1] - 35:19
**punch** [1] - 77:9
**punished** [1] - 82:25
**punishment** [2] - 110:8, 110:10
**punishments** [1] - 155:9
**pure** [1] - 137:2
**purpose** [6] - 38:4, 38:16, 60:12, 74:15, 119:1, 119:5
**purposes** [2] - 44:2, 96:13
**pursuant** [1] - 95:2
**push** [3] - 32:22, 150:6, 152:6
**pushing** [2] - 33:20, 36:7
**put** [9] - 33:2, 35:19, 38:10, 41:15, 55:16, 86:2, 143:19, 146:3, 156:25
**putting** [1] - 38:4

## Q

**qualify** [1] - 120:9
**quarters** [1] - 153:22
**questioning** [1] - 77:5
**questions** [13] - 20:10, 32:18, 64:21, 65:17, 65:18, 65:19, 65:23, 75:25, 79:14, 103:17, 104:2, 112:25, 125:24
**quick** [2] - 31:7, 32:18
**quickly** [4] - 27:10, 30:6, 41:3, 94:9
**quite** [3] - 42:21, 65:4,

89:19
**quote** [2] - 32:1, 92:16

## R

**rage** [3] - 31:1, 116:21, 117:24
**rail** [6] - 27:2, 27:3, 33:16, 34:2, 34:3, 43:18
**railing** [1] - 30:5
**raise** [2] - 16:2, 20:24
**raised** [1] - 9:8
**ran** [4] - 128:4, 130:21, 133:20, 141:24
**rather** [3] - 36:1, 92:24, 152:5
**reach** [7] - 83:10, 102:23, 110:18, 122:9, 145:4, 160:3
**reached** [4] - 28:13, 30:3, 61:25, 62:1, 62:10, 131:2
**reaching** [2] - 51:2, 62:11
**react** [1] - 115:1
**reacted** [1] - 41:9
**reacting** [2] - 44:16, 74:5
**reaction** [2] - 116:21, 127:22
**read** [30] - 24:4, 24:5, 25:18, 25:24, 26:6, 46:5, 53:22, 59:20, 60:8, 60:10, 60:11, 60:15, 74:20, 90:23, 100:9, 113:13, 145:14, 145:15, 162:14, 162:17, 162:20, 162:23, 163:1, 163:4, 163:7, 163:14, 163:17, 163:20, 163:23, 164:1
**reading** [1] - 89:19
**reads** [1] - 111:17
**ready** [4] - 16:20, 96:19, 99:16, 159:2
**real** [4] - 14:6, 31:9, 102:2, 110:23
**realistic** [2] - 88:1, 140:12
**reality** [2] - 83:7, 91:16
**realize** [1] - 19:4
**realized** [2] - 6:22, 20:5
**really** [16] - 7:18, 19:4, 64:9, 65:16, 69:14, 71:22, 72:8, 72:17,

73:23, 74:11, 86:5, 132:13, 135:10, 135:19, 143:18
**reason** [6] - 43:25, 102:3, 103:20, 144:12, 153:21, 155:3
**reasonable** [66] - 33:1, 33:22, 81:15, 81:17, 83:8, 83:12, 89:10, 90:13, 90:24, 91:4, 91:5, 92:14, 92:20, 93:7, 96:14, 101:3, 101:19, 101:22, 101:25, 102:2, 102:5, 102:9, 105:20, 106:3, 106:5, 107:13, 107:20, 108:3, 108:15, 108:21, 109:6, 109:12, 109:22, 111:20, 112:2, 112:12, 112:18, 113:10, 114:22, 116:23, 119:20, 121:3, 121:4, 124:11, 127:4, 129:2, 129:8, 130:19, 133:10, 134:25, 135:2, 139:16, 140:6, 140:15, 141:8, 141:21, 142:13, 142:17, 143:8, 144:16, 151:14, 151:17, 156:9, 161:18, 161:24
**reasonably** [2] - 35:2, 109:13
**reasoning** [2] - 102:23, 140:21
**reasons** [5] - 80:21, 80:22, 85:25, 96:11, 144:15
**rebuttal** [4] - 96:23, 98:24, 99:11, 124:16
**REBUTTAL** [2] - 4:16, 145:12
**received** [9] - 23:9, 46:13, 57:7, 58:17, 59:22, 72:24, 87:1, 125:16, 160:19
**RECEIVED** [1] - 5:2
**receiving** [1] - 72:20
**recently** [4] - 43:1, 71:23, 86:14, 87:8
**recess** [12] - 16:13, 80:10, 97:5, 98:10, 98:12, 158:21, 160:5, 160:8,

160:12, 165:11
**recognized** [1] - 19:20
**recollection** [6] - 42:23, 42:25, 69:10, 70:14, 102:21, 104:18
**recommended** [2] - 97:20, 97:21
**record** [7] - 6:21, 15:5, 24:9, 24:20, 66:4, 99:8, 164:4
**recorded** [1] - 126:5
**recording** [23] - 46:12, 46:13, 67:8, 67:9, 67:12, 67:15, 70:20, 70:23, 128:23, 129:3, 129:4, 129:23, 131:17, 134:8, 136:4, 136:5, 138:1, 139:14, 139:15, 143:13
**recordings** [3] - 17:9, 124:4, 159:9
**red** [1] - 144:4
**redirect** [6] - 3:9, 3:14, 3:18, 18:17, 46:23, 76:4
**REDIRECT** [3] - 18:19, 47:1, 76:6
**reduced** [1] - 86:4
**reexamine** [1] - 110:19
**refer** [4] - 82:23, 104:25, 134:18, 139:8
**reference** [4] - 7:22, 9:7, 90:3, 135:17
**references** [2] - 15:15, 112:16
**referencing** [1] - 61:18
**referred** [1] - 139:6
**referring** [3] - 19:13, 34:19, 66:7
**refers** [5] - 7:7, 134:16, 135:5, 137:17, 139:18
**reflected** [1] - 24:22
**regard** [2] - 129:24, 144:20
**registered** [1] - 148:12
**regulations** [1] - 157:1
**reject** [3] - 90:22, 92:12, 95:3
**rejected** [2] - 9:12, 14:1
**relating** [1] - 109:25
**relationship** [1] - 43:4
**released** [1] - 121:22
**relevance** [2] - 38:8, 65:20

**relevant** [1] - 112:14
**relief** [2] - 54:11, 54:14
**rely** [1] - 102:6
**relying** [1] - 91:11
**remain** [3] - 20:23, 52:10, 124:25
**remainder** [1] - 100:15
**remained** [1] - 37:9
**remaining** [3] - 60:20, 112:24, 124:16
**remains** [1] - 98:19
**remanded** [1] - 165:6
**remarks** [1] - 158:20
**remember** [34] - 23:21, 31:9, 31:10, 42:21, 43:15, 43:22, 61:9, 61:10, 65:19, 69:14, 72:8, 74:3, 75:15, 110:22, 119:15, 126:17, 143:1, 143:18, 143:24, 143:25, 144:1, 144:6, 144:7, 146:11, 146:21, 148:13, 150:24, 155:24, 156:22, 157:6
**remembering** [1] - 143:1
**remove** [4] - 7:22, 21:8, 52:11, 146:1
**removed** [4] - 74:1, 74:2, 94:10, 121:22
**reoriented** [1] - 81:4
**repeat** [2] - 80:20, 145:17
**repeating** [1] - 30:25
**report** [1] - 164:19
**REPORTED** [1] - 2:13
**reporter** [9] - 66:5, 66:7, 66:12, 66:20, 66:25, 129:21, 136:2, 137:24, 139:13
**Reporter** [1] - 2:13
**reporters** [1] - 153:10
**representation** [2] - 71:2, 165:8
**representations** [1] - 159:12
**representative** [1] - 82:19
**representing** [1] - 6:13
**request** [2] - 96:21, 96:24
**require** [2] - 30:14, 143:12
**required** [1] - 97:25

**requirement** [1] - 89:1
**requirements** [1] - 130:17
**requires** [6] - 14:4, 90:8, 97:9, 106:21, 107:13, 114:9
**resistance** [3] - 32:20, 62:12, 119:4
**resisting** [5] - 32:19, 78:11, 115:11, 117:12, 121:16
**resolution** [1] - 165:1
**resolving** [1] - 92:11
**respect** [6] - 92:18, 93:16, 94:21, 115:4, 118:16, 139:21
**respond** [2] - 25:22, 111:12
**response** [2] - 11:6, 95:8
**responsibility** [4] - 43:24, 44:1, 44:3, 139:20
**responsible** [3] - 22:17, 22:18, 23:6
**rest** [1] - 64:16
**resting** [1] - 99:8
**restrain** [8] - 30:22, 31:2, 31:16, 62:16, 78:12, 117:8, 117:11, 158:3
**restrained** [1] - 31:21, 32:8, 32:20, 50:6, 72:12, 93:17, 94:10, 115:10, 121:9, 121:15, 122:1
**restraining** [1] - 158:5
**restraint** [1] - 48:21
**restraints** [4] - 38:1, 64:13, 64:14, 94:7
**restrict** [2] - 38:18, 39:17
**restricted** [1] - 48:16
**restrictions** [6] - 48:3, 48:14, 49:9, 49:11, 64:7, 156:4
**restricts** [1] - 155:22
**rests** [2] - 79:25, 99:25
**RESTS** [2] - 4:4, 4:8
**result** [1] - 84:3
**resulted** [1] - 87:8
**resulting** [1] - 85:13
**resumes** [1] - 16:25
**retaliate** [3] - 108:10, 108:19, 120:3
**retaliation** [5] - 11:16, 120:15, 120:21, 120:24, 120:25
**retire** [2] - 65:10, 164:8

**return** [5] - 59:20, 111:9, 111:18, 117:25, 161:16
**returned** [6] - 59:17, 120:16, 122:3, 157:17, 160:20, 160:25
**review** [4] - 59:24, 144:25, 159:7, 159:23
**reviewed** [2] - 66:16, 159:24
**rewind** [1] - 156:20
**Rhode** [1] - 2:4
**rigged** [1] - 147:6
**rightfully** [1] - 154:6
**rise** [13] - 6:2, 16:12, 16:14, 80:5, 80:11, 98:11, 98:13, 131:13, 158:23, 160:10, 160:15, 164:13, 165:12
**risk** [4] - 14:6, 50:6, 50:8, 94:9
**road** [1] - 151:24
**role** [11] - 66:1, 76:15, 114:11, 114:12, 114:15, 114:16, 114:17, 114:18, 129:19, 129:21
**roles** [1] - 129:18
**Ron** [12] - 43:13, 43:19, 43:25, 69:16, 69:21, 70:10, 77:6, 85:24, 86:15, 86:17, 86:19, 132:8
**room** [20] - 26:8, 31:13, 37:4, 61:5, 62:22, 73:4, 73:5, 75:10, 75:11, 75:13, 75:18, 75:19, 76:19, 100:24, 111:1, 111:6, 116:8, 124:6, 158:15, 164:9
**roughly** [1] - 16:11
**row** [5] - 28:14, 34:20, 62:9, 75:5, 75:22
**Roy** [2] - 53:5, 53:9
**RPR** [2] - 2:13, 165:22
**Rule** [5] - 87:15, 91:3, 95:3, 96:13, 96:16
**rule** [1] - 129:11
**ruled** [2] - 94:12, 94:22
**rules** [3] - 72:22, 100:21, 157:1
**ruling** [1] - 95:2
**rulings** [1] - 87:10
**run** [6] - 29:7, 94:8, 130:24, 130:25,

156:3, 156:4
**running** [9] - 31:15, 38:5, 38:6, 38:17, 85:11, 93:24, 117:3, 121:8, 131:21
**runs** [2] - 115:8, 144:4
**rush** [2] - 125:6, 158:19
**rushing** [1] - 150:17

## S

**s/Glenda** [1] - 165:21
**salt** [1] - 136:23
**SARA** [2] - 3:7, 17:3
**Sara** [3] - 146:12, 148:1, 153:8
**sat** [1] - 68:3
**satisfies** [1] - 92:21
**saw** [8] - 24:9, 31:13, 43:2, 44:13, 71:22, 122:15, 128:8, 135:1
**scary** [2] - 18:6, 20:5
**scenario** [1] - 88:5
**scenarios** [1] - 30:11
**Scheduled** [1] - 1:9
**scheduling** [1] - 53:19
**Schettino** [1] - 52:18
**SCHETTINO** [2] - 3:15, 52:22
**SCOTT** [1] - 2:9
**Scott** [1] - 6:9
**scratch** [1] - 150:7
**script** [1] - 128:13
**seat** [1] - 116:7
**seated** [18] - 6:3, 6:14, 16:15, 16:17, 17:11, 17:13, 21:9, 52:19, 71:8, 80:7, 80:12, 98:16, 99:21, 131:25, 135:23, 159:1, 160:17, 160:24
**second** [7] - 6:17, 32:5, 46:3, 82:11, 85:9, 117:14, 142:2
**secondary** [1] - 141:23
**seconds** [1] - 30:9
**secret** [1] - 110:13
**Section** [9] - 13:13, 14:2, 81:9, 83:21, 84:13, 105:13, 107:9, 107:12
**section** [1] - 113:11
**Sections** [1] - 105:5
**secure** [2] - 62:10, 141:5
**securing** [1] - 22:23
**security** [37] - 21:24,

21:25, 22:1, 22:19, 23:3, 23:5, 23:7, 23:19, 29:1, 38:11, 44:2, 44:17, 44:20, 50:6, 62:14, 62:16, 71:9, 71:12, 72:5, 72:11, 74:13, 86:4, 128:7, 128:18, 130:9, 130:13, 131:2, 131:12, 132:3, 134:17, 140:10, 142:6, 142:11, 143:5, 149:16, 149:22, 158:1
**see** [67] - 16:11, 17:23, 17:24, 17:25, 19:18, 20:3, 24:12, 28:5, 28:8, 29:1, 29:8, 37:5, 42:7, 43:1, 48:1, 50:13, 55:14, 56:3, 56:6, 62:12, 63:7, 71:21, 73:10, 75:2, 80:9, 81:2, 81:22, 84:17, 84:19, 90:20, 96:7, 98:10, 109:9, 113:20, 115:1, 115:5, 116:11, 116:12, 117:2, 118:17, 119:12, 124:7, 125:7, 126:25, 128:9, 131:5, 131:10, 132:22, 134:5, 134:12, 135:11, 135:15, 136:6, 137:7, 139:4, 139:5, 142:20, 142:25, 146:18, 147:1, 148:10, 156:13, 156:16, 164:22
**seeing** [9] - 36:18, 42:21, 43:15, 43:22, 72:8, 72:17, 128:19, 130:8, 143:6
**seek** [1] - 110:24
**seem** [2] - 103:24, 125:22
**select** [1] - 113:7
**selecting** [1] - 113:8
**selection** [2] - 156:23, 158:18
**sense** [11] - 102:3, 102:23, 112:10, 140:20, 157:5, 157:10, 157:11, 157:16, 158:10
**sentence** [6] - 87:8, 138:3, 154:17,

154:23, 155:2
**sentenced** [1] - 26:2
**sentences** [1] - 155:9
**sentencing** [8] - 62:25, 86:25, 87:2, 87:13, 164:18, 164:19, 164:25, 165:7
**separate** [7] - 11:8, 11:14, 15:2, 68:21, 84:12, 104:23, 109:24
**separately** [1] - 110:1
**separates** [1] - 25:8
**separating** [1] - 98:17
**sequence** [1] - 144:10
**sequences** [1] - 128:21
**series** [1] - 145:14
**serious** [33] - 13:21, 15:2, 88:23, 89:4, 89:16, 89:25, 90:5, 90:14, 90:25, 91:13, 91:22, 92:17, 95:14, 106:1, 106:4, 106:17, 106:22, 107:3, 109:4, 116:3, 116:24, 118:7, 118:9, 119:1, 119:8, 121:1, 121:16, 123:7, 126:13, 127:2, 149:5, 149:17, 150:9
**served** [2] - 22:11, 54:2
**Service** [5] - 6:10, 21:21, 22:17, 23:8, 23:10
**service** [6] - 114:24, 124:14, 131:11, 164:6, 164:12, 164:14
**serving** [2] - 54:6, 59:13
**session** [8] - 6:2, 62:19, 62:20, 62:23, 80:11, 98:13, 122:4, 160:16
**set** [6] - 44:7, 63:4, 84:12, 90:17, 96:2, 164:19
**sets** [2] - 84:14, 146:5
**setup** [3] - 23:23, 25:1, 44:11
**seven** [3] - 35:7, 137:9, 153:25
**several** [7] - 10:13, 61:6, 61:8, 61:17, 65:23, 130:5, 138:16
**shackled** [8] - 28:22,

73:25, 74:6, 74:15, 93:25, 94:1, 140:11

**shackles** [23] - 28:24, 37:25, 38:1, 38:2, 38:14, 38:16, 38:20, 39:14, 39:17, 39:19, 47:21, 48:6, 49:12, 73:22, 74:1, 74:4, 78:19, 86:3, 116:17, 122:16, 130:23, 142:6, 142:10

**shake** [1] - 51:12

**shall** [3] - 79:17, 82:25, 83:1

**share** [1] - 64:12

**shear** [1] - 117:4

**shirt** [1] - 24:17

**shit** [4] - 121:12, 137:4, 137:5, 138:4

**shocked** [1] - 19:3

**shoot** [1] - 39:8

**short** [1] - 85:25

**shot** [1] - 144:23

**shoulder** [1] - 122:19

**shoulders** [1] - 39:6

**shouting** [5] - 19:5, 19:7, 19:8, 19:10, 19:11

**shove** [1] - 150:7

**shoved** [1] - 152:3

**show** [11] - 43:3, 55:18, 57:18, 57:22, 85:19, 85:22, 95:24, 106:18, 121:13, 138:21, 138:22

**showed** [3] - 116:21, 116:22, 147:22

**showing** [2] - 86:17, 151:10

**shows** [7] - 85:4, 125:18, 128:6, 131:1, 131:16, 131:17, 135:4

**shuffle** [2] - 29:7, 130:23

**side** [11] - 24:10, 25:4, 27:1, 34:4, 36:21, 44:11, 63:12, 77:19, 97:4, 147:3

**side-to-side** [1] - 77:19

**sign** [4] - 111:8, 112:25, 115:3, 118:16

**signature** [2] - 56:7, 113:12

**signed** [3] - 55:16, 162:8, 162:10

**significant** [3] - 95:7, 95:10, 118:13

**silent** [1] - 61:25

**similar** [10] - 34:17, 37:12, 42:9, 44:7, 63:3, 68:7, 81:7, 92:7, 132:5, 142:15

**simple** [1] - 82:16, 82:20, 83:23, 84:3, 84:9, 91:17, 91:18, 105:10, 107:9, 107:18, 107:19, 107:25, 112:13, 140:2, 142:8, 149:22, 149:23, 150:6

**simply** [3] - 110:22, 114:15, 114:18

**Simpson** [1] - 10:10

**SIMPSON** [1] - 10:11

**single** [4] - 13:22, 47:24, 101:10, 155:20

**singular** [1] - 91:2

**sit** [4] - 51:21, 144:22, 146:7, 157:9

**sitting** [23] - 24:16, 25:3, 25:5, 25:10, 25:11, 25:12, 25:15, 27:2, 27:13, 28:3, 28:14, 33:18, 34:19, 35:14, 35:16, 42:6, 42:7, 51:16, 61:7, 62:9, 63:4, 68:4

**situation** [14] - 10:4, 17:20, 26:3, 31:8, 35:22, 36:2, 41:9, 67:18, 68:5, 72:19, 127:22, 143:9, 144:8, 156:9

**situations** [1] - 86:2

**six** [6] - 23:15, 34:21, 83:1, 83:24, 84:6, 155:11

**six-three** [1] - 23:15

**six-year** [2] - 83:24, 84:6

**size** [3] - 36:16, 92:19, 118:10

**skip** [2] - 112:24, 137:4

**skull** [1] - 149:18

**slammed** [2] - 147:3, 150:24

**slide** [1] - 35:20

**slow** [3] - 89:8, 89:17, 156:20

**slow-motion** [1] - 156:20

**small** [2] - 70:16, 164:11

**smaller** [1] - 63:9

**smart** [1] - 146:18

**smoothly** [1] - 76:16

**snap** [1] - 126:7

**snapped** [5] - 122:24, 126:6, 126:10, 147:10

**so...** [1] - 89:20

**solely** [1] - 90:15

**solemnly** [2] - 20:25, 52:12

**solid** [2] - 63:20, 63:21

**someone** [13] - 19:19, 37:4, 38:11, 38:16, 47:10, 47:12, 78:19, 89:3, 104:7, 134:22, 134:23, 136:3, 164:21

**sometime** [1] - 48:10

**sometimes** [3] - 26:2, 139:22, 148:14

**somewhat** [1] - 42:9

**soon** [2] - 71:19, 150:16

**sorry** [8] - 11:11, 11:12, 20:15, 35:18, 90:8, 94:4, 98:15, 163:9

**sort** [12] - 11:11, 11:12, 64:14, 77:11, 82:15, 125:18, 126:22, 127:11, 130:10, 134:15, 135:16, 136:20

**sound** [14] - 19:2, 20:2, 46:12, 67:8, 67:9, 67:12, 67:15, 116:14, 128:23, 129:3, 131:16, 139:15, 143:13

**SOUTHERN** [1] - 1:1

**Southern** [4] - 53:7, 57:16, 161:11, 164:6

**space** [1] - 70:16

**speaker** [1] - 89:22

**speaking** [1] - 136:25

**speaks** [3] - 15:7, 156:20, 161:1

**Special** [6] - 18:21, 20:9, 116:13, 117:19, 122:10, 133:14

**SPECIAL** [2] - 3:7, 17:3

**special** [1] - 146:17

**specific** [11] - 13:19, 14:3, 81:12, 87:18, 92:2, 95:11, 95:17, 101:2, 110:5, 110:7, 113:9

**specifically** [11] -

13:3, 59:16, 69:23, 72:13, 72:14, 75:16, 76:15, 86:11, 87:4, 97:10, 138:5

**specifies** [1] - 109:18

**speculation** [2] - 66:21, 67:4

**spelling** [2] - 21:4, 52:16

**spend** [2] - 152:25, 155:14

**spending** [1] - 48:25

**spent** [3] - 50:4, 153:14, 156:17

**splitting** [1] - 30:8

**spontaneous** [1] - 127:22

**sports** [3] - 34:24, 38:25, 39:1

**springboard** [1] - 6:24

**stack** [1] - 116:16

**stand** [13] - 16:25, 20:22, 26:14, 31:19, 41:25, 42:16, 45:23, 52:10, 68:13, 68:15, 68:17, 68:19, 132:15

**standard** [4] - 8:11, 15:10, 35:22, 35:25

**standing** [16] - 20:23, 24:5, 37:9, 42:19, 42:22, 45:10, 51:1, 52:10, 61:5, 69:17, 70:17, 82:20, 85:24, 86:16, 156:12

**stands** [3] - 21:23, 42:2, 115:6

**Staples** [18] - 25:14, 31:7, 33:21, 34:7, 34:14, 35:11, 35:15, 35:18, 36:2, 36:13, 37:16, 37:17, 41:11, 44:19, 45:15, 47:3, 49:23, 139:5

**staples** [2] - 71:15, 71:18

**Staples'** [1] - 36:14

**staring** [2] - 121:20, 123:17

**start** [4] - 7:2, 21:18, 88:16, 100:4

**started** [5] - 19:5, 20:3, 26:11, 26:12, 28:9

**starting** [1] - 6:17

**state** [5] - 10:4, 21:4, 52:16, 95:11, 159:11

**statement** [20] - 18:4, 70:18, 88:3, 88:4, 88:5, 88:6, 97:9, 100:12, 100:13,

104:7, 104:10, 104:12, 126:4, 131:15, 134:10, 137:19, 138:2, 138:7, 138:20, 143:6

**statements** [23] - 18:8, 61:8, 61:9, 61:17, 74:22, 74:23, 75:3, 75:8, 75:14, 75:17, 78:10, 78:13, 123:14, 130:5, 130:6, 130:10, 130:11, 134:23, 136:21, 142:16, 146:1, 146:2, 150:9

**STATES** [3] - 1:1, 1:5, 1:16

**States** [50] - 1:21, 1:23, 2:14, 6:7, 6:8, 6:9, 10:10, 11:15, 13:7, 13:12, 22:16, 53:6, 53:9, 54:8, 58:5, 59:7, 74:12, 81:8, 84:12, 86:12, 99:3, 105:5, 105:13, 106:6, 106:9, 106:11, 106:12, 106:13, 107:7, 107:9, 107:11, 107:12, 108:23, 108:25, 109:1, 114:4, 115:25, 117:16, 117:17, 124:2, 152:12, 153:24, 156:12, 160:6, 161:10, 161:12, 162:8, 164:21, 165:3, 165:23

**stating** [1] - 96:6

**status** [1] - 120:11

**statute** [8] - 10:14, 82:23, 83:3, 83:21, 88:7, 90:18, 95:10, 109:18

**statutes** [2] - 14:3

**stay** [3] - 47:13, 125:2, 125:8

**stenographer** [1] - 46:8

**STENOGRAPHICALLY** [1] - 2:12

**step** [6] - 28:8, 50:19, 51:3, 118:22, 122:23, 123:16

**stepped** [2] - 42:23, 45:16

**stepping** [1] - 150:18

**stick** [1] - 97:7

**sticker** [1] - 56:4

**sticky** [1] - 159:18
**still** [33] - 7:16, 23:17, 23:19, 32:11, 33:20, 36:6, 39:18, 45:13, 46:1, 48:1, 49:17, 50:6, 50:8, 50:11, 50:15, 51:6, 51:11, 59:2, 62:19, 62:20, 62:24, 75:22, 81:21, 94:9, 122:4, 122:19, 132:2, 138:18, 138:19, 144:20, 156:5, 158:8
**stomp** [1] - 138:17
**stood** [10] - 24:4, 26:13, 26:14, 42:15, 45:17, 61:11, 71:8, 76:19, 115:4
**stop** [7] - 29:25, 30:2, 62:11, 122:21, 138:17, 151:19
**stopped** [1] - 29:18
**stops** [1] - 29:23
**strangle** [1] - 77:7
**Street** [1] - 1:21
**stress** [2] - 126:2, 127:14
**stressed** [1] - 127:22
**stride** [1] - 150:19
**strike** [1] - 49:18
**strong** [5] - 29:21, 33:3, 35:8, 51:13, 144:14
**stronger** [1] - 35:9
**struck** [2] - 149:15, 152:18
**struggling** [1] - 37:2
**study** [1] - 15:23
**stuff** [1] - 40:1
**subdued** [2] - 131:2, 138:10
**subduing** [1] - 138:18
**subject** [4] - 11:4, 35:23, 86:24, 86:25
**subjective** [1] - 90:15
**subjectively** [1] - 91:1
**submission** [3] - 12:21, 13:2, 13:17
**submit** [30] - 9:9, 10:7, 12:11, 85:6, 85:14, 85:15, 85:18, 86:7, 87:22, 88:4, 97:21, 99:16, 127:21, 130:2, 130:25, 133:6, 134:7, 137:18, 138:8, 140:13, 141:11, 141:20, 142:12, 142:19, 142:22, 143:6, 143:14,

144:11, 144:15, 145:23
**submits** [1] - 87:11
**submitted** [2] - 8:17, 85:16
**subsequently** [1] - 81:16
**succeeded** [2] - 151:6, 152:15
**successful** [1] - 117:5
**sufficient** [2] - 90:16, 109:22
**suggest** [2] - 103:16, 145:4
**suggests** [1] - 86:20
**suit** [3] - 24:19, 64:3, 156:12
**Suite** [2] - 1:24, 2:5
**suits** [2] - 22:24, 149:7
**summation** [1] - 144:24
**supplemented** [1] - 137:25
**supplied** [1] - 6:19
**support** [7] - 22:1, 53:16, 87:15, 92:22, 93:11, 96:14, 133:21
**supportable** [2] - 125:19, 142:1
**supported** [4] - 54:12, 134:24, 135:2, 141:25
**supports** [1] - 113:9
**suppose** [5] - 41:16, 68:2, 133:2, 133:15, 142:3
**supposed** [1] - 140:18
**supposedly** [1] - 144:4
**supposes** [1] - 132:23
**supposition** [4] - 133:6, 135:16, 135:20, 139:1
**surprised** [1] - 40:2
**suspect** [1] - 36:24
**swear** [2] - 20:25, 52:12
**sweater** [2] - 25:5, 34:18
**Sweeney** [1] - 159:14
**swift** [3] - 115:8, 116:9, 118:24
**swing** [1] - 77:19
**swinging** [1] - 50:25
**sworn** [6] - 17:3, 20:23, 21:13, 22:9, 52:10, 52:22
**sympathetic** [1] - 126:19
**sympathy** [2] - 101:6,

154:20
**system** [1] - 114:9

## T

**table** [45] - 6:14, 16:9, 17:11, 17:14, 24:7, 25:2, 25:16, 27:8, 28:12, 29:23, 32:25, 42:3, 42:5, 42:13, 43:4, 48:11, 51:23, 51:24, 54:24, 56:17, 56:18, 61:8, 63:5, 63:11, 63:12, 63:14, 63:17, 64:11, 68:21, 70:11, 70:18, 75:6, 77:25, 78:9, 85:24, 86:21, 122:5, 125:4, 132:1, 133:13, 133:17, 141:18, 149:24, 156:13
**tables** [6] - 42:9, 44:7, 44:8, 55:2, 56:15, 156:14
**tackle** [2] - 39:11
**tackled** [2] - 115:10, 134:9
**tails** [2] - 136:2, 138:1
**talks** [6] - 117:18, 123:4, 126:23, 147:17, 154:16, 158:8
**tall** [4] - 23:14, 69:18, 69:19, 132:8
**target** [8] - 93:4, 93:8, 93:12, 115:19, 117:15, 118:3, 141:13, 141:15
**targeted** [5] - 70:1, 93:3, 133:10, 145:22, 147:16
**targeting** [8] - 86:12, 92:24, 95:25, 96:4, 96:10, 96:12, 122:5, 122:24
**taught** [1] - 148:14
**Tavorris** [14] - 59:8, 62:5, 64:3, 77:3, 111:21, 112:3, 112:13, 112:19, 114:5, 119:22, 123:24, 161:12, 161:19, 161:25
**TAVORRIS** [1] - 1:8
**team** [1] - 136:14
**telephone** [7] - 126:5, 126:15, 126:18, 126:20, 127:19, 136:24, 137:6
**temporarily** [1] - 146:3

**tend** [1] - 103:5
**term** [8] - 9:22, 13:1, 87:18, 87:20, 126:7, 136:15
**terminology** [2] - 84:3, 127:11
**terms** [5] - 46:15, 63:18, 64:13, 67:18, 75:11
**testified** [13] - 18:24, 19:7, 21:13, 46:15, 52:22, 77:14, 85:10, 86:15, 104:1, 114:6, 128:2, 128:8, 132:7
**testify** [6] - 17:4, 97:24, 98:1, 101:16, 101:17, 138:15
**testifying** [2] - 97:18, 103:14
**testimony** [28] - 20:25, 33:12, 52:13, 66:17, 67:10, 70:24, 92:5, 93:23, 94:6, 102:13, 103:1, 103:11, 104:4, 104:5, 104:22, 114:1, 116:13, 117:9, 122:14, 123:16, 123:22, 128:7, 130:1, 134:19, 138:15, 141:25, 142:20, 157:3
**thanked** [1] - 114:24
**THE** [203] - 1:16, 1:20, 2:3, 6:3, 6:5, 6:11, 6:15, 7:6, 7:10, 7:16, 7:22, 8:1, 8:3, 8:5, 8:7, 8:9, 8:11, 8:14, 8:16, 8:20, 8:22, 8:25, 9:2, 9:5, 9:11, 9:16, 10:1, 10:8, 10:22, 11:5, 11:14, 11:23, 12:14, 12:24, 13:3, 13:9, 13:15, 13:25, 14:10, 14:12, 14:14, 14:16, 14:21, 14:24, 15:5, 15:13, 15:15, 15:18, 15:20, 15:24, 16:2, 16:8, 16:15, 16:17, 16:22, 16:24, 17:1, 18:16, 20:11, 20:15, 20:17, 20:20, 20:21, 20:22, 21:3, 21:6, 21:8, 21:11, 24:22, 26:23, 27:1, 32:15, 33:8, 38:9, 38:10, 46:22, 52:2, 52:4, 52:6, 52:9, 52:15, 52:18, 52:19, 52:21, 55:20,

55:23, 56:1, 56:23, 56:25, 57:6, 57:25, 58:13, 58:15, 58:19, 63:24, 64:22, 65:21, 65:22, 66:22, 67:2, 67:5, 67:6, 76:2, 76:3, 79:15, 79:16, 79:18, 79:20, 79:21, 79:23, 80:1, 80:7, 80:12, 80:17, 80:22, 81:2, 81:22, 82:2, 82:6, 82:12, 83:17, 84:11, 87:14, 88:11, 88:16, 89:8, 89:17, 89:19, 89:23, 90:19, 92:9, 93:10, 94:2, 94:20, 94:25, 95:2, 95:20, 96:3, 96:11, 96:20, 96:24, 97:2, 97:23, 98:3, 98:6, 98:9, 98:14, 98:24, 99:1, 99:4, 99:6, 99:10, 99:13, 99:19, 99:21, 100:1, 100:3, 100:20, 113:19, 113:22, 124:17, 125:5, 126:25, 129:12, 143:21, 145:7, 145:10, 155:11, 158:14, 159:1, 159:4, 159:10, 159:14, 159:22, 159:25, 160:8, 160:17, 160:24, 161:2, 161:3, 161:5, 161:6, 161:9, 161:10, 161:15, 162:11, 162:13, 162:16, 162:19, 162:22, 162:25, 163:3, 163:6, 163:9, 163:12, 163:13, 163:16, 163:19, 163:25, 164:3, 164:16, 165:4, 165:6
**themselves** [4] - 122:18, 154:4, 154:22, 155:18
**theory** [3] - 12:12, 13:24, 153:19
**therefore** [1] - 9:12
**thing's** [1] - 133:24
**thinking** [4] - 117:7, 135:21, 154:4, 154:21
**thinks** [4] - 133:18, 133:19, 133:20, 151:3
**thought-out** [1] -

126:9
**thousand** [2] - 122:8, 150:11
**threat** [67] - 10:25, 12:4, 12:7, 12:12, 13:17, 13:20, 13:21, 14:5, 15:2, 15:3, 44:17, 44:20, 50:11, 51:11, 82:13, 82:24, 83:9, 83:14, 83:24, 83:25, 84:15, 87:16, 87:17, 87:22, 88:6, 88:7, 88:22, 90:8, 95:10, 97:10, 97:11, 105:25, 106:22, 108:1, 108:18, 108:24, 109:4, 115:13, 116:3, 119:10, 119:14, 120:3, 121:1, 121:16, 123:18, 127:2, 128:5, 131:15, 139:9, 140:4, 142:14, 147:9, 151:12, 151:20, 151:22, 151:23, 151:25, 152:23, 153:2, 153:13, 157:14, 158:1
**threaten** [3] - 89:4, 108:7, 146:23
**threatened** [15] - 83:1, 83:3, 83:13, 95:18, 105:11, 108:16, 112:19, 113:4, 113:5, 120:1, 124:1, 124:3, 161:25, 162:5, 162:6
**threatening** [5] - 108:6, 113:3, 115:13, 119:24, 162:4
**threats** [18] - 18:6, 31:22, 32:11, 50:3, 50:5, 50:12, 50:15, 77:1, 78:3, 79:11, 122:1, 146:12, 146:24, 147:8, 151:13, 151:18, 158:7
**three** [15] - 22:11, 23:15, 27:6, 34:22, 38:22, 45:24, 51:20, 54:5, 83:21, 84:12, 120:17, 128:17, 137:10, 153:22
**three-quarters** [1] - 153:22
**threw** [13] - 24:7, 27:7,

28:10, 61:7, 76:24, 77:21, 79:1, 92:2, 96:6, 118:25, 121:25, 131:14, 153:12
**throughout** [2] - 32:12, 122:13
**throw** [9] - 20:7, 33:18, 79:3, 79:5, 79:7, 118:20, 122:20, 127:8, 158:2
**throwing** [4] - 92:25, 93:21, 121:8, 151:6
**thrown** [39] - 17:22, 17:23, 17:24, 18:1, 18:2, 18:10, 19:16, 62:4, 62:7, 67:22, 67:24, 69:10, 70:5, 70:17, 75:4, 76:23, 85:6, 85:23, 86:19, 88:18, 92:13, 92:20, 117:5, 118:11, 119:1, 131:6, 131:16, 131:17, 131:19, 131:22, 131:23, 131:24, 132:12, 133:2, 133:15, 133:18, 133:24, 133:25
**throws** [2] - 115:9, 132:14
**thumb** [1] - 159:4
**Thursday** [1] - 1:7
**tie** [2] - 143:12, 143:14
**timing** [1] - 118:12
**Title** [6] - 13:12, 81:8, 84:12, 105:5, 105:13, 107:12
**today** [6] - 22:25, 46:15, 55:5, 70:24, 80:3, 86:14
**today's** [1] - 156:15
**together** [3] - 82:16, 130:2, 143:14
**token** [1] - 164:12
**ToniAnn** [2] - 52:8, 52:18
**TONIANN** [2] - 3:15, 52:22
**took** [11] - 28:13, 41:8, 43:18, 87:5, 114:7, 115:5, 117:8, 117:11, 152:3, 152:4
**top** [11] - 25:5, 30:5, 34:4, 34:12, 34:15, 34:19, 34:21, 35:15, 69:11, 70:4, 134:12
**Torres** [1] - 143:2
**totality** [1] - 90:16
**touch** [1] - 86:1

toward** [11] - 27:7, 45:17, 51:3, 73:18, 85:6, 86:23, 130:6, 130:21, 132:16, 135:22, 138:11
**towards** [27] - 24:10, 25:3, 28:6, 28:11, 28:12, 29:22, 31:2, 32:24, 50:16, 61:7, 62:7, 62:8, 62:22, 70:18, 70:19, 79:11, 93:22, 93:25, 115:9, 116:22, 117:3, 150:18, 151:5, 152:4
**traditional** [1] - 82:8
**trained** [1] - 25:23
**training** [3] - 23:2, 23:9, 137:24
**transcribe** [2] - 66:13, 89:20
**transcribing** [1] - 137:25
**transcript** [30] - 46:5, 46:8, 66:10, 66:16, 66:24, 67:14, 67:16, 67:17, 123:10, 123:13, 123:15, 129:17, 129:22, 129:25, 130:1, 130:4, 131:7, 131:8, 131:16, 134:4, 135:3, 135:5, 135:17, 135:24, 137:17, 138:14, 139:12, 142:16, 143:13, 143:16
**transcription** [1] - 165:17
**transcriptionist** [1] - 66:4
**transcripts** [2] - 66:19, 130:5
**transpired** [2] - 59:19, 122:15
**transpires** [1] - 115:2
**transpiring** [2] - 20:3, 123:10
**transport** [2] - 22:18, 38:13
**transported** [1] - 38:14
**transporting** [1] - 28:25
**treat** [2] - 50:11, 139:21
**trial** [31] - 6:17, 17:10, 24:3, 53:21, 55:5, 59:6, 59:9, 59:11, 59:14, 60:1, 64:2, 64:4, 65:4, 66:6,

67:14, 73:24, 79:17, 87:5, 97:3, 102:19, 104:15, 110:4, 113:25, 114:6, 122:14, 126:2, 126:3, 133:1, 145:13, 155:10
**TRIAL** [1] - 1:13
**trials** [2] - 23:1, 53:18
**tried** [7] - 7:18, 40:2, 47:10, 47:12, 49:25, 123:5, 136:9
**triers** [1] - 136:6
**tries** [1] - 152:5
**trouble** [2] - 145:8, 145:9
**truck** [1] - 32:4
**true** [35] - 39:16, 42:20, 60:15, 60:16, 71:20, 86:20, 103:9, 122:6, 128:14, 130:21, 142:3, 142:5, 142:23, 143:24, 145:4, 146:24, 151:12, 151:22, 152:23, 153:2, 153:13, 157:14, 162:14, 162:17, 162:20, 162:23, 163:1, 163:4, 163:7, 163:14, 163:17, 163:20, 163:23, 164:1
**truly** [1] - 127:16
**trust** [3] - 132:21, 145:3, 159:12
**truth** [9] - 21:1, 21:2, 52:13, 52:14, 103:19, 103:21, 110:24
**try** [10] - 30:23, 31:1, 31:2, 32:22, 32:24, 41:3, 62:16, 110:17, 124:24, 141:2
**trying** [34] - 11:10, 19:6, 31:6, 32:3, 32:22, 32:24, 33:5, 33:20, 35:19, 35:20, 36:7, 36:22, 36:24, 40:13, 50:15, 50:18, 51:2, 78:11, 116:6, 116:7, 117:9, 117:10, 117:20, 117:21, 119:6, 119:7, 129:20, 135:21, 136:11, 144:23, 152:25, 158:4, 158:5
**turn** [6] - 12:19, 17:19,

81:22, 91:8, 126:24, 138:13
**turns** [2] - 115:6, 115:7
**twice** [2] - 35:10, 71:22
**twisting** [1] - 33:20
**two** [40] - 11:8, 11:14, 18:7, 27:6, 30:8, 32:18, 38:21, 38:22, 38:23, 41:14, 44:7, 44:8, 44:10, 54:15, 62:9, 62:15, 68:2, 68:7, 71:9, 81:17, 86:3, 95:23, 98:23, 98:24, 104:23, 111:16, 115:20, 120:1, 120:17, 126:4, 126:13, 128:17, 132:2, 133:13, 133:17, 139:24, 144:18, 146:5, 153:20, 154:11
**two-minute** [1] - 98:23
**type** [5] - 37:21, 37:23, 119:14, 126:8, 159:21
**types** [3] - 23:2, 54:20, 54:23
**typing** [1] - 123:11

---

## U

**U.S** [17] - 2:9, 6:10, 21:21, 22:2, 22:3, 22:4, 22:6, 22:14, 22:15, 23:17, 25:13, 57:11, 58:22, 61:20, 76:11, 115:7, 120:7
**ultimate** [2] - 84:18, 119:19
**ultimately** [6] - 7:15, 45:23, 71:24, 77:23, 79:1, 81:14
**unanimous** [2] - 110:12, 161:4
**unanimously** [4] - 14:4, 109:23, 111:18, 161:16
**unarmed** [1] - 85:12, 131:19, 131:23
**unavailable** [1] - 60:4
**uncertainty** [1] - 126:3
**uncontested** [1] - 7:1
**undeniable** [1] - 120:6
**under** [26] - 10:9, 11:15, 28:13, 37:18, 41:3, 44:25, 45:23, 50:1, 62:1, 72:4,

72:22, 83:18, 88:7, 88:20, 91:4, 96:12, 96:13, 104:12, 107:8, 107:12, 109:5, 121:3, 121:17, 127:3, 127:14, 129:22
**undergone** [1] - 126:2
**underlying** [1] - 141:7
**understood** [2] - 14:21, 33:24
**undisputed** [2] - 90:2, 114:2
**unduly** [1] - 104:19
**unhappy** [1] - 130:12
**uniform** [1] - 22:24
**UNITED** [3] - 1:1, 1:5, 1:16
**united** [1] - 2:14
**United** [49] - 1:21, 1:23, 6:7, 6:8, 9:7, 9:9, 10:10, 11:15, 13:6, 13:12, 22:16, 53:6, 53:9, 54:8, 58:5, 59:7, 74:12, 81:8, 84:12, 86:12, 99:3, 105:5, 105:13, 106:6, 106:9, 106:11, 106:12, 106:13, 107:7, 107:9, 107:11, 107:12, 108:23, 108:25, 109:1, 114:4, 115:25, 117:16, 117:17, 124:2, 152:12, 153:24, 156:12, 160:6, 161:10, 161:12, 162:8, 164:21, 165:3, 165:23
**unnerving** [1] - 126:3
**unsuccessful** [1] - 118:21
**up** [68] - 17:9, 23:25, 26:12, 26:14, 27:21, 28:13, 29:8, 30:3, 30:4, 30:14, 31:19, 32:22, 32:23, 33:5, 33:21, 42:15, 42:16, 44:7, 44:13, 44:14, 45:23, 50:2, 50:13, 50:17, 55:3, 61:6, 63:4, 63:22, 74:1, 76:19, 82:25, 86:18, 88:12, 90:2, 97:4, 110:20, 115:3, 115:4, 115:8, 115:11, 116:9, 116:11, 118:24,

119:21, 122:21, 123:11, 124:22, 126:16, 129:2, 130:3, 137:23, 142:13, 145:20, 146:11, 146:14, 146:15, 146:16, 147:3, 147:22, 148:5, 149:9, 149:11, 150:23, 151:16, 153:6
**up-side** [1] - 147:3
**updated** [1] - 57:4
**upset** [1] - 137:7
**upstairs** [1] - 62:17
**USC** [2] - 14:2, 83:21
**ushered** [1] - 37:10

## V

**vantage** [1] - 63:7
**various** [3] - 53:20, 84:14, 143:4
**verbal** [2] - 151:13, 151:18
**verbatim** [1] - 12:20
**VERDICT** [3] - 4:5, 4:20, 161:14
**verdict** [88] - 14:3, 15:16, 15:20, 16:3, 16:9, 24:4, 24:5, 25:18, 25:24, 26:5, 40:19, 53:22, 59:17, 59:20, 59:21, 59:22, 60:7, 60:8, 60:10, 60:11, 60:15, 60:16, 72:20, 72:24, 80:13, 80:15, 80:18, 84:20, 97:5, 97:14, 110:2, 110:11, 110:14, 111:4, 111:6, 111:7, 111:16, 111:18, 112:10, 112:25, 113:14, 118:1, 119:19, 120:16, 120:18, 122:3, 125:18, 125:25, 129:8, 144:14, 144:16, 145:4, 145:5, 153:17, 157:17, 160:20, 160:25, 161:4, 161:8, 161:9, 161:15, 161:16, 162:13, 162:14, 162:16, 162:17, 162:19, 162:20, 162:22, 162:23, 162:25, 163:1, 163:3, 163:4, 163:6,

163:7, 163:13, 163:14, 163:16, 163:17, 163:19, 163:20, 163:22, 163:23, 163:25, 164:1, 164:4
**verifying** [1] - 159:11
**VERNON** [2] - 3:11, 21:13
**Vernon** [3] - 20:14, 20:19, 21:6
**version** [2] - 81:1, 82:20
**versus** [7] - 10:10, 59:8, 82:13, 114:5, 130:8, 153:25, 161:12
**victim** [16] - 85:8, 90:7, 90:9, 90:16, 91:1, 106:6, 106:9, 106:23, 108:22, 108:24, 119:11, 137:15, 141:11, 152:19, 156:8
**video** [40] - 43:1, 43:3, 43:7, 43:10, 43:22, 46:14, 70:20, 70:23, 71:2, 71:5, 71:21, 71:22, 72:8, 72:17, 75:21, 75:23, 86:17, 115:2, 115:6, 117:2, 117:6, 124:4, 128:6, 128:9, 128:18, 128:20, 129:2, 129:4, 130:8, 130:25, 131:5, 132:20, 133:21, 134:9, 139:14, 143:13, 151:16, 156:13, 156:17, 156:18
**videos** [1] - 43:11
**view** [1] - 81:5
**viewed** [1] - 78:2
**violates** [1] - 10:2
**violating** [1] - 10:14
**violation** [6] - 9:24, 82:24, 95:4, 105:4, 105:13, 109:3
**violations** [1] - 106:14
**visit** [1] - 25:9
**voluntarily** [2] - 98:4, 109:16
**voted** [1] - 111:15
**VS** [1] - 1:7

## W

**wait** [1] - 79:17
**waited** [2] - 118:12,

120:17
**waiting** [1] - 99:14
**waiving** [3] - 14:20, 14:25, 15:3
**walk** [11] - 20:22, 29:4, 45:25, 50:20, 51:7, 118:14, 118:15, 130:23, 130:24, 155:18, 155:19
**walked** [6] - 27:7, 32:12, 45:24, 50:22, 114:25, 152:6
**walking** [4] - 51:7, 51:10, 75:9, 118:13
**walks** [1] - 155:16
**wants** [1] - 159:7
**warning** [2] - 118:18, 145:9
**warrant** [1] - 91:3
**warrants** [1] - 84:16
**wash** [1] - 154:24
**Watch** [1] - 134:12
**watch** [7] - 70:23, 117:6, 117:7, 128:20, 132:20, 156:19
**watched** [1] - 27:4
**watching** [1] - 118:15
**ways** [7] - 53:16, 109:18, 109:20, 122:8, 125:22, 136:15, 152:1
**weapon** [63] - 9:7, 9:18, 12:15, 49:19, 73:10, 73:14, 78:15, 78:16, 85:12, 85:20, 86:9, 91:9, 91:12, 91:19, 91:24, 92:15, 105:3, 105:9, 105:16, 105:17, 105:24, 106:16, 106:18, 106:19, 107:8, 107:12, 107:15, 111:23, 112:5, 115:22, 116:18, 117:1, 118:5, 118:8, 118:9, 119:9, 119:23, 123:19, 123:20, 124:1, 124:10, 131:18, 131:19, 131:20, 133:22, 141:10, 142:2, 142:4, 148:4, 148:7, 148:8, 148:17, 148:20, 148:22, 148:25, 149:2, 152:2, 152:3, 152:8, 161:21
**weaponized** [3] -

91:16, 124:9, 148:21
**weapons** [2] - 91:18, 148:12
**wear** [1] - 22:24
**wearing** [7] - 22:23, 24:15, 48:13, 64:3, 93:17, 94:4, 94:5
**weekend** [2] - 136:15
**weigh** [2] - 34:22, 36:8
**weighed** [1] - 35:5
**weighing** [1] - 92:10
**weight** [16] - 34:3, 35:3, 36:13, 36:14, 36:15, 47:4, 51:20, 63:18, 92:3, 92:7, 92:19, 103:6, 104:10, 104:21, 118:10, 118:25
**welcome** [2] - 76:2, 159:7
**well-established** [2] - 10:12, 144:13
**West** [1] - 54:13
**whatsoever** [2] - 125:7, 145:22
**wheels** [1] - 55:3
**whereas** [1] - 51:23
**white** [2] - 25:5, 56:7
**whole** [12] - 21:1, 23:9, 35:21, 52:14, 74:15, 101:10, 103:13, 117:10, 119:5, 147:12, 152:24, 153:19
**wife** [1] - 65:14
**WILKINS** [4] - 1:8, 98:2, 98:5, 98:8
**Wilkins** [133] - 6:13, 6:16, 12:7, 17:20, 18:6, 19:9, 24:3, 24:4, 24:6, 24:9, 25:11, 26:9, 27:2, 27:4, 30:24, 32:19, 33:13, 34:9, 34:12, 34:13, 34:21, 35:5, 35:7, 35:18, 36:3, 36:5, 36:11, 36:16, 37:15, 37:21, 39:24, 40:25, 41:16, 41:23, 42:6, 42:15, 43:16, 43:18, 43:23, 44:3, 44:5, 44:22, 45:7, 45:10, 45:22, 50:20, 59:8, 60:25, 61:1, 61:5, 62:6, 62:10, 62:12, 64:3, 68:3, 68:15, 68:19, 68:24, 69:2, 69:11, 70:8, 71:8, 71:25, 72:3, 72:11, 72:23, 73:1,

73:10, 73:13, 73:18, 73:21, 74:23, 75:12, 77:3, 77:6, 80:25, 84:25, 85:11, 86:11, 87:1, 87:19, 97:24, 111:21, 112:3, 112:13, 112:19, 114:5, 119:22, 121:6, 122:7, 123:24, 125:15, 126:4, 126:14, 127:14, 128:9, 128:16, 129:20, 130:20, 130:21, 131:2, 132:4, 133:11, 133:20, 134:9, 134:19, 134:20, 134:23, 135:3, 135:13, 135:23, 136:24, 137:6, 137:12, 137:21, 138:9, 138:18, 138:20, 139:2, 139:7, 139:10, 140:10, 142:7, 142:10, 143:3, 143:20, 145:2, 153:25, 161:13, 161:19, 161:25, 164:16, 165:6

**Wilkins'** [9] - 31:10, 34:1, 36:19, 37:23, 42:24, 73:10, 74:6, 130:22, 143:7

**willful** [2] - 107:25, 140:3

**willing** [1] - 102:6

**win** [1] - 136:15

**window** [2] - 135:10, 135:14

**windshield** [1] - 135:12

**wish** [5] - 97:4, 97:20, 97:25, 98:1, 111:10

**witness** [25] - 16:25, 20:12, 20:22, 28:18, 52:6, 52:10, 55:18, 57:24, 103:10, 103:13, 103:16, 103:18, 103:20, 103:22, 103:24, 103:25, 104:2, 132:7, 136:9, 143:18, 143:19, 143:20, 143:23, 144:9

**Witness** [3] - 20:18, 52:5, 79:22

**WITNESS** [16] - 3:6,
16:24, 20:17, 20:21, 21:3, 21:6, 27:1, 38:10, 52:4, 52:15, 52:18, 65:22, 67:6, 76:2, 79:16, 79:21

**witness's** [1] - 104:4

**witnessed** [2] - 31:12, 49:22

**witnesses** [8] - 53:22, 99:11, 102:13, 103:14, 114:1, 114:6, 122:15, 125:22

**wonder** [1] - 139:3

**wood** [1] - 63:21

**wooden** [5] - 34:17, 55:2, 79:9, 90:3, 116:17

**word** [12] - 61:10, 75:16, 87:20, 95:6, 95:12, 100:9, 109:15, 109:21, 127:18, 145:25

**word-for-word** [2] - 61:10, 75:16

**words** [9] - 13:7, 110:12, 119:3, 136:13, 139:17, 142:25, 143:11, 148:7

**works** [1] - 154:25

**world** [2] - 125:5, 139:3

**worried** [1] - 158:1

**worse** [1] - 156:5

**worthy** [2] - 143:7, 143:16

**write** [1] - 111:11

**writing** [1] - 111:13

**written** [3] - 100:7, 113:14, 159:19

## Y

**ye** [1] - 67:1

**year** [3] - 10:12, 83:24, 84:6

**years** [18] - 22:11, 23:5, 47:8, 54:5, 54:10, 54:15, 82:25, 83:2, 137:13, 147:4, 147:5, 150:3, 154:17, 155:25, 157:21

**yelled** [3] - 27:17, 29:14, 29:16

**yelling** [3] - 46:1, 77:1, 115:13

**yesterday** [2] - 97:18, 125:13

**young** [2] - 25:4, 153:9

**yourself** [7] - 22:22, 32:8, 103:16, 104:9, 104:19, 110:15, 149:10